# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,          )
                                   )
          v.                       )          Crim. No. 17-246
                                   )
RACOCO WILLIAMS,                   )
          Defendant.               )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**CONTI, Senior District Judge**

## I.    Introduction

Pending before the court are two motions to suppress evidence (ECF Nos. 55, 56) filed by defendant Racoco Williams ("defendant"). Defendant is charged in a criminal indictment with possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii) on or about August 29, 2017. (ECF No. 14.) The charge in the indictment is based upon evidence obtained pursuant to, among other things, two search warrants issued by a federal magistrate judge for a hotel room occupied by defendant and statements made by defendant to law enforcement officers after he was arrested following the execution of the search warrants. According to defendant, the evidence obtained from the search warrants was obtained in violation of his rights guaranteed by the Fourth Amendment to the United States Constitution and his statements to law enforcement were elicited

in violation of his rights guaranteed by the Fifth Amendment to the United States Constitution. Defendant argues that evidence should, therefore, be suppressed. The government argues in response that the search warrants issued by the federal magistrate judge were properly supported by probable cause and defendant waived his Fifth Amendment Rights prior to speaking to law enforcement following his arrest.

For the reasons set forth in these findings of fact and conclusions of law, the court agrees with the government that the search warrants were valid and defendant waived his Fifth Amendment rights prior to making statements to law enforcement. The motions to suppress will, therefore, be denied.

## II.  **Procedural History**

On September 13, 2017, a federal grand jury returned a one-count indictment against defendant charging him with possession with the intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii) on or about August 29, 2017. (ECF No. 14.) On October 1, 2018, defendant filed a motion to suppress statements (ECF No. 55) and a motion to suppress evidence (ECF No. 56). On October 15, 2018, the government filed an omnibus response in opposition to defendant's suppression motions. (ECF No. 59.) On November 19, 2018, November 26, 2018, November 30, 2018, and December 17, 2018, the court held a hearing on pretrial motions during which

the parties presented evidence, including testimony of various witnesses. After considering the parties' submissions and the evidence presented at the suppression hearings, the court makes the following findings of fact and conclusions of law:

### III. Findings of Fact

FOF 1.    Defendant submitted an affidavit, which, in pertinent part, provides:

> I…checked into Room #219 at the Extended Stay America, located at 3851 Northern Pike, Monroeville, PA 15146 on August 24, 2017 and occupied that room until approximately 5:30 p.m. on August 29, 2017. At no time during this period did I or anyone else smoke marijuana in Room #219.

(ECF No. 57-7 at 1.)

FOF 2.    Defendant also submitted an affidavit of an investigator for the Federal Public Defender for the Western District of Pennsylvania. (ECF No. 57-8.) The investigator's affidavit provides that on September 11, 2017, she interviewed a hotel employee, Joseph Echie ("Echie"), who was working at the hotel on August 29, 2017. (Id.) The investigator's affidavit provides, among other things:

> [Another hotel employee,] Danielle Maisel[,] informed…[Echie] that two officers had come earlier that day. The officers told Ms. Maisel that they were planning on arresting Racoco Williams, the guest in Room 219.
> …
> Mr. Eichie [sic] had no knowledge of marijuana being complained about by any guest, or anyone else for that matter, on August 29, 2017. Likewise, Mr. Eichie [sic] was not aware of any complaints or reports of marijuana use in the days leading up to August 29, 2017.

> In his discussion with Ms. Maisel on August 29, 2017,
> she never mentioned anything about the scent of burning
> or fresh marijuana emanating from anywhere within the
> hotel.

(Id.)

## August 28, 2017

FOF 3.    Pennsylvania State Police Troopers Daniel Beatty ("Beatty") and David Williams ("D. Williams") testified on behalf of the government.

FOF 4.    Beatty has been a state police trooper since 2012. (H.T. 11/19/2018 (ECF No. 78) at 32.) He received training on, among other things, the recognition of when someone is under the influence of marijuana, detecting the odor of marijuana, and indications of marijuana use. (H.T. 11/19/2018 (ECF No. 78) at 32.)

FOF 5.    D. Williams has been employed as a state police trooper for approximately fifteen years. (H.T. 11/26/2018 (ECF No. 64) at 49.)

FOF 6.    D. Williams has training and experience with respect to the odor of "regular," "processed," "raw," and "burnt" marijuana.[1] (H.T. 11/26/2018 (ECF No. 64) at 69.)

---

[1]    D. Williams has not had training "in tracking the scent of marijuana inside a hotel to a particular room." (H.T. 11/26/2018 (ECF No. 64) at 67.) Prior to August 28, 2017, however, he had tracked the odor of fresh or burning marijuana to a particular room. (Id. at 66.)

FOF 7.    On August 28, 2017, Beatty and D. Williams were in an undercover capacity conducting surveillance of defendant at the Extended Stay America Hotel ("hotel") in Monroeville, Pennsylvania. (H.T. 11/19/2018 (ECF No. 78) at 32, 41; H.T. 11/26/2018 (ECF No. 64) at 56-57.)

FOF 8.    Beatty and D. Williams were in separate vehicles. (H.T. 11/19/2018 (ECF No. 78) at 61.)

FOF 9.    Defendant was a guest at the hotel repeatedly for many months over the course of 2017. (H.T. 11/26/2018 (ECF No. 64) at 43-44.)

FOF 10.    The hotel is "designed a little bit different than conventional hotels[,]"i.e., "individuals stay there for a longer period of time, so the hotel rooms are larger, thus causing a larger distance between hotel room doors within the hotel interior."[2] (H.T. 11/19/2018 (ECF No. 78) at 33.)

FOF 11.    For example, the hotel room next to room 219 was room 217. Room 217 "was around the corner similar to an L-shape" from room 219. (H.T. 11/26/2018 (ECF No. 64) at 21-22.) Beatty and D. Williams could not see room 219 from room 217. (Id. at 22.)

---

[2]    Vivian Sullivan ("Sullivan"), the general manager of the hotel, confirmed that the hotel rooms are far apart. (H.T. 11/26/2018 (ECF No. 64) at 5, 42.) On August 28, 2017, Sullivan, who was in Cleveland, Ohio, at the time, was not made aware that Beatty and D. Williams were at the hotel. (H.T. 11/26/2018 (ECF No. 64) at 23.)

FOF 12.    On August 28, 2017, at 3:00 p.m. Beatty arrived at the hotel. (H.T. 11/19/2018 (ECF No. 78) at 41-42; ECF No. 57-6 at 3.)

FOF 13.    Beatty and D. Williams upon arrival to the hotel conducted surveillance outside the hotel. (H.T. 11/6/2018 (ECF No. 64) at 56.)

FOF 14.    At approximately 4:30 p.m., Beatty entered the hotel and spoke with the desk clerk named Cheryl Safar ("Safar"). (H.T. 11/19/2018 (ECF No. 78) at 42, 51-52.) Beatty asked Safar whether defendant was a guest at the hotel. (H.T. 11/19/2018 (ECF No. 78) at 43, 52.)

FOF 15.    Beatty asked Safar to go into the hotel's computer system to determine whether defendant was a guest at the hotel. (H.T. 11/19/2018 (ECF No. 78) at 52.)

FOF 16.    Safar confirmed that defendant was a guest at the hotel. (H.T. 11/19/2018 (ECF No. 78) at 52.)

FOF 17.    Safar[3] provided Beatty defendant's room number, room 219. (H.T. 11/19/2018 (ECF No. 78) at 52.)

FOF 18.    Beatty exited the hotel and made some telephone calls. (H.T. 11/19/2018 (ECF No. 78) at 51.)

---

[3]    Safar testified that she did not provide defendant's room number to Beatty or D. Williams because she is "not allowed to give out rooms." (H.T. 11/26/2018 (ECF No. 64) at 117.) She also testified that she did not see Beatty and D. Williams travel to the second floor of the hotel. (Id.)

FOF 19.   Beatty and D. Williams reentered the hotel and took the elevator to the second floor. (H.T. 11/19/2018 (ECF No. 78) at 53-54.)

FOF 20.   Beatty and D. Williams went to the second floor "to see if…[defendant]…was…maybe in that area." (H.T. 11/26/2018 (ECF No. 64) at 57.)

FOF 21.   Beatty and D. Williams exited the elevator on the second floor. (H.T. 11/19/2018 (ECF No. 78) at 54-55; H.T. 11/26/2018 (ECF No. 64) at 50.)

FOF 22.   Immediately off the elevator on the second floor is a foyer. (H.T. 11/26/2018 (ECF No. 64) at 59.)

FOF 23.   D. Williams turned right out of the elevator. (H.T. 11/26/2018 (ECF No. 64) at 65.) He then made a left to walk down the hallway in which room 219 was located. (Id. at 68.)

FOF 24.   In the section of the hallway on the section floor there were two rooms, room 219 and "another room right off of the elevator." (H.T. 11/19/2018 (ECF No. 78) at 54.)

FOF 25.   There was not "another hotel room door within 15 to 20 feet from" room 219.[4] (H.T. 11/19/2018 (ECF No. 78) at 33.)

FOF 26.   Directly across from room 219 was a maintenance closet. (H.T. 11/19/2018 (ECF No. 78) at 33.) The maintenance

---

[4]    Beatty did not know how many hotel rooms were on the second floor of the hotel. (H.T. 11/19/2018 (ECF No. 78) at 58.)

closet was fifteen to twenty feet away from room 219.[5] (H.T. 11/26/2018 (ECF No. 64) at 104.)

FOF 27.   Approximately fifteen to twenty feet from room 219, D. Williams smelled a faint odor of marijuana. (H.T. 11/26/2018 (ECF No. 64) at 68.)

FOF 28.   D. Williams testified that as he walked passed room 219 and turned down another hallway, "that odor started to faint or dissipate." (H.T. 11/26/2019 (ECF No. 64) at 51.)

FOF 29.   Beatty smelled[6] "[a] strong odor of burnt marijuana" emanating from room 219. (H.T. 11/19/2018 (ECF No. 78) at 32-33.)

FOF 30.   Beatty believed the odor of burnt marijuana was emanating from room 219 because as he exited the elevator and walked down the hallway he smelled a moderate odor of burnt marijuana, and as he approached room 219, he smelled a strong odor of burnt marijuana. (H.T. 11/19/2018 (ECF No. 78) at 33-34, 54-55.)

---

[5]   D. Williams testified that neither room 217 nor the maintenance closet contained an odor of burnt marijuana. (H.T. 11/26/2018 (ECF No. 64) at 110-11.)

[6]   Sullivan testified that she has been in the hotel industry for thirteen years. (H.T. 11/26/2018 (ECF No. 64) at 24.) According to Sullivan, it is "hard to track" people smoking cigarettes or marijuana inside hotel rooms. (Id.) Sullivan "personally" could not pinpoint in which room of a hotel the smoking was taking place. (Id.) She testified that "it does take some investigation work…you have to walk around the hallway and try to figure it out[.]" (Id. at 25.)

FOF 31.   He explained: "I followed the odor and the intensity of the odor, and it reached its climax in front of…[defendant's] door.…The odor was diminishing in that other direction." (H.T. 11/19/2018 (ECF No. 78) at 58-59.)

FOF 32.   Beatty did not know whether defendant was inside room 219. (H.T. 11/19/2018 (ECF No. 78) at 60.)

FOF 33.   There was an approximate one-inch gap from the base of the door of room 219 to the carpeted floor. (H.T. 11/19/2018 (ECF No. 78) at 34.)

FOF 34.   Beatty explained that he did not bend down to smell underneath the door:

> I didn't think it was necessary. And, secondly, it's a little bit nerve racking. You know, we're two undercover officers trying to maintain an undercover integrity in the capacity of this mission. And Heaven forbid a guest pokes their head out and sees us lying on the ground with our noses underneath another door. And Heaven forbid that that guest would be involved with the Defendant, with multiple rooms at play here.

(H.T. 11/19/2018 (ECF No. 78) at 119.)

FOF 35.   D. Williams did not detect smoke on the second floor of the hotel. (H.T. 11/26/2018 (ECF No. 64) at 74.)

FOF 36.   Beatty and D. Williams spent approximately five to ten minutes on the second floor. (H.T. 11/19/2018 (ECF No. 78) at 55.)

FOF 37.   After Beatty and D. Williams exited the second floor, they returned to the outside of the hotel and continued

surveillance around the property. (H.T. 11/19/2018 (ECF No. 78) at 55.)

FOF 38.  Beatty did not inform the hotel about the odor of burnt marijuana emanating from room 219. (H.T. 11/19/2018 (ECF No. 78) at 63.)

FOF 39.  In Beatty's experience, hotel guests may be fined for smoking marijuana in a hotel room. (H.T. 11/19/2018 (ECF No. 78) at 37-38.)

FOF 40.  The hotel did not receive a specific complaint about an odor of burnt marijuana emanating from room 219 on August 28, 2017. (H.T. 11/26/2018 (ECF No. 64) at 24.)

### August 29, 2017

FOF 41.  On August 29, 2017, at 8:30 a.m. Beatty arrived at the hotel. (H.T. 11/19/2018 (ECF No. 78) at 63.)

FOF 42.  Beatty and D. Williams entered the lobby of the hotel at approximately 9:46 a.m. (H.T. 11/19/2018 (ECF No. 78) at 65-66.)

FOF 43.  Beatty learned from D. Williams that defendant rented a Jeep Grand Cherokee that was parked at the hotel. (H.T. 11/19/2018 (ECF No. 78) at 63-64.)

FOF 44.  Beatty approached the front desk and spoke with a hotel "team lead" named "Danielle"[7] for approximately thirty to

---

[7]  Counsel for defendant referred to "Danielle" as "Danielle Mytell." (H.T. 11/30/2018 (ECF No. 65) at 4, 13.) The

forty-five minutes. (H.T. 11/19/2018 (ECF No. 78) at 65-66; H.T. 11/26/2019 (ECF No. 64) at 6, 11.)

FOF 45. Beatty introduced himself to Danielle and told her that he was there to investigate a "specific person." (H.T. 11/19/2018 (ECF No. 78) at 67-68.)

FOF 46. At some point, Beatty asked Danielle for paperwork with respect to defendant.[8] (H.T. 11/19/2018 (ECF No. 78) at 73.)

FOF 47. At approximately 10:20 a.m., after Beatty was in the lobby for approximately 30 to 45 minutes, defendant entered the lobby from the center stairwell. (H.T. 11/19/2018 (ECF No. 78) at 35, 72-73.) Defendant approached the front desk. (Id. at 35.)

---

investigator's affidavit provided that she interviewed "Danielle Maisel," who was working at the hotel on August 29, 2017. (ECF No. 57-8.)

[8]    At around 9:30 a.m., Danielle contacted Sullivan to request permission to give to D. Williams information about defendant, i.e., his "folio receipt and the date he checked in and date he checked out[.]" (H.T. 11/26/2018 (ECF No. 64) at 6-7.)
    Danielle also received from Sullivan permission for D. Williams to monitor defendant in the hotel and for Danielle to give D. Williams "access to the hotel rooms next door or the housekeeping closet across the hallway from that room." (Id.)
    Danielle told Sullivan that D. Williams reported that they had "paperwork coming[,]" i.e., an administrative subpoena "[f]or them to have access to the building and to get the information that they needed" with respect to defendant. (Id. at 6-7, 29.) D. Williams provided an administrative subpoena to the hotel prior to the end of Danielle's shift at 3:00 p.m. (Id. at 9.) Sullivan gave D. Williams "permission to monitor the hotel." (Id. at 31.)

FOF 48.  Beatty and defendant had a brief conversation. (H.T. 11/19/2018 (ECF No. 78) at 35.) Beatty described the conversation as follows: "You know, I was at the front desk, he was walking forward, we looked at each other. I said, go ahead; he acknowledged that, and he began to speak to the front desk staff." (H.T. 11/19/2018 (ECF No. 78) at 35.)

FOF 49.  Prior to defendant's arrival in the lobby, Beatty did not smell any odor of burnt marijuana. (H.T. 11/19/2018 (ECF No. 78) at 35.) After defendant's arrival in the lobby, Beatty "immediately detected a strong odor of burnt marijuana." (H.T. 11/19/2018 (ECF No. 78) at 35.)

FOF 50.  Beatty looked at defendant during their brief conversation and noticed that his eyes were bloodshot and watery. (H.T. 11/19/2018 (ECF No. 78) at 35.) Beatty took pictures of defendant on his cellular telephone. (H.T. 11/19/2018 (ECF No. 78) at 75; Def. Exs. 3 and 4.) The pictures do not provide a clear view of defendant's eyes, and, therefore, it is not possible to determine from the picture whether his eyes were "bloodshot or red or watery or glassy[.]" (H.T. 11/19/2018 (ECF No. 78) at 75; Def. Ex. 3 and 4.)

FOF 51.  As defendant exited the hotel via the lobby, he walked passed Beatty, and Beatty could smell the odor of burnt marijuana "trailing" defendant. (H.T. 11/19/2018 (ECF No. 78) at 35-36.)

FOF 52. Beatty believed the odor of burnt marijuana to be associated with defendant. (H.T. 11/19/2018 (ECF No. 78) at 36.)

FOF 53. After defendant exited the hotel, Beatty followed defendant and watched him enter a vehicle. (H.T. 11/19/2018 (ECF No. 78) at 76.) Defendant drove away. (Id.)

FOF 54. Law enforcement officers involved in the investigation of defendant followed him. (H.T. 11/19/2018 (ECF No. 78) at 97.)

FOF 55. Beatty did not stop defendant or notify another police officer to conduct a traffic stop based upon Beatty's observations of defendant, i.e., his eyes were bloodshot and watery and he smelled of burnt marijuana. (H.T. 11/19/2018 (ECF No. 78) at 77.)

FOF 56. Later that same day (August 29, 2017) at approximately 11:14 a.m., Beatty reentered the hotel and spoke with Danielle at the front desk. (H.T. 11/19/2018 (ECF No. 78) at 78.)

FOF 57. Beatty asked Danielle to exit the front desk to privately speak with him. (H.T. 11/19/2018 (ECF No. 78) at 80.) Beatty and Danielle entered a back room. (Id.)

FOF 58. At approximately 11:16 a.m., Danielle handed Beatty a key card. (H.T. 11/19/2018 (ECF No. 78) at 91.) The key card "accessed the entire hotel facility." (H.T. 11/19/2018 (ECF No. 78) at 106.)

FOF 59.    D. Williams explained the reason they needed the key card:

> We had the key to set up what was called a command and
> control center. And we also were trying to establish
> surveillance points within the hotel that once again I
> explained it's like a maintenance key. So we had to be
> able to access certain points within the hotel from that
> key card because he had check out – or he was – we
> thought he was checking out, but then he didn't. So that
> card key was needed then.

(H.T. 11/26/2018 (ECF No. 64) at 128-29.)

FOF 60.    Beatty exited the hotel after receiving the key card to discuss the "undercover operation" with D. Williams. (H.T. 11/19/2018 (ECF No. 78) at 92-93.)

FOF 61.    At approximately 11:17 a.m., Beatty and D. Williams reentered the hotel,[9] traveled via the center stairwell to the second floor, approached room 219, and smelled a strong odor of burnt marijuana emanating from that room. (H.T. 11/19/2018 (ECF No. 78) at 36-37, 68, 92-94.)

FOF 62.    Beatty explained:

> [O]n the 29th I remember coming up the stairwell and I
> approached with my partner, and we have to be somewhat
> discrete, so emerging from the stairwell we were quiet,
> we waited there for a moment to see if anybody was in
> the hallway. And as we walked down the hallway, there
> was a moderate odor of burnt marijuana. As we approached
> the Defendant's door, it became stronger; and in a very
> similar fashion, it was in the same room as the previous

---

[9]    As Beatty and D. Williams walked into the lobby and
toward the stairwell, they looked over their right should to
behind the desk to see if Danielle or any member of the hotel
staff was there. (H.T. 11/19/2018 (ECF No. 78) at 93.)

> day. We went into the other hallway and the odor
> dissipated as we entered the hallway and traveled down.

(H.T. 11/19/2018 (ECF No. 78) at 37.)

FOF 63.  Beatty gave the key card he received from Danielle to D. Williams. (H.T. 11/19/2018 (ECF No. 78) at 105-06.)

FOF 64.  Beatty was on the second floor for approximately four minutes. (H.T. 11/19/2018 (ECF No. 78) at 98-99.)

FOF 65.  D. Williams testified that while on the second floor he smelled a faint odor of marijuana as he walked toward room 219, and the odor became stronger as he got closer to room 219. (H.T. 11/26/2018 (ECF No. 64) at 52.) The odor of marijuana "started to dissipate" after he passed room 219. (Id.)

FOF 66.  D. Williams[10] stayed on the second floor when Beatty traveled to the lobby. (H.T. 11/19/2018 (ECF No. 78) at 103-04.)

FOF 67.  D. Williams reported his observations to Brianna Tetrault ("Tetrault"), a special agent of Homeland Security Investigations, Immigration and Customs Enforcement, United States Department of Homeland Security. (H.T. 11/26/2019 (ECF No. 64) at 54; Gov't Ex. 1 at 00:45; ECF No. 57-1 ¶ 1.)

---

[10]  At approximately 1:58 p.m., D. Williams reentered the hotel lobby and entered the stairwell via a door in the lobby. (H.T. 11/26/2018 (ECF No. 64) at 105-06.) D. Williams could not recall entering the stairwell or walking to the second floor at that time. (Id. at 107-08.)

FOF 68.   On August 28, 2017, and on August 29, 2017, Beatty smelled a "masking agent" emanating from room 219.[11] (H.T. 11/19/2018 (ECF No. 78) at 37.)

FOF 69.   A "masking agent" is something like an air freshener that individuals who smoke marijuana use to mask or disguise the odor of marijuana. (H.T. 11/19/2018 (ECF No. 78) at 37.)

FOF 70.   D. Williams also smelled a masking agent outside room 219. (H.T. 11/26/2018 (ECF No. 64) at 86.)

FOF 71.   According to D. Williams, the odor he smelled on August 28, 2017, and the odor he smelled on August 29, 2017, were similar. (H.T. 11/26/2018(ECF No. 64) at 86.)

FOF 72.   On August 29, 2017, Beatty observed from the rear parking lot of the hotel that defendant's window was open "probably a quarter of the way" and was the only window "in the entire hotel that had an open window." (H.T. 11/19/2018 (ECF No. 78) at 38, 71.)

FOF 73.   Beatty explained that it was "very abnormal" to see a window open at the hotel because each room of the hotel was individually climate controlled. (H.T. 11/19/2018 (ECF No. 78) at 39.)

---

[11]   Beatty did not provide in his report that he smelled a masking agent outside room 219 on August 29, 2017. (H.T. 11/19/2018 (ECF No. 78) at 100.)

FOF 74.   Beatty assumed that the individual inside room 219 "had his window open merely to vacate the smell, the odor of burnt marijuana." (H.T. 11/19/2018 (ECF No. 78) at 39.)

FOF 75.   Beatty reasoned: (1) the occupant of room 2019 would not want to draw attention to himself; and (2) the occupant of the room would be aware there was a fee for smoking. (H.T. 11/19/2018 (ECF No. 78) at 39.)

FOF 76.   Beatty informed Tetrault about his observations with respect to defendant and room 219. (H.T. 11/19/2018 (ECF No. 78) at 39.)

FOF 77.   In the late afternoon of August 28, 2017, D. Williams spoke with Sullivan, (H.T. 11/26/2019 (ECF No. 64) at 78-79), and obtained multiple keys for the hotel "for tactical reasons and for officer's safety and for safety of the other people in the hotel[,]" (id. at 111).

FOF 78.   D. Williams explained to Sullivan that Beatty and he "were doing an investigation on an individual and that…[they] needed something similar to like a maintenance key card that…[they] could utilize other rooms to set up surveillance points." (H.T. 11/26/2018 (ECF No. 64) at 124-25.)

FOF 79.   At 3:00 p.m., Echie, a guest service representative for the hotel, began his shift at the front desk. (H.T. 11/26/2018(ECF No. 64) at 26.)

17

FOF 80.   Echie testified his responsibilities at the hotel are to "check people in…check people out…check rooms…do laundry…stuff like that." (H.T. 11/30/2018 (ECF No. 65) at 13.)

FOF 81.   Echie's memory with respect to the events of August 29, 2017, was "sort of foggy." (H.T. 11/30/2018 (ECF No. 65) at 25.)

FOF 82.   Sullivan called Echie at the start of his shift and explained to him that law enforcement was at the hotel "investigating someone" that he should call her to inform her about what is going on inside the hotel. (H.T. 11/26/2018 (ECF No. 64) at 36.)

FOF 83.   Echie testified that he was told by another hotel employee, i.e., Danielle, that "the police would be coming to the hotel to arrest…[defendant]." (H.T. 11/30/2018 (ECF No. 65) at 16.)

FOF 84.   On August 29, 2017, Echie wrote an email to one of his superiors about the events of that day. (H.T. 11/30/2018 (ECF No. 65) aft 17.) Echie in the email wrote that at 4:23 p.m., D. Williams asked him about "getting a room" next to room 219. (Id. at 17-18.) Echie provided to D. Williams a key card to room 217. (Id. at 20.)

FOF 85.   At some point D. Williams entered room 217; it did not smell of burnt marijuana. (H.T. 11/26/2018 (ECF No. 64) at 110.)

FOF 86.  Echie testified that "roughly, around 6:30 p.m.[,]" the person law enforcement intended to arrest at the hotel "got away." (H.T. 11/30/2018 (ECF No. 65) at 25.) Echie did not know whether the person that "got away" was defendant or someone else targeted by a law enforcement investigation. (Id. at 26.)

FOF 87.  Echie did not recall smelling marijuana in the hotel on August 29, 2017. (H.T. 11/30/2018 (ECF No. 65) at 21.) Echie on that day, however, did not walk the second floor of the hotel. (Id. at 22.) He testified: "I know for certain I didn't check any rooms that day." (Id. at 23.) Echie that day did not receive any complaints from law enforcement, Danielle, or guests about marijuana. (Id.)

### The Affidavits of Probable Cause and Search Warrants

FOF 88.  On August 29, 2017, prior to 3:53 p.m., Tetrault authored a first affidavit of probable cause. (ECF Nos. 57-1 and 57-2.) The first affidavit of probable cause provided:

- her training and experience, which included, among other things, seven years of employment as the special agent in charge of the contraband smuggling group, participation in narcotics and money laundering investigations, covert surveillance of suspected drug traffickers, and familiarity with the modus operandi of persons involved in illicit distribution of controlled substances (ECF No. 57-1 ¶ 2);

- Tetrault was aware that individuals involved in illicit activities "oftentimes utilize hotels to conceal their activities and movement and to keep a low profile" (id. ¶ 13);

- on August 29, 2017, Tetrault, the Pennsylvania State Police, and the Monroeville Police Department "became aware of possible narcotics activities" occurring at the hotel (id. ¶ 7);

- Pennsylvania State Police Troopers were conducting surveillance at the hotel, walked by room 219, and based upon their training and experience smelled marijuana emanating from room 219 (id.);

- the troopers also observed that the outside window of room 219 was open, which was "odd" (id.);

- one of the troopers, Beatty, was standing in the lobby of the hotel when he encountered defendant who smelled of marijuana (id. ¶ 8);

- Beatty heard defendant tell hotel staff that he was extending his stay in room 219 by one additional day, which is indicative of illegal drug activity because it is a "characteristic of those involved in illicit activities to have no set period to stay at a hotel" (id. ¶¶ 8-9);

- an administrative subpoena was served on the hotel, the results of which showed that defendant was the renter of room 219 (id. ¶ 9);

- defendant was observed in the hotel parking lot entering a vehicle rented in his name (id. ¶¶ 8, 10);

- Tetrault was involved in a controlled delivery of a marijuana-filled parcel to a residence in which six kilograms of cocaine and approximately $78,500.00 were found (id. ¶ 11);

- five of the occupants of the residence were from Jamaica and only one of the five occupants had legal status in the United States (id.);

- one of the residents informed law enforcement he overheard a telephone conversation between a female resident and her boyfriend, a man by the street name of "Q," about a possible delivery to the residence (id.);

- Tetrault was aware that defendant goes by the street name of "Q" (id.);

- defendant was born in Jamaica and currently is a lawful permanent resident of the United States (id. ¶ 12);

- defendant has a criminal history involving the possession of marijuana, possession with intent to distribute marijuana, and money laundering (id. ¶ 12); and

- law enforcement in Phoenix, Arizona previously conducted a traffic stop on defendant during which they found marijuana and approximately $100,000.00 (id.).

FOF 89. Tetrault concluded in the first affidavit of probable cause that she had probable cause to believe that there existed in room 219 evidence of possession of a controlled substance, e.g., marijuana, a violation of 21 U.S.C. § 844. (ECF NO. 57-1 ¶ 14.)

FOF 90. On the same day at 3:53 p.m. a magistrate judge issued the first search warrant[12] for room 219 based upon the first affidavit of probable cause authored by Tetrault. (H.T. 11/19/2018 (ECF No. 78) at 39-40; ECF Nos. 57-1 and 57-2.)

FOF 91. The first search warrant provided that the affidavit of probable cause set forth probable cause that marijuana would be found inside room 219. (ECF No. 57-2 at 1.)

---

[12] As of November 26, 2018, Sullivan was not aware that any search warrants had been obtained for room 219. (H.T. 11/26/2018 (ECF No. 64) at 41.)

FOF 92.   At approximately 4:00 p.m., Beatty and three other members of law enforcement[13] executed the first search warrant on room 219. (H.T. 11/19/2018 (ECF No. 78) at 109.)

FOF 93.   D. Williams went to the second floor of the hotel to execute the first search warrant and smelled burnt marijuana in the hallway outside room 219. (H.T. 11/26/2018 (ECF No. 64) at 91-92.)

FOF 94.   At that time, there was a moderate odor of burnt marijuana in room 219. (H.T. 11/19/2018 (ECF No. 78) at 110.)

FOF 95.   During the execution of the first search warrant, a packet of incense sticks, "two packs of rolling papers[,]" and a "clear glass jar containing marijuana residue" were recovered from room 219. (H.T. 11/19/2018 (ECF No. 78) at 40; H.T. 11/26/2018 (ECF No. 64) at 53.)

FOF 96.   Beatty believed the incense sticks were "correlated to masking the odor" of burnt marijuana. (H.T. 11/19/2018 (ECF No. 78) at 40.)

FOF 97.   The "rolling papers" were consistent with the use of marijuana. (H.T. 11/26/2018 (ECF No. 64) at 54.)

---

[13]   D. Williams, Joshua Giran, a Pennsylvania State Police Trooper, and Stephen Maritz, a detective with the Monroeville Police Department, executed the search warrant of room 219 with Beatty. (H.T. 11/19/2018 (ECF No. 78) at 115.)

FOF 98.  Law enforcement officers also found $192,000.00 and seventeen kilograms of cocaine inside room 219. (H.T. 11/26/2018 (ECF No. 64) at 110; ECF No. 57-4 ¶ 3.)

FOF 99.  Beatty did not see any indication of marijuana having been smoked, e.g., ashes or charred residue of a rolling paper. (H.T. 11/19/2018 (ECF No. 78) at 111-12.)

FOF 100.  D. Williams testified that he found burnt incense ashes on the counter in room 219. (H.T. 11/26/2018 (ECF No. 64) at 88.)

FOF 101.  Prior to 6:00 p.m., Tetrault applied for a second search warrant for room 219 based upon the cocaine and money found inside room 219 during the execution of the first search warrant. (ECF No. 57-4.)

FOF 102.  At 6:00 p.m., a federal magistrate judge issued a second search warrant for room 219 based upon probable cause that inside room 219 there would be found "controlled substances, money, personal effects, clothing, indicia, an electronic table, and jewelry." (ECF No. 57-4 at 1.)

### The Arrest and Interview of Defendant

FOF 103.  On August 29, 2017, at approximately 5:30 p.m., defendant was arrested by Beatty and five or six other law enforcement officers in the parking lot of the hotel. (H.T. 1/15/2019 (ECF No. 71) at 18, 20, 23.)

FOF 104. Beatty testified that defendant "resisted arrest." (H.T. 1/15/2019 (ECF No. 71) at 25.) Beatty explained:

> I was on his right side, pulling his right arm, which he was forcibly holding to himself and not allowing me to move into the small of his back. Trooper Williams was on the left, trying to take control of his left arm, to which he was moving towards the front center waistband of his area.

(Id.)

FOF 105. Defendant sustained a scrape above his left eye during the arrest, (H.T. 1/15/2019 (ECF No. 71) at 20-21), and "several abrasions[,]" (ECF No. 57-6 at 6). There was "a little bit of blood on the sidewalk" of the hotel. (H.T. 1/15/2019 (ECF No. 71) at 24.) Beatty asked defendant if he wanted medical attention; defendant answered in the affirmative. (Id. at 21.)

FOF 106. "Some firearms were drawn" during the arrest; Beatty testified that he did not "believe" that he had his firearm drawn because his hands were on defendant's right arm during the arrest. (H.T. 1/15/2019 (ECF No. 71) at 30.)

FOF 107. Law enforcement officers in a marked car transported defendant from the hotel to the Monroeville Police Department. (H.T. 1/15/2019 (ECF No. 71) at 14, 39.)

FOF 108. An ambulance came to the Monroeville Police Department for paramedics to provide medical attention to defendant. (H.T. 1/15/2019 (ECF No. 71) at 22.)

FOF 109. At the Monroeville Police Department at 7:40 p.m., Beatty and Tetrault began to interview defendant (the "initial questioning"). (H.T. 1/15/2019 (ECF No. 71) at 18.)

FOF 110. Prior to the initial questioning, defendant was in a cell in the Monroeville Police Department. (H.T. 1/15/2019 (ECF No. 71) at 38.)

FOF 111. The initial questioning was video and audio recorded. (H.T. 1/15/2019 (ECF No. 71) at 14; Gov't Ex. 1.) Defendant was informed the initial questioning was subject to audio and video recording. (Gov't Ex. 1 (audio pt. 1) at 00:52.)

FOF 112. Beatty informed defendant that he was being held at the Monroeville Police Department in the municipality of Monroeville. (Gov't Ex. 1 (audio pt. 1) at 00:33.)

FOF 113. Beatty introduced himself and Tetrault to defendant. (Gov't Ex. 1 (audio pt. 1) at 00:43.)

FOF 114. Tetrault informed defendant that he was under arrest on federal charges of distribution of cocaine and that he would be spending the night at the Allegheny County Jail. (Gov't Ex. 1 (audio pt. 1) at 1:01.)

FOF 115. Tetrault read to defendant his Miranda warnings. (Gov't Ex. 1 (audio pt. 1) at 01:45.) She stated:

> Before I ask you any questions I want to explain your rights to you. You have the right to remain silent. Anything you say can be used against you in a court of law, and you have the right to consult with a lawyer before questioning and to have a lawyer present during

questioning. If you cannot afford a lawyer, one will be
appointed to represent you free of charge prior to any
questioning.

Do you understand those rights?

(Id.)

FOF 116. Defendant responded to Tetrault: "Yeah." (Gov't Ex
1 (audio pt. 1) at 01:08.)

FOF 117. The following exchange then took place between
Tetrault and defendant:

<blockquote>

Tetrault:        Right now what we want to do is try to
                 get some information from you if you are
                 willing to talk to us because like I said
                 you do have a criminal history that we
                 are aware of. We haven't done an
                 extensive look at your criminal history
                 but you also have a significant arrest
                 right now and you are looking at
                 significant time and deportation.

Defendant:       Oh.

Tetrault:        Okay? So right now is your opportunity to
                 you know just just talk with us.

Defendant:       Talk about what?

Tetrault:        Well, whatever you think that could help
                 you right now.

Defendant:       I don't know what to say to you….

</blockquote>

(Gov't Ex 1. (audio pt. 1) at 02:11.)

FOF 118. After a twenty-four second pause, Tetrault and
defendant discussed defendant being born in Jamaica, defendant's
citizenship in the United States of America, defendant's current

address, and cellular telephone numbers. (Gov't Ex 1. (audio pt. 1) at 03:20.)

FOF 119.  Tetrault asked defendant whether he was visiting Monroeville, Pennsylvania for business or pleasure. (Gov't Ex. 1 (audio pt. 1) at 06:04.)

FOF 120.  Defendant explained he was in Monroeville, Pennsylvania, for his property business. (Gov't Ex 1 (audio pt. 1) at 06:21.)

FOF 121.  Tetrault and defendant discussed: whether defendant knew anyone in the area; the crimes for which defendant was previously arrested; defendant's cars and property businesses; defendant's method of transportation to the hotel; and defendant's connection to Phoenix, Arizona. (Gov't Ex. 1 (audio pt. 1) at 06:55-10:40.)

FOF 122.  The following exchange then took place between Tetrault and defendant:

> Tetrault:     You know, the thing right now is that, it's late, we've been working for a long time, and you can tell us all this crap or you can take this opportunity to help yourself.
>
> Defendant:    Why would I help myself?
>
> Tetrault:     Well, because like I said, you are probably facing twenty years, maybe more. Plus deportation and you said you have a wife here, do you have kids?

```
Defendant:      Well, I ain't got nothing, I don't know
                what to say to you. So, I can't help my
                situation. So…

Tetrault:       Do you have kids?

Defendant:      Yes, I do have kids.

Tetrault:       How many kids?

Defendant:      Three kids.

Tetrault:       Where are they?

Defendant:      They here…one is here. Two is in Jamaica.
```

(Gov't Ex. 1 (audio pt. 1) at 10:45.)

FOF 123. Beatty then discussed defendant's arrest with him.

(Gov't Ex. 1 (audio pt. 1) at 11:31.)

FOF 124. Beatty apologized to defendant for the injury defendant sustained during the arrest.[14] (H.T. 1/15/2019 (ECF No. 71) at 25.)

FOF 125. Beatty told defendant:

That being said, I'm just trying to level with you. What I'm trying to explain to you is time time is of the

---

[14] Beatty at the hearing on defendant's motions to suppress explained:

> Quite frankly, he did receive an injury and that injury was as a result of him resisting arrest. But, nonetheless, I was going into an interview with that individual and I didn't want there to be hard feelings between the two of us.

(H.T. 1/15/2019 (ECF No. 71) at 25.) Beatty "hope[d]" that defendant would cooperate with him, i.e., "give an incriminating statement" about himself and "possibly…other people." (Id. at 25-26.)

essence. I don't…you're going to learn throughout this process, specifically dealing with me is, I'm not going to bullshit you. I'm going to shoot you straight. I'm going to keep everything up front with you.

Now understand, this is a game of poker, I'm not going to show you my hand, but I'll tip you a card or two so you know I'm not pulling bullshit.

I just want to stress to you right now and I can't say it enough, if you care anything about your wife, if you care anything about your kids, if you ever want to see them again and I'm not talking through a plate of bulletproof glass at a visiting detention center or something like that. Aside from that shit, if you ever want to see them again bro, you're going to have to talk. And you're going to have to talk now. And this isn't down the line when we sit you in front of an AUSA and we proffer it out and then you of kind of sit there and kind of hold your hands and just hope if I tell these guys everything will they still work with me.

You need to understand the level of people you're dealing with. I work miracles. Okay. Um, that being said, I only work those miracles and bend over my back and call my bosses and tell them X-Y-Z needs to be done because Mr. Williams is playing it straight and he is talking to us. I only do that when you work with me back. If not, then hey, man I got the system I got to deal with. I got reports I got to punch. We got court we got to go to. And you got a sentence you got to serve. And I'm just I'm just shooting you straight. I don't say this stuff to…I'm very myself and I got kids. If I was in your shoes, I would be thinking about kids at this point.[15]

(Gov't Ex. 1 (audio pt. 1) at 12:30.)

---

[15] Beatty asked defendant about his children for two reasons: (1) for defendant to waive his Fifth Amendment rights and speak to Beatty; and (2) for defendant to "understand the gravity of the situation." (H.T. 1/15/2019 (ECF No. 71) at 36.)

FOF 126. Beatty explained to defendant the kind of cooperation for which he was looking, e.g., for defendant to set up a purchase of cocaine to reveal the person from who defendant purchases cocaine. (Gov't Ex. 1 (audio pt. 1) at 14:56.)

FOF 127. Beatty and Tetrault explained to defendant that law enforcement possessed the cocaine and currency found in room 219. (Gov't Ex. 1 (audio pt. 1) at 17:08.)

FOF 128. Tetrault told defendant: "[H]im and I know both know people don't just walk around after losing that much from the crew." (Gov't Ex. 1 (audio pt. 1) at 17:38.)

FOF 129. Defendant responded: "So now you're trying to get me killed?" (Gov't Ex. 1 (audio pt. 1) at 17:44.)

FOF 130. Beatty and Tetrault explained to defendant that they were not trying to get defendant killed; rather, they were presenting him a "golden opportunity" to cooperate with law enforcement. (Id. at 17:55.)

FOF 131. Defendant asked Beatty and Tetrault: "So what you want me to do now?" (Gov't Ex. 1 (audio pt. 1) at 19:06.) Tetrault responded: "We just want you to be real." (Id.)

FOF 132. Tetrault asked defendant: "Where'd the coke come from?" (Gov't Ex. 1 (audio pt. 1) at 19:17.) Defendant responded: "Which coke?" (Id. at 19:18.)

FOF 133. Tetrault explained to defendant that if he provided information he could receive a lesser sentence. (Gov't Ex. 1 (audio

pt. 1) at 19:44.) Defendant responded: "There is nothing I'm going to say to help myself." (Id. at 19:47.)

FOF 134. Beatty described how defendant could "cooperate" with the government. (Gov't Ex. 1 (audio pt. 1) at 22:15.) Defendant responded: "At the end of the day I'd still be in jail…can't see my kids or nothing." (Id. at 22:44.)

FOF 135. Beatty told defendant that if he helped Beatty "get" someone above defendant's "status" defendant would have Beatty's "word" that Beatty "would do everything he possibly…[could]" for defendant. (Gov't Ex. 1 (audio pt. 1) at 24:15.)

FOF 136. Defendant in response requested from Beatty and Tetrault assurances in return. (Gov't Ex. 1 (audio pt. 1) at 24:44.)

FOF 137. Tetrault told defendant Beatty and she could not make defendant any promises about defendant's charges or sentences because those decisions would be made by the prosecutors; Tetrault and Beatty could only make recommendations to the prosecutor. (Gov't Ex. 1 (audio pt. 1) at 24:58.)

FOF 138. Defendant told Tetrault and Beatty "I've never been in this situation before." (Gov't Ex. 1 (audio pt. 1) at 25:33.)

FOF 139. Tetrault explained to defendant that if convicted of the cocaine distribution charges, "it was almost guaranteed" that defendant would serve a long term of imprisonment and then

would be deported from the United States. (Gov't Ex. 1 (audio pt. 1) at 25:51.) Thus, defendant would never see his daughter again unless she traveled to see him in Jamaica. (Id.)

FOF 140.  Defendant again expressed his dissatisfaction with the lack of promises or assurances made by Tetrault and Beatty in exchange for his cooperation. (Gov't Ex. 1 (audio pt. 1) at 28:20.)

FOF 141.  Beatty in response told defendant their interactions were not a negotiation. (Gov't Ex. 1 (audio pt. 1) at 29:04.)

FOF 142.  Defendant told Tetrault and Beatty that he would rather serve a term of imprisonment of twenty years and "keep…[his] dignity" than "say something" and still serve a term of imprisonment of twenty years. (Gov't Ex. 1 (audio pt. 2) at 00:36.)

FOF 143.  Beatty explained to defendant that significant cooperation may substantially decrease the term of imprisonment defendant would serve. (Gov't Ex. 1 (audio pt. 2) at 01:28.)

FOF 144.  Beatty told defendant he wanted "to do business" with defendant and provide him leniency because defendant did not have a weapon on him or run when he was arrested. (Gov't Ex. 1 (audio pt. 2) at 04:51.)

FOF 145.  Tetrault asked for permission to "look through defendant's phones." (Gov't Ex. 1 (audio pt. 2) at 05:29.)

FOF 146.  Defendant refused to provide Tetrault the passcode for his cellular telephone. (Gov't Ex. 1 (audio pt. 2) at 08:19.)

FOF 147. Defendant wanted to speak with Tetrault's and Beatty's supervisors about cooperation. (Gov't Ex. 1 (audio pt. 2) at 11:11.) Tetrault informed defendant, however, that they would not call their supervisors because defendant had not provided them any information. (Id. at 11:16.)

FOF 148. Defendant again expressed his concern that Tetrault wanted information from him without providing anything to him in return. (Gov't Ex. 1 (audio pt. 2) at 12:09.)

FOF 149. Tetrault told defendant she would not guarantee anything to him because he did not provide any information to them. (Gov't Ex. 1. (audio pt. 2) at 13:32.)

FOF 150. After further conversation, Tetrault ended the interview. (Gov't Ex. 1 (audio pt. 2) at 18:13; H.T. 1/15/2019 (ECF No. 71) at 43.)

FOF 151. The initial questioning lasted approximately one hour. (H.T. 1/15/2019 (ECF No. 71) at 15.)

FOF 152. Defendant was not shackled to a chair during the initial questioning. (H.T. 1/15/2019 (ECF No. 71) at 28.)

FOF 153. Defendant was not handcuffed during the initial questioning. (Gov't Ex. 1 (video recording) at 04:17.)

FOF 154. Defendant for the majority of the initial questioning sat on the edge of a chair facing Tetrault and Beatty with his feet on the ground and arms folded in his lap. (Gov't Ex. 1 (video recording).)

FOF 155.  Tetrault and Beatty appeared to be taking notes on paper throughout the initial questioning. (Gov't Ex. 1 (video recording).)

FOF 156.  Neither Tetrault nor Beatty made any threatening moves toward defendant during the initial questioning. (Gov't Ex. 1 (video recording).)

FOF 157.  Neither Tetrault nor Beatty screamed, yelled, or cursed at defendant during the initial questioning. (Gov't Ex. 1 (video recording).)

FOF 158.  Defendant during the initial questioning spoke in a lower tone, i.e., "he wasn't speaking up or speaking loudly." (H.T. 1/15/2019 (ECF No. 71) at 32-33.)

FOF 159.  During the initial questioning, batteries fell out of the audio recorder. (H.T. 1/15/2019 (ECF No. 71) at 14-15, 41.) The batteries were out of the audio recorder for approximately five to ten seconds. (H.T. 1/15/2019 (ECF No. 71) at 15, 41.) The batteries were placed back into the audio recorder during that time. (Id. at 41.)

FOF 160.  Defendant during the initial questioning did not state that he was in any physical pain and he coherently and intelligently responded to Tetrault and Beatty's questioning. (Gov't Ex. 1 (audio pts. 1 and 2).) There was no indication that defendant did not understand or had trouble understanding any communication from Tetrault or Beatty. (Id.)

FOF 161. After the initial questioning, at approximately 8:40 p.m., Beatty transported defendant in an undercover state police vehicle to the "UPMC-East" hospital to be cleared for incarceration. (H.T. 1/15/2019 (ECF No. 71) at 15, 22, 43.)

FOF 162. Beatty explained:

It's very standard. Any time there's a, an instance like this where there was a resisting arrest instance, someone receives some form of injury, they be [sic] treated. And we always go to a hospital following treatment in order to receive a physician's note that clears them for incarceration. They've looked them over to make sure there's no issues at the in-take at the jail.

(H.T. 1/15/2019 (ECF No. 71) at 22-23.)

FOF 163. The undercover state police vehicle was not equipped with an interior camera or audio recorder. (H.T. 1/15/2019 (ECF No. 71) at 43-44.)

FOF 164. The drive from the Monroeville Police Department to the "UPMC-East" hospital was approximately five to ten minutes. (H.T. 1/15/2019 (ECF No. 71) at 15.)

FOF 165. Defendant was cleared from the hospital at approximately 9:10 p.m. (H.T. 1/15/2019 (ECF No. 71) at 15.)

FOF 166. Beatty then transported defendant to the Allegheny County Jail. (H.T. 1/15/2019 (ECF No. 71) at 15.)

FOF 167. Defendant sat next to Beatty during the transport. (H.T. 1/15/2019 (ECF No. 71) at 52.)

FOF 168. Defendant was handcuffed per Pennsylvania State Police Policy during transport. (H.T. 1/15/2019 (ECF No. 71) at 52.)

FOF 169. Beatty had a conversation with defendant during the transport from the hospital to the jail (the "continued questioning"). (H.T. 1/15/2019 (ECF No. 71) at 16.)

FOF 170. Defendant during the conversation did not assert his right to counsel or his right to remain silent. (H.T. 1/15/2019 (ECF No. 71) at 16.)

FOF 171. Beatty remained calm during the conversation and could not recall raising his voice during the conversation. (H.T. 1/15/2019 (ECF No. 71) at 16, 52.)

FOF 172. Beatty did not have a firearm drawn during the transport of defendant. (H.T. 1/15/2019 (ECF No. 71) at 51-52.) Beatty did not physically threaten defendant or threaten defendant's family during the conversation. (Id. at 52.)

FOF 173. Beatty did not bring up defendant's family during the transport of defendant in the undercover state police vehicle to the Allegheny County Jail. (H.T. 1/15/2019 (ECF No. 71) at 54.) Defendant, however, "made an inquiry somewhere along the line of, if the, the deal has to be good for him to cooperate and he wanted protection for himself and his family," (Id. at 54-55.)

FOF 174. Beatty in his report of the investigation of defendant described that the continued questioning involved

discussions about whether defendant would cooperate. (ECF No. 57-6 at 7.)

FOF 175. Beatty explained:

[Defendant] related he wants to see an agreement in writing before he commits to cooperating with law enforcement. …[Defendant] related that the deal needs to be good for himself and his family if he were to provide any information. …[Defendant] related he could arrange for a meeting of certain individuals and then we would be free to work with them as we would want to. …[Defendant] was hesitant when asked if he could arrange to order in a large quantity. When I seconded the question he smiled and put his head down. I rephrased the question and asked him if he knew a friend that could order a large quantity and he related he does and that he hears his friend talking in numbers of 50 to 70. As we approached the jail facility…[defendant] stated he is "in to them for over a hundred." I asked him if it was kilos or money and he stated "one hundred grand." I explained to him that if he cooperates I could help him with that and he did not reply.

Id.

FOF 176. Once at the parking area of the Allegheny County Jail, Beatty had an additional conversation with defendant in the presence of Tetrault (the "final questioning"). (H.T. 1/15/2019 (ECF No. 71) at 16.)

FOF 177. Beatty explained:

We arrived at Allegheny County Jail in-take and, when you arrive there, there's a, a large sally port area, parking area. And as I pulled in and parked, I remained seated in my vehicle with the defendant seated next to me. Special Agent Tettrault exited her vehicle, and I waved her over to my vehicle, as well, so she would be able to hear and witness what we were discussing.

(H.T. 1/15/2019 (ECF No. 71) at 47.)

FOF 178.  Neither Beatty nor Tetrault drew a firearm during the final questioning of defendant while in Beatty's vehicle outside the Allegheny County Jail. (H.T. 1/15/2019 (ECF No. 71) at 53.) The tone of the conversation was "[v]ery calm…[and] casual." (Id.)

FOF 179.  Defendant did not assert his rights to counsel or to remain silent during the conversations at the Allegheny County Jail. (H.T. 1/15/2019 (ECF No. 71) at 16.)

FOF 180.  Beatty described the conversations with defendant at the Allegheny County Jail as "fairly calm." (H.T. 1/15/2019 (ECF No. 71) at 17.)

FOF 181.  Defendant advised that he was not a "big guy" and said: "[I]f I was a big guy[,] why would I be out driving it on the street?" (ECF No. 57-6 at 8.)

FOF 182.  Approximately four hours passed from the time defendant was arrested at 5:30 p.m. and placed into Beatty's custody to when defendant was placed in the custody of the relevant authorities at the Allegheny County Jail at approximately 9:30 p.m. (H.T. 1/15/2019 (ECF No. 71) at 17.)

FOF 183.  As of August 29, 2017, defendant was thirty-five years old and appeared to speak and understand the English language. (H.T. 1/15/2019 (ECF No. 71) at 17.)

FOF 184.  Defendant did not appear to Beatty to have any mental disability or impairment and appeared to be intelligent. (H.T. 1/15/2019 (ECF No. 71) at 17.)

FOF 185.  Defendant during his conversations with Beatty did not appear to be under the influence of drugs or alcohol. (H.T. 1/15/2019 (ECF No. 71) at 17.)

FOF 186.  Beatty knew that defendant had prior experience with law enforcement, e.g., previous arrests. (H.T. 1/15/2019 (ECF No. 71) at 18.)

FOF 187.  Defendant was not reread his <u>Miranda</u> rights after the initial questioning at the Monroeville Police Department. (H.T. 1/15/2019 (ECF No. 71) at 53.)

FOF 188.  Defendant did not sign a <u>Miranda</u> waiver. (H.T. 1/15/2019 (ECF No. 71) at 53-54.)

**IV.  Conclusions of Law**

**A.    Evidence Obtained from Room 219**

COL 1.    The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause…." U.S. CONST. AMEND. IV. U.S.

COL 2.    Defendant does not argue the first affidavit of probable cause in support of the search warrant for room 219 is

39

insufficient on its face; rather, defendant argues that the first affidavit of probable cause contains falsities, and, therefore, he is entitled to relief under Franks v. Delaware, 438 U.S. 154 (1978).

COL 3.    Under Franks, when a warrant is obtained based upon a false statement made in a supporting affidavit, the fruits of the search warrant must be excluded if the remaining material, following the excision of the falsity, is independently insufficient to support a finding of probable cause. United States v. Frost, 999 F.2d 737, 742-43 (3d Cir. 1993) (citing Franks, 438 U.S. at 155-56).

COL 4.    If the falsity is based upon an omission rather than a misstatement of facts, the court must remove the falsehood "by supplying the omitted information to the original affidavit" and determine if the affidavit with the added information contains probable cause. Sherwood v. Mulvihill, 113 F.3d 396, 400 (3d Cir. 1997).

COL 5.    If probable cause exists after the affidavit has been "corrected," then the deficiency, i.e., the falsity or omission, is not material. United States v. Yusuf, 461 F.3d 374, 383-84 (3d Cir. 2006).

COL 6.    In order to obtain a <u>Franks</u> hearing, the defendant[16] must first make a "substantial preliminary showing" that (a) the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, and (b) the false statement is material to the finding of probable cause. <u>United States v. Yusuf</u>, 461 F.3d 374, 383 (3d Cir. 2006).

COL 7.    To make a substantial preliminary showing, defendant must present more than conclusory statements or arguments. <u>Id.</u> at 383 n. 8 ("In order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an

---

[16]    The Supreme Court explained the government's burden as follows:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

<u>Franks</u>, 438 U.S. at 171-72.

offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses.").

COL 8.  The Court of Appeals for the Third Circuit has explained the "substantial preliminary showing" required by the defendant as follows:

> To obtain a Franks hearing, the defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause."…To meet this threshold, a challenger must present more than conclusory statements that the affidavit contains false statements or omissions.…The challenger must specifically identify allegedly false statements or omissions in the affidavit and provide a statement of reasons supporting the argument….The challenger must also provide an offer of proof or give a satisfactory explanation for the absence of proof….Sworn affidavits or reliable statements from witnesses are examples of offers of proof sufficient to satisfy the substantial preliminary showing…. When demonstrating that the affiant omitted a material fact or included a false statement with the requisite mens rea, it is insufficient to prove the affiant acted with negligence or made an innocent mistake….If the challenger provides sufficient proof and obtains a Franks hearing, the challenger must prove by a preponderance that (1) the affiant made false statements or omissions intentionally, knowingly, or with reckless disregard for the truth, and (2) such statements were material to the probable cause determination….If the challenger satisfies this burden, we will excise the false statements and omissions from the affidavit and assess whether the corrected affidavit establishes probable cause.

United States v. Heilman, 377 F. App'x 157, 177 (3d Cir. 2010) (citations omitted).

COL 9.   If the substantial preliminary showing is made, and a hearing is granted, defendant must prove by a preponderance of the evidence that: (a) the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (b) such statements or omissions were material, or necessary, to the probable cause determination. Yusuf, 461 F.3d at 383.

COL 10.   Here, defendant argues the first affidavit of probable cause contains three falsehoods.

COL 11.   First, defendant argues that the statement in the first affidavit that law enforcement "became aware of possible narcotics activities occurring at the…[hotel]" on August 29, 2017, is inaccurate because law enforcement began their surveillance of defendant at the hotel on August 28, 2017. (ECF No. 57 at 3.)

COL 12.   Defendant satisfied his burden to make a substantial preliminary showing that law enforcement became aware of defendant's "possible" illegal narcotics activities at the hotel prior to August 29, 2017; indeed, law enforcement's surveillance of defendant at the hotel began on August 28, 2017. Thus, law enforcement became aware of defendant's allegedly illegal narcotics activities prior to August 29, 2017.

COL 13. Defendant, however, did not satisfy his burden to make a substantial preliminary showing that the inaccuracy in the date on which law enforcement became aware of the possible illegal narcotics activities at the hotel is material to the determination of probable cause in the first affidavit.

COL 14. If the incorrect date (August 29, 2017) is excised from the report and the date offered by defendant (August 28, 2017) is inserted into the report, the magistrate judge would still have probable cause to believe there was evidence of the possession of marijuana inside room 219 based upon Beatty and D. Williams' knowledge that defendant was the occupant of room 219, and their detection on August 29, 2017 of the odor of marijuana emanating from room 219.[17]

COL 15. The affidavit of probable cause provides that Beatty overheard defendant extending his stay at the hotel through August 30, 2017.[18] Thus, even if law enforcement first learned of possible illegal narcotics activities at the hotel on August 28,

---

[17] The government in its response to defendant's findings of fact and conclusions of law argues that there was "plenty of other evidence to serve as the basis for probable cause" without considering Beatty's and D. Williams' statements to Tetrault that they smelled marijuana emanating from 219. (ECF No. 77 at 3.) The court need not address that argument, however, because the first affidavit was valid and the statements by Beatty and D. Williams' were not falsehoods.

[18] Defendant did not challenge the veracity of Beatty's statement to Tetrault that he overheard defendant extending his stay at the hotel until August 30, 2017.

2017, there would be probable cause to believe that on August 29, 2017, the day on which Beatty and D. Williams smelled the odor of marijuana emanating from room 219, evidence of the possession of marijuana would be found in room 219.

COL 16.   Defendant's second argument under <u>Franks</u> is that the statement in the affidavit that law enforcement intended to search room 219 for evidence of the possession of marijuana is "inaccurate and misleading" because law enforcement's "real purpose was to search for evidence of major narcotics trafficking." (ECF No. 57 at 3, 6.)

COL 17.   Defendant did not satisfy his burden to make a substantial preliminary showing that Tetrault's statement in the affidavit that the affidavit was submitted to obtain a search warrant to search room 219 for "controlled substances, including marijuana" was false. (ECF No. 57-1 ¶ 5.)

COL 18.  Defendant conflates the purpose of law enforcement's investigation of defendant at the hotel with the purpose of the affidavit for the first search warrant. The court would agree with defendant that original purpose of law enforcement's investigation of defendant at the hotel was to gather evidence about defendant's involvement in a larger scale narcotics crime. As defendant argues, three law enforcement agencies, including Homeland Security, were involved in the surveillance of defendant. Thus, is it unlikely that defendant was the target of

an investigation for mere possession of a controlled substance like marijuana.

COL 19.   Tetrault in the affidavit of probable cause, however, does not state that the purpose of her *investigation* of defendant at the hotel was to gather evidence that he possessed marijuana; rather, she states that the purpose of the *affidavit* is to obtain a search warrant of room 219 to gather evidence that defendant possessed marijuana in room 219.

COL 20.   The first affidavit contains information that shows law enforcement was investigating defendant at the hotel to obtain evidence that he was involved in a large-scale drug trafficking crime, rather than the mere possession of marijuana.

COL 21.   Tetrault provides in the affidavit, among other things, that she has experience with large-scale drug investigations, at least three law enforcement agencies were involved in the investigation at the hotel, including state police performing interdiction duties, a controlled delivery implicating defendant was performed approximately two weeks prior to Tetrault authoring the affidavit, and law enforcement officers obtained administrative subpoenas to determine defendant's room number and information about defendant's rental vehicle.

COL 22.   Under those circumstances, Tetrault's statement that the purpose of the search warrant was to search for marijuana in room 219 was not false and she did not omit from the affidavit

material information about the original purpose of the investigation of defendant.

COL 23. In any event, law enforcement officers may investigate smaller crimes (possession of marijuana) in the course of an investigation of larger crimes (distribution of controlled substances) even if the smaller crimes are "merely pretext" for the investigation of the larger crime. United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006) ("[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime."); United States v. Vires, No. 4:12-CR-00306-17 KGB, 2014 WL 12687442, at *5 (E.D. Ark. Dec. 8, 2014), aff'd, 656 F. App'x 266 (8th Cir. 2016); Ferguson v. United States, No. CIV. 11-0154, 2012 WL 5398809, at *9 (W.D. Pa. Nov. 2, 2012).

COL 24. Because defendant did not satisfy his burden to make a substantial preliminary showing about his first and second arguments, no Franks hearing is necessary with respect to those matters.

COL 25. Defendant's third Franks argument is that Tetrault's statement in the first affidavit that "the officers smelled an odor of burnt marijuana coming from [r]oom 219…is an outright falsehood." (ECF No. 57 at 6.)

COL 26. Tetrault's affidavit provides:

> While conducting narcotics interdiction duties, PSP Troopers walked by room 219 and based on their training and experience identified the smell of marijuana emanating from the door to that room.

(ECF No. 57-1 ¶ 7.)

COL 27.   Defendant provides in his affidavit that neither he nor anyone in room 219 were smoking marijuana. (ECF No. 57-7 at 1.) The affidavit by the investigator provided that, among other things, Echie was not aware of any complaints about marijuana use at the hotel on August 29, 2017. (ECF No. 57-8 ¶ 5.)

COL 28.   The affidavits submitted by defendant were sufficient to meet his burden to make a substantial preliminary showing that Beatty's and D. Williams' statements that they smelled the odor of marijuana emanating from room 219, which Tetrault included in her first affidavit of probable cause, were false and material to the determination of probable cause in the first affidavit. (H.T. 11/19/2018 (ECF No. 78) at 26.)

COL 29.   The court, therefore, held a <u>Franks</u> hearing with respect to those statements and the first affidavit.

COL 30.   Defendant's arguments, however, were incorrectly focused upon the statements by Beatty and D. Williams. The appropriate focus of defendant's substantial preliminary showing should have been on Tetrault's knowledge about whether those statements were false.

COL 31.   The Third Circuit Court of Appeals has instructed: "[I]nformation received from other law enforcement officials during the course of an investigation is generally presumed to be reliable." <u>Yusuf</u>, 461 F.3d at 378, 384.

COL 32.   The police, however, "cannot insulate a deliberate falsehood from a <u>Franks</u> inquiry simply by laundering the falsehood through an unwitting affiant who is ignorant of the falsehood." <u>United States v. Shields</u>, 458 F.3d 269, 276-77 (3d Cir. 2006). "[T]he conduct of officers who relayed facts to the affiant" is relevant to a <u>Franks</u> inquiry. <u>Id.</u> (citing <u>United States v. Calisto</u>, 838 F.3d 711, 714 (3d Cir. 2006)).

COL 33.   To challenge an affidavit containing statements made to the author of the affidavit by another law enforcement officer:

> [A] defendant is required to demonstrate initially that the information provided by the agency would have put a reasonable official on notice that further investigation was necessary. If the defendant can meet this initial burden, the defendant must point to additional objective factors, suggesting that the agent's subsequent inquiry would have rendered the agent's reliance upon that information unreasonably reckless.

<u>Yusuf</u>, 461 F.3d at 385.

COL 34.   Here, defendant did not make a substantial preliminary showing that the information provided by Beatty and Tetrault would have put a reasonable official on notice that

further investigation into those statements was necessary. Thus, defendant would not be entitled to a <u>Franks</u> hearing on that issue.

COL 35.   In any event, the court conducted a <u>Franks</u> hearing about the veracity of Beatty's and D. Williams' statements and defendant had a full opportunity to cross-examine Beatty and D. Williams about their investigation and statements to Tetrault. For the reasons explained below, defendant at the <u>Franks</u> hearing did not prove by a preponderance of the evidence that Beatty's and D. Williams' statements were false. Thus, whether a reasonable law enforcement official in Tetrault's position would have been on notice that further investigation of their statements was necessary is moot.

COL 36.   First, evidence obtained from room 219 contradicts defendant's affidavit and the investigator's affidavit. Law enforcement officers recovered from room 219 marijuana residue in a glass container and rolling papers, which are associated with smoking marijuana.

COL 37.   Second, the court found Beatty and D. Williams credible with respect to their detailed and consistent testimony about smelling the odor of marijuana emanating from room 219 on August 29, 2017.

COL 38.   Beatty and D. Williams each have training or experience with detecting the odor of marijuana.

COL 39.   They similarly testified that on August 28 and 29, 2017, once they arrived on the second floor of the hotel and walked down the hallway in which room 219 was located, they could smell the odor of burnt marijuana. The odor of burnt marijuana became stronger the closer they walked to room 219 and the odor of burnt marijuana dissipated the farther away they traveled from room 219.

COL 40.   Evidence was presented that the hotel rooms were large and there was approximately fifteen to twenty feet between room 219 and the maintenance closet. D. Williams testified that neither room 217 nor the maintenance closet smelled of burnt marijuana.

COL 41.   Beatty and D. Williams testified about smelling masking agents outside room 219; indeed, incense sticks were found inside room 219.

COL 42.   Beatty also smelled the odor of marijuana when defendant entered the lobby the morning of August 29, 2017.

COL 43.   Beatty and D. Williams observed that the window to room 219 was open, which was abnormal in light of the climate controls in each of the hotel rooms.

COL 44.   Defendant during the suppression hearing and in his submissions to the court attacked the credibility of Beatty and D. Williams to show they intentionally or recklessly lied to Tetrault when they told her they smelled the odor of burnt marijuana emanating from room 219.

COL 45.  Defendant argued that Beatty and D. Williams could have done more in their investigation including "examining the rest of the second floor." (ECF No. 76 at 15.) For example, defendant argued that once Beatty and D. Williams smelled the odor of burnt marijuana outside room 219, they did not: (1) bend down and smell in the area of the gap between the bottom of the door and the floor; (2) knock on the door of room 219; (3) prohibit defendant from driving a vehicle while under the influence of marijuana; or (4) inform the hotel employees that they smelled burnt marijuana emanating from room 219.

COL 46.  Beatty and D. Williams explained, however, that their surveillance of defendant was an undercover operation. Bending down to smell the gap between the door and the floor, knocking on the door, prohibiting defendant from leaving the hotel, or reporting the odor to hotel employees would have placed at risk the undercover operation.

COL 47.  Defendant also grapples with the short amount of time Beatty and D. Williams spent on the second floor.  Beatty and D. Williams testified, however, that they have specific training in the detection of the odor of burnt marijuana and on two separate occasions they walked onto the second floor and discovered the odor of burnt marijuana emanating from room 219. Although Sullivan, who is not a trained law enforcement professional, testified that it can be *difficult* to determine from which hotel room the odor of

burnt marijuana is emanating, she explained that with some investigation it is possible.

COL 48.  Defendant argued that Beatty's testimony that when he saw defendant in the hotel lobby defendant's eyes were bloodshot and watery should be discredited because it was inconsistent with Beatty's cellular telephone pictures of defendant. The pictures, however, do not clearly depict defendant's eyes making it impossible to determine whether they were clear or bloodshot or watery.

COL 49.  Defendant also attacks the credibility of Beatty and D. Williams by arguing that they were planning to arrest defendant prior to developing probable cause to obtain a search warrant for room 219. Echie testified that Danielle told him that the police would be coming to the hotel to arrest defendant. According to defendant, Beatty and D. Williams last spoke with Danielle prior to smelling the marijuana outside room 219 on August 29, 2017, which shows they intended to arrest defendant prior to developing probable cause.

COL 50.  Beatty's and D. Williams' intent to arrest defendant, i.e., target of their narcotics investigation, however, is not sufficient to show that despite other corroborating evidence Beatty's and D. Williams' statements about smelling marijuana outside room 219 on August 29, 2017 were false. Defendant, in any event, did not show that it is more likely than not that a

reasonable law enforcement official in Tetrault's position would have known additional investigation into their statements was necessary.

FOF 189.  Third, the testimony by Echie[19] that he did not remember smelling marijuana at the hotel on August 29, 2017, and that he did not recall any complaints about hotel guests smoking marijuana on that day did not overcome the testimony by Beatty and D. Williams.

FOF 190.  Echie testified that on August 29, 2017, he did not walk the second floor of the hotel or check any rooms. (H.T. 11/30/2018 (ECF No. 65) at 21-23.) There was no evidence of record that Echie had training or experience detecting the odor of marijuana and his memory of that day was "sort of foggy." (H.T. 11/30/2018 (ECF No. 65) at 25.)

COL 51.  For the same reasons, the court was not persuaded by the investigator's affidavit, which reported, among other things, that on August 29, 2017, Echie did not have "knowledge of marijuana being complained about." (ECF No. 57-8.)

COL 52.  Based upon the foregoing, the statements by Beatty and D. Williams about smelling marijuana outside room 219 and

---

[19]    Defendant argues that Echie's testimony that Danielle told him that the police would be coming to the hotel to arrest defendant shows that Beatty and D. Williams intended to arrest defendant on August 29, 2017, prior to smelling the odor of marijuana outside room 219. Defendant's argument is not

relied upon by Tetrault were not false. Defendant, therefore, did not meet his burden to prove by a preponderance of the evidence that those statements were false, and clearly he did not overcome the presumptive reliability of those statements. Yusuf, 461 F.3d at 385 ("[I]nformation received from other law enforcement officials during the course of an investigation is generally presumed to be reliable."). He is not entitled to relief under Franks with respect to those statements.

COL 53. Defendant's motion to suppress evidence (ECF No. 56) will be denied. The evidence obtained pursuant to the first and second search warrants will not, therefore, be suppressed.[20]

### B. Defendant's Statements to Beatty and Tetrault

COL 54. A defendant who has "been taken into custody or otherwise deprived of his freedom of action in any significant way" must be given the warnings prescribed in Miranda v. Arizona, 384 U.S. 436 (1967), i.e., "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney either retained or appointed." Id. at 444, 467.

---

[20] **The court rejects defendant's Franks challenge to the first search warrant. The court, therefore, denies as moot defendant's motions to suppress with respect to his arguments that the evidence obtained pursuant to the second search warrant and his statements made subsequent to his arrest should be suppressed as "fruit of the poisonous tree[.]" (ECF No. 76 ¶¶ 108-09.)**

COL 55. <u>Miranda</u> warnings are required because custodial interrogation involves "inherently compelling pressures." <u>Id.</u> at 467.

COL 56. A defendant, however, may waive his <u>Miranda</u> rights. <u>United States v. Whiteford</u>, 676 F.3d 348, 362 (3d Cir. 2012).

COL 57. One court has explained:

> When the issue of waiver of <u>Miranda</u> rights arises on a motion to suppress statements, the government bears the burden of proving by a preponderance of the evidence that (1) the defendant was properly advised of his <u>Miranda</u> rights; (2) the defendant voluntarily, knowingly, and intelligently waived his rights; and (3) the ensuing statements were made voluntarily.

<u>United States v. King</u>, No. 1:16-CR-321, 2017 WL 2506395, at *9 (M.D. Pa. June 9, 2017) <u>aff'd</u>, No. 18-1622, 2019 WL 384444 (3d Cir. Jan. 30, 2019) (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 169 (1986); <u>United States v. Jacobs</u>, 431 F.3d 99, 108-09 (3d Cir. 2005)).

COL 58. To determine whether a <u>Miranda</u> waiver is valid, the government must establish that:

> First, the relinquishment of the right…[was] voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver…[was] made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

<u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).

COL 59. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and

the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived." <u>Id.</u> (quoting <u>Fare v. Michael C.</u>, 442 U.S. 707, 725 (1979)).

COL 60.  The court to determine the validity of the waiver must consider the "facts of the particular case, including the background, experience, and conduct" of the defendant. <u>United States v. Velasquez</u>, 885 F.2d 1076, 1086 (3d Cir. 1989).

COL 61.  The government has "the burden of proving, at least by a preponderance of the evidence, the <u>Miranda</u> waiver," <u>Missouri v. Seibert</u>, 542 U.S. 600, 608 n.1 (2004) (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 169 (1986)), "and the voluntariness of the confession[,]" <u>id.</u> (citing <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972)).

COL 62.  A <u>Miranda</u> waiver is not required to be "an explicit written waiver or a formal, express oral statement." <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 383 (2010). In other words, the government may satisfy its burden to prove defendant knowingly, voluntarily, and intelligently waived his or her <u>Miranda</u> rights "even absent formal or express statements of waiver." <u>Id.</u>

COL 63.  The court in <u>Berghuis</u> explained:

An "implicit waiver" of the "right to remain silent" is sufficient to admit a suspect's statement into evidence. <u>Butler</u>, <u>supra</u>, at 376, 99 S.Ct. 1755. <u>Butler</u> made clear that a waiver of <u>Miranda</u> rights may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." 441 U.S., at 373, 99 S.Ct. 1755. The Court in <u>Butler</u>

therefore "retreated" from the "language and tenor of the <u>Miranda</u> opinion," which "suggested that the Court would require that a waiver ... be 'specifically made.' " <u>Connecticut v. Barrett</u>, 479 U.S. 523, 531–532, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) (Brennan, J., concurring in judgment).

<u>Id.</u> at 384.

COL 64.    The court in <u>Berghuis</u>, however, emphasized that proof that "a <u>Miranda</u> warning was given and the accused made an uncoerced statement…is insufficient to demonstrate 'a valid waiver'" of <u>Miranda</u> rights." <u>Id.</u> (quoting <u>Miranda</u>, 384 U.S. at 475). "The prosecution must make the additional showing that the accused understood these rights." <u>Id.</u>

COL 65.    If the government proves by a preponderance of the evidence that "a <u>Miranda</u> warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." <u>Id.</u> at 384.

COL 66.    Here, it is undisputed that defendant was subject to interrogations while in police custody.

COL 67.    Defendant as of August 29, 2017, was thirty-five years old, had previous experience with the criminal justice system, communicated in the English language, and during the interview at the Monroeville Police Department intelligently conversed with Tetrault and Beatty.

COL 68.   The   undisputed   evidence   of   record   shows   that
Tetrault read to defendant his _Miranda_ rights prior to the initial
interrogation at the Monroeville Police Department. Tetrault asked
defendant whether he understood his _Miranda_ rights and defendant
answered in the affirmative.

COL 69.   At   approximately   two   minutes   and   forty-seven
seconds into the questioning at the Monroeville Police Department,
defendant told Tetrault and Beatty that he had nothing to say to
them. At approximately three minutes and twenty-six seconds into
the questioning, defendant—after being informed he was subject to
deportation—told  Tetrault  he  was  born  in  Jamaica.  Defendant
continued  to  converse  with  Tetrault  and  Beatty  throughout  the
initial questioning, continued questioning, and final questioning.

COL 70.   Thus,   the   evidence   shows   that   defendant   was
provided his _Miranda_ warnings, understood his _Miranda_ rights, and
gave voluntary statements to Tetrault and Beatty.

COL 71.   Defendant argues, however, that the statements he
made to Tetrault and Beatty were not the result of a voluntary,
knowing,  and  intelligent  waiver  of  his  _Miranda_  rights;  rather,
Tetrault  and  Beatty  coerced  him  to  give  statements  against  his
interest.

COL 72.   Defendant points to the following facts of record
to support his argument: (A) he sustained injuries prior to the
interrogation;  (B)  he  was  subject  to  continuous  questioning  for

four hours after being read his <u>Miranda</u> rights; and (C) references were made to his family throughout the questioning.

COL 73.   Defendant's arguments are not convincing or belied by the record before this court.

COL 74.   With respect to defendant's injuries, the evidence presented showed that defendant while resisting arrest by Beatty and five or six other members of law enforcement sustained a cut above his eye and other abrasions. Blood was found in the hotel parking lot at the scene of defendant's arrest.

COL 75.   The evidence also showed that defendant following his arrest declined immediate medical attention and was provided medical attention at the Monroeville Police Department prior to the initial questioning. Defendant walked by himself, i.e., unassisted, into the interview room at the Monroeville Police Department, did not appear to be in physical pain during the initial questioning, and did not request additional medical attention during the initial questioning.

COL 76.   Defendant after making voluntary statements to Beatty and Tetrault received additional medical attention to be cleared for incarceration prior to the questioning that occurred en route to the Allegheny County Jail and in Beatty's vehicle in the parking area outside the the Allegheny County Jail.

COL 77.   Defendant did not appear to be or sound physically frightened by Beatty during the questioning at the Monroeville

Police Department. Defendant for most of the questioning sat on the edge of his chair facing Beatty with his arms folded in his lap. Defendant sat next to Beatty in the front seat of Beatty's vehicle during transport from the hospital to the Allegheny County Jail and while in the parking area of the Allegheny County Jail.

COL 78. There is no evidence of record to suggest that while in police custody defendant was frightened or physically threatened by Tetrault or Beatty or that defendant's injuries prevented him from understanding his Miranda rights or the questions asked by Tetrault or Beatty.

COL 79. In other words, defendant's injuries or alleged fear of Beatty did not prevent him from voluntarily, intelligently, and knowingly waiving his Miranda rights.

COL 80. With respect to defendant's second argument, Tetrault's and Beatty's references to defendant's family do not rise to the level of coercion which would negate defendant's voluntary, knowing, and intelligent waiver of his Miranda rights.

COL 81. First, the references to defendant's family by Tetrault and Beatty were made after defendant acknowledged that he understood his Miranda rights and began to make statements to Tetrault and Beatty. Thus, the references to defendant's family

could not in the first instance coerce him to waive his <u>Miranda</u> rights.[21]

COL 82.  Second, Beatty and Tetrault in order to persuade defendant to cooperate with them explained to defendant that he was facing significant jailtime and would be unable to see his family except through a bulletproof glass during visitation at a prison.[22] The record shows that defendant understood Beatty and Tetrault because he responded that even if he cooperated, he would still be unable to see his children because he was facing a prison sentence.

COL 83.  Defendant during the initial questioning expressed concern about his safety and the safety of his family if he cooperated with law enforcement. Defendant did not express concern about his family if he chose *not* to cooperate with law enforcement.

---

[21]  As discussed below, defendant's <u>Miranda</u> waiver was not stale during the continued questioning or final questioning.

[22]  The court in its assessment of the totality of the circumstances must consider, among other things, whether the <u>Miranda</u> waiver was the product of deception. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). Police misrepresentations, however, "do not necessarily make a confession involuntary; rather, this is simply one factor to consider out of the totality of the circumstances." <u>United States v. Velasquez</u>, 885 F.2d 1076, 1088 (3d Cir. 1989) (citing <u>Frazier v. Cupp</u>, 394 U.S. 731, 739 (1969)). In any event, defendant does not argue that the representation that defendant was facing significant jailtime based upon the large amount of cocaine found in room 219 was false.

COL 84. Neither Tetrault nor Beatty threatened defendant's family during the initial questioning. The only reference to defendant's family made during the continued questioning and final questioning were by defendant when he told Beatty that any deal made by defendant would also have to provide protection to defendant's family.

COL 85. Under those circumstances, the references made to defendant's family during the initial questioning, continued questioning, and final questioning do not serve as a basis upon which to find defendant's Miranda waiver was coerced by law enforcement.

COL 86. With respect to defendant's argument about the length of time that defendant was in custody, the evidence showed that approximately four hours passed from his arrest to his placement at the Allegheny County Jail.

COL 87. At 5:30 p.m., defendant was arrested and driven to the Monroeville Police Department.

COL 88. At approximately 7:40 p.m., Tetrault's and Beatty's initial questioning of defendant commenced. Tetrault at the beginning of the interview read defendant his Miranda rights and defendant said he understood his Miranda rights. The interview lasted approximately one hour.

COL 89.   Between approximately 8:40 p.m. and 9:10 p.m., Beatty transported defendant to the hospital and defendant was cleared for incarceration.

COL 90.   At some time between 9:10 p.m. and approximately 9:30 p.m., the continued questioning and final questioning took place after which defendant was placed into the custody of the relevant authorities at the Allegheny County Jail.

COL 91.   Approximately two hours passed from when defendant first waived his Miranda rights to when all questioning ceased.

COL 92.   Within those two hours, defendant was questioned in the interview room, en route to the Allegheny County Jail, and while in the parking area outside the Allegheny County Jail.

COL 93.   The Third Circuit Court of Appeals has recognized that Miranda "does not necessarily require that a suspect be warned anew each time he is questioned." United States v. Pruden, 398 F.3d 241, 246 (3d Cir. 2005).

COL 94.   The court of appeals instructed that the district court must engage in a two-step inquiry to determine whether Miranda rights must be read for a second time when questioning resumes:

> "(1) At the time the Miranda warnings were provided, did the defendant know and understand his rights? [and] (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise

64

or waiver of those rights before making a statement to
law enforcement officers?"

Id. (quoting Untied States v. Vasquez, 889 F.Supp. 171, 177 (M.D.
Pa. 1995).

COL 95. With respect to the first inquiry, soon after 7:40
p.m., Tetrault read defendant his Miranda rights and defendant
stated that he understood his Miranda rights. Defendant then made
voluntary statements to Tetrault and Beatty and engaged in
conversation with them.

COL 96. With respect to the second inquiry, defendant
within less than two hours of waiving his Miranda was transported
by Beatty to the hospital and to the Allegheny County Jail.

COL 97. Courts have held that lapses of time much greater
than two hours do not invalidate otherwise voluntary, knowing, and
intelligent waivers of Miranda rights. See e.g., United States v.
Hodge, No. 1:16-CR-242-2, 2017 WL 2672303, at *8 (M.D. Pa. June
21, 2017) (finding that "Defendant's prior Miranda warnings were
not stale and there was no need to be re-Mirandized when she agreed
to accompany police to the station several hours later"); Castro
v. Folino, No. CIV. 10-2568, 2014 WL 56882, at *10 (E.D. Pa. Jan.
7, 2014) (holding that "[i]t is true that a period of roughly four
hours passed between the original Miranda warnings and the Blue
Marsh statements, but the passage of time, on its own, is not
determinative of whether the warnings needed to be reissued);

_Pruden_, 398 F.3d at 247-48 (finding in a "fairly close case" that the passage of twenty hours, i.e, "the upper end of the permissible range," did not invalidate a _Miranda_ waiver where the agent reminded the defendant of his _Miranda_ rights); _Guam v. Dela Pena_, 72 F.3d 769-70 (9th Cir. 1995) (a new warning and waiver was not required after a fifteen-hour delay between the first waiver and subsequent questioning) (cited by _Pruden_, 398 F.3d at 246); _Stumes v. Solem_, 752 F.2d 317, 320 (8th Cir. 1985) (finding a "nearly five-hour break between the interviews does not of itself invalidate the initial waiver"); _Jarrell v. Balkcom_, 735 F.2d 1242, 1254 (11th Cir. 1984) (holding that "we do not view a confession given less than four hours after the issuance of _Miranda_ warnings inadmissible because of the failure to reissue the warnings"); _see also_ _United States v. McClain_, No. CRIM. 06-008 (FLW), 2006 WL 2403926, at *11 (D.N.J. Aug. 18, 2006) (finding a _Miranda_ waiver stale after twelve days where the identity of the questioners changed, defendant learned he was subject to more serious penalties, and defendant was not provided a reminder of his waiver).

COL 98.    Other than the lapse of two hours between defendant waiving his _Miranda_ rights and the questioning by Beatty in his vehicle, there is no other event of record that "lessened the effectiveness of…[defendant's] _Miranda_ waiver[,]" e.g.,

"mistreatment, intimidation, or deprivation of food or sleep during the intervening detention." Pruden, 398 F.3d at 247.

COL 99. The evidence presented shows that during the continued and final questioning: Beatty remained calm; no firearms were drawn; Beatty did not threaten defendant or his family; defendant did not assert his Miranda rights; and defendant was seated next to Beatty in the front seat of the vehicle.

COL 100. Based upon the foregoing, defendant's waiver of his Miranda rights at the beginning of the interview at the Monroeville Police Department was not stale two hours later during the approximately twenty minutes of continued questioning and final questioning.

COL 101. The court is also not persuaded to the extent defendant argues that the total length of the interrogation, i.e., approximately two hours, is evidence that defendant's statements were coerced and not voluntarily made.

COL 102. Defendant is correct that length of time of an interrogation is a relevant consideration to determine whether statements were voluntarily made to law enforcement. Miller v. Fenton, 796 F.2d 598, 604 (3d Cir. 1986).

COL 103. The court must determine whether the interrogation was "'so prolonged and unremitting, especially when accompanied by deprivation of refreshment, rest or relief, as to accomplish extortion of an involuntary confession.'" Miller, 796 F.3d at 606

(quoting Stein v. New York, 346 U.S. 156, 184 (1953) (overruled on other grounds)).

COL 104. In this case, however, defendant was subject to an interrogation lasting less than two hours, which included: (A) a one-hour long questioning at the Monroeville Police Department; and (B) questioning lasting less than one-hour, i.e., approximately twenty minutes, during transport from the hospital to the Allegheny County Jail and in the parking area of the Allegheny County Jail.

COL 105. Courts have held that an interrogation lasting less than one to three hours does not—without more—render a statement made to law enforcement while in custody involuntary. See e.g., Miller, 795 F.3d at 606 (less than one hour); Townsend v. Gilmore, No. CV 15-1475, 2016 WL 8504502, at *8 (E.D. Pa. Sept. 30, 2016), report and recommendation adopted, No. CV 15-1475, 2017 WL 1021561 (E.D. Pa. Mar. 15, 2017) (more than two hours); United States v. Lawrence, No. CRIM. 2007-002, 2008 WL 5632268, at *5 (D.V.I. Jan. 30, 2008) (less than three hours); United States v. Sturgis, No. CR.A. 02-34-GMS, 2003 WL 1746244, at *7 (D. Del. Mar. 31, 2003) (two hours); see also Cook v. Nogan, No. CV 05-3916 (KM), 2016 WL 6892080, at *8 (D.N.J. Nov. 22, 2016) (holding that the will of a defendant who was subjected to one interview lasting five hours and a second interview lasting eight to nine hours was not overborne in light of other considerations) (citing Cunningham v.

City of Wenatchee, 345 F.3d 802, 810 (9th Cir. 2003) (defendant's will was not overborne in an interview lasting eight hours); United States v. Lehamn, 468 F.2d 93, 101 (7th Cir. 1972) (same); but see United States v. Ramirez, No. CRIM.A. 14-617 JLL, 2015 WL 4393744, at *6 (D.N.J. July 15, 2015) (holding in an "unusual" case that the defendant's will was overborne in an interview lasting two hours because the interviewing agents knew that the defendant was very worried and distracted about his baby who had just been taken to the hospital, which created a "great deal of pressure on him to speak to the agents").

COL 106.  "Cases in which psychological coercion has been found to result in involuntary confessions typically involved longer periods of interrogation than that to which Defendant was submitted." Lawrence, 2008 WL 5632268, at *5 (citing Blackburn v. Alabama, 361 U.S. 199 (1960) (eight to nine hours); Spano v. New York, 360 U.S. 315 (1959) (two weeks); Payne v. Arkansas, 356 U.S. 560 (1958) (forty-nine hours)).

COL 107.  In light of defendant's age, ability to converse in English, intelligence, and familiarity with the criminal justice system, the length of time during which he was interrogated does not show that his statements were involuntary or the result of coercion by Tetrault or Beatty.[23]

_____

[23]    There is no evidence of record to show that defendant was deprived of food or water during his detainment or otherwise

COL 108. Defendant's motion to suppress statements (ECF No. 56) will, therefore, be denied.

## V. Conclusion

Defendant did not satisfy his burden to make a substantial preliminary showing that: (A) the statement in the first affidavit of probable cause that the investigation began on August 28, 2017, was a material falsehood; or (B) Tetrault knowingly or recklessly omitted material information from the first affidavit about the purpose of the investigation of defendant. Defendant is, therefore, not entitled to a <u>Franks</u> hearing with respect to either of those matters.

Defendant, however, made a substantial preliminary showing that the statements made by Beatty and D. Williams about smelling marijuana outside room 219 were material falsehoods. The court held a <u>Franks</u> hearing with respect to that matter. Defendant at the hearing did not satisfy his burden to show by a preponderance of the evidence that Beatty's and D. Williams' statements to Tetrault that they smelled marijuana emanating from room 219 were false. Defendant could not, therefore, overcome the presumptive reliability of those statements. Thus, the evidence obtained pursuant to the first search warrant was not obtained in violation of defendant's Fourth Amendment rights.

---

made uncomfortable by the accommodations provided by Tetrault and Beatty.

Tetrault informed defendant about his _Miranda_ rights, defendant understood his _Miranda_ rights, and voluntarily, knowingly, and intelligently waived those rights by making statements to Tetrault and Beatty. His Fifth Amendment rights were not violated during the initial questioning, the continued questioning, or the final questioning.

The motions to suppress (ECF Nos. 55, 56) will, therefore, be denied. An appropriate order will be entered.

BY THE COURT,

Dated: May 17, 2019      /s/ JOY FLOWERS CONTI
                         Joy Flowers Conti
                         Senior United States District Court Judge