**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **v.** | ) | Crim. No. 17-246 |
| | ) | |
| RACOCO WILLIAMS, | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**CONTI, Senior District Judge**

**I.    Introduction**

Pending before the court is a motion to suppress evidence (ECF No. 171) filed by

defendant Racoco Williams ("Williams" or "defendant"). Williams is charged in a

superseding indictment with six counts of serious drug charges based upon his alleged

role in a conspiracy to distribute significant amounts of cocaine. (ECF Nos. 95-96.)

The charges in the superseding indictment stem from, among other things, a

traffic stop that occurred on May 11, 2017, and led to searches of Williams' vehicle,

hotel room, and electronic devices. According to Williams, the evidence obtained from

those searches was obtained in violation of his rights guaranteed by the Fourth

Amendment to the United States Constitution. Williams argues that evidence should,

therefore, be suppressed. The government argues in response that the searches of

Williams' vehicle, hotel room, and electronic devices were proper and lawful.

For the reasons set forth in these findings of fact and conclusions of law, the

court agrees with the government that the searches of Williams' vehicle, hotel room,

and electronic devices were lawful and did not violate his Fourth Amendment rights. The

motion to suppress will, therefore, be denied.

II.   **Procedural History**

On August 31, 2017, a criminal complaint was filed against Williams alleging that on or about August 29, 2017, he possessed with the intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). (ECF No. 1.) The complaint was signed by Brianna Maria Tetrault ("Tetrault"), a special agent with the Department of Homeland Security. (Id. at 1.) Attached to the complaint was an affidavit signed by Tetrault. (ECF No. 3-1.) On September 13, 2017, a grand jury returned a one-count indictment against Williams charging him with: possession with the intent to distribute five kilograms or more of cocaine, on or about August 29, 2017, in violation of 18 U.S.C. § 841(a)(1) and (b)(1)(A)(ii).

In October 2018, Williams filed a motion for discovery and two motions to suppress. (ECF Nos. 54-56.) The court held a pretrial motions hearing (over the course of 3 days) and granted in part and denied in part the motion for discovery. On May 17, 2019, the court issued Findings of Fact and Conclusions of Law denying the motions to suppress. (ECF No. 79.)

On August 27, 2019, a grand jury returned a superseding indictment against Williams charging him with:

–   **Count One**:  possession with the intent to distribute five kilograms or more of cocaine on April 13, 2017, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii);

–   **Count Two**: possession with the intent to distribute five kilograms or more of cocaine on August 29, 2017, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii);

–   **Count Three**: conspiracy to distribute five kilograms or more of cocaine and a quantity of marijuana from 2012 to March 2018, in violation of 21 U.S.C. § 846;

2

– **Count Four**: participating in a continuing criminal enterprise as principal administrator that involves 150 kilograms or more of cocaine, from 2012 through March 2018, in violation of 21 U.S.C. § 848(b);

– **Count Five**: conspiracy to commit money laundering from 2012 through August 2017, in violation of 18 U.S.C. § 1956(h); and

– **Count Six**: interstate travel or transmission in aid of racketeering from 2012 through August 2017, in violation of 18 U.S.C. § 1952(a)(3).

(ECF Nos. 95-96.)

On July 17, 2022, Williams filed eight pretrial motions, including the pending motion to suppress. On September 14, 2022, the government filed its omnibus response in opposition to the pretrial motions. (ECF No. 176.) On October 14, 2022, Williams filed a reply brief in support of his pretrial motions. (ECF No. 184.)

On January 12, 2023, (Hearing Transcript ("H.T.") 1/12/23 (ECF No. 202)), and January 20, 2023, (H.T. 1/20/2023 (ECF No. 203)), the court held a pretrial motions and suppression hearing. The court ruled upon seven of the pretrial motions, and the parties presented evidence with respect to the eighth motion, i.e., the motion to suppress, including documentary exhibits and the testimony of various witnesses. The record remained open for the government to submit an affidavit by Justin Keenan ("Keenan"), detective with the Borough of Swissvale Police Department, to address an issue raised by the court with respect to government Exhibit 1. (ECF No. 194.) Williams filed a response to Keenan's affidavit and requested that portions of the affidavit be stricken from the record. (ECF No. 196.) The court granted in part and denied in part Williams' request and ordered the record for the suppression hearing closed. (ECF No. 200.)

On March 23, 2023, the parties filed proposed findings of fact and conclusions of law. (ECF Nos. 204, 205.) On April 4, 2023, the government filed a response to

Williams' proposed findings of fact and conclusions of law. (ECF No. 206.) On April 13, 2023, Williams filed a response to the government's proposed findings of fact and conclusion of law. (ECF No. 208.)

After considering the parties' submissions and the evidence presented at the suppression hearings, the court makes the following findings of fact and conclusions of law:

### III.     Findings of Fact

### A.  Traffic Stop of Williams on May 11, 2017

FOF 1.          On May 11, 2017, Robert Gowans ("Gowans")[1] was employed as a part-time police officer with the Swissvale Borough Police Department. (H.T. 1/12/2023 (ECF No. 202) at 57.)

FOF 2.          As of that date, Gowans was a "fairly inexperienced" police officer, who had been on the job for approximately four and one-half years. (H.T. 1/12/2023 (ECF No. 202) at 55-56.) He did not have any specialized training "outside of the Police Academy and yearly updates that were required through MPOETC[,]" i.e., the state agency that provides police officer certifications. (Id. at 55-56.)

FOF 3.          During the evening of May 11, 2017, Gowans was by himself on patrol in a "fully marked" Ford Explorer police vehicle. (H.T. 1/12/2023 (ECF No. 202) at 57, 66.) The vehicle did not have a dashboard camera, and Gowans was not wearing a body camera. (Id. at 57-58.)

---

[1]     As of January 12, 2023, Gowans was employed as a full-time police officer assigned to the uniformed patrol division of the municipality of Monroeville, Pennsylvania. (H.T. 1/12/2023 (ECF No. 202) at 54.)

4

FOF 4.        At 9:45 p.m. on May 11, 2017, Gowans was positioned in the police vehicle "on Monongahela Avenue, where it intersects with the I-376 Eastbound off-ramp for the Swissvale Exit." (H.T. 1/12/2023 (ECF No. 202) at 58.)

FOF 5.        There was a three-way stop sign at the intersection at which Gowans was positioned in the police vehicle. (H.T. 1/12/2023 (ECF No. 202) at 58.)

FOF 6.        Gowans explained his reason for being positioned at the three-way stop sign as follows:

> And the reason that I was there is Swissvale is a small bedroom community. A lot of the residents walk either to the bus system or stores. There's a large amount of heavy foot traffic through Swissvale. So oftentimes we'll either get complaints from residents -- this particular stretch of roadway does have residential houses. We'll get complaints from residents about people not stopping for the stop sign, creating a particularly hazardous environment. You have vehicles exiting the Parkway at a high rate of speed and then you have people cutting through town, as this is one of the cut-throughs to get from South Braddock Avenue over to, say, the Rankin area or the Rankin Bridge. So this a heavily traveled roadway. So we'll get complaints from residents. Oftentimes, we do directed traffic enforcement to educate and enforce people on the stop sign speed limits, you know, whatever the applicable traffic laws would be.

(H.T. 1/12/2023 (ECF No. 202) at 59.)

FOF 7.        At or around 9:45 p.m., Gowans observed a small, dark colored four-door "SUV" fail to stop at the stop sign. (H.T. 1/12/2023 (ECF No. 202) at 59-60.) Gowans observed that the SUV did not have its "taillights on" as it proceeded through the intersection. (Id. at 60.)

FOF 8.        According to Gowans, the SUV's failure to stop at the stop sign was a violation of 75 PA. CONS. STAT. § 3323(b), and the SUV's failure to have its "taillights on" was a violation of 75 PA. CONS. STAT. § 4302. (H.T. 1/12/2023 (ECF No. 202) at 60.)

FOF 9.        Gowans initiated a traffic stop of the SUV. (H.T. 1/12/2023 (ECF No. 202) at 60.)

FOF 10.        Before Gowans exited his police vehicle, he notified dispatch of his location via the radio. (H.T. 1/12/2023 (ECF No. 202) at 65.) He provided dispatch the SUV's registration, license plate number, and a brief description of the SUV. (Id.)

FOF 11.        Once dispatch received the foregoing information, it opened an "incident" in the dispatch system and "[ran] the vehicle to obtain the registration information." (H.T. 1/12/2023 (ECF No. 202) at 65-66.)

FOF 12.        Gowans learned the SUV was a rental vehicle.[2] (H.T. 1/12/2023 (ECF No. 202) at 68.)

FOF 13.        Gowans explained the procedures for a traffic stop that involves a rental vehicle as follows:

> So the procedures are generally to either view a rental agreement that has the operator's name on it which shows that person has permission from the company to rent and operate that vehicle, or if the name on the rental agreement was different than the operator, I would make it a point to have that person call the renter of the vehicle to verify that the person driving has permission to be operating that vehicle.

(H.T. 1/12/2023 (ECF No. 202) at 68.)

---

[2]        Gowans explained:

> When we run the plate information, it will come back, it will say who the rental company is, whether it be Avis, Dollar, Budget, whoever. They will give whatever corporate address they list or would list on a corporate registration. The same as if you ran a U-haul vehicle. It would come back registered out of Arizona to U-haul Corporation. But it was a PA plate with their corporate business information on it.

(H.T. 1/12/2023 (ECF No. 202) at 74-75.)

FOF 14.    Gowans explained the Swissvale Police Department's procedure

with respect to providing police officers "backup" as follows:

> [T]he general procedure for Swissvale and for most police departments is, once anybody begins engaging in any kind of law enforcement activity where they're going to be contacting somebody, the procedure is, if another officer doesn't, you know, mark up on the radio or acknowledge that they're coming to back me up, dispatch would assign a backup unit.

(H.T. 1/12/2023 (ECF No. 202) at 66.)

FOF 15.    Gowans exited his police vehicle, approached the SUV, and made

contact with the driver of the vehicle, who was the only occupant of the vehicle. (H.T.

1/12/2023 (ECF No. 202) at 60-61.)

FOF 16.    Gowans explained:

> So generally during traffic stops, we maintain a reaction -- a proper reactionary gap. So the purpose of that gap is to remain close enough to engage with the operator, talk to them, get the information that we need, have an open line of dialect, but enough of a gap that if the operator were to become aggressive or do something we have a safety distance.

(H.T. 1/12/2023 (ECF No. 202) at 69.)

FOF 17.    Gowans introduced himself to the driver of the SUV, i.e., he told the

driver his name and that he worked for the Swissvale Police Department. (H.T.

1/12/2023 (ECF No. 202) at 67.) Gowans gave the driver a "brief description" about why

Gowans conducted the traffic stop. (Id.) He requested the driver's license, registration,

and proof of insurance, which are the "three standard documents that an operator is

required by law to provide…on a traffic stop." (Id.)

FOF 18.    The driver provided Gowans a Florida driver's license. (H.T.

1/12/2023 (ECF No. 202) at 67.)

FOF 19.       Because the SUV was a rental vehicle, Gowans requested the driver to produce the rental agreement for the SUV. (H.T. 1/12/2023 (ECF No. 202) at 68.) The driver, however, did not provide Gowans a rental agreement for the SUV or otherwise demonstrate to Gowans that he had the authority to operate the SUV. (H.T. 1/12/2023 (ECF No. 202) at 68.)

FOF 20.       The driver did not provide Gowans proof of insurance. (H.T. 1/12/2023 (ECF No. 202) at 68.)

FOF 21.       Gowans noticed that the driver "was just a little off…very quiet…kind of retracted upon initial contact." (H.T. 1/12/2023 (ECF No. 202) at 67.)

FOF 22.       Gowans, who maintained a "reaction area gap" between Williams and himself during the traffic stop, noticed a "fair odor of marijuana" during his interaction with Williams. (H.T. 1/12/2023 (ECF No. 202) at 69.)

FOF 23.       Gowans asked the driver to remain inside of his SUV, i.e., not to exit the vehicle, while Gowans returned to his police vehicle. (H.T. 1/12/2023 (ECF No. 202) at 69.)

FOF 24.       After Gowans returned to his police vehicle, via the radio he provided dispatch the driver's license number. (H.T. 1/12/2023 (ECF No. 202) at 70-71.) Dispatch used that information to obtain the information on a driver's license, e.g., name, home address, date of birth. (Id. at 70.) Gowans positively identified the driver as Williams. (H.T. 1/12/2023 (ECF No. 202) at 60-61.)

FOF 25.       Gowans explained that when a driver's license is from out of state, i.e., from a state other than Pennsylvania, it can take dispatch a longer time to retrieve information about the driver. (H.T. 1/12/2023 (ECF No. 202) at 70.) Gowans did not

remember how long it took for dispatch to provide information about Williams based upon Williams' driver's license. (Id.)

FOF 26.     Dispatch responded to Gowans and confirmed that Williams had a valid driver's license issued by the state of Florida, and, therefore, he was permitted to operate a motor vehicle in the state of Pennsylvania. (H.T. 1/12/2023 (ECF No. 202) at 71.)

FOF 27.     Gowans intended to issue Williams a traffic citation because he did not stop at the stop sign and a verbal warning for the taillight violation. (H.T. 1/12/2023 (ECF No. 202) at 61.) He explained that Williams' vehicle had functioning taillights, but the taillights were not on when Gowans observed Williams failing to stop the SUV at the stop sign. (Id.)

FOF 28.     Prior to conducting the traffic stop, Gowans did not know Williams was the driver of the SUV or that he was a target of a drug trafficking investigation. (H.T. 1/12/2023 (ECF No. 202) at 64.) Gowans was not asked by anyone associated with law enforcement to conduct a traffic stop of Williams; rather, "[h]is traffic stop was completely random based on observed violations." (Id. at 64-65.)

FOF 29.     Keenan, a detective for the Swissvale Police Department and the active supervisor on May 11, 2017,[3] testified that he arrived on scene "no more than

_____

[3]     The Swissvale Police Department is a small department, and, therefore, police officers sometimes wore "multiple hats." (H.T. 1/12/2023 (ECF No. 202) at 98-99.) Keenan explained:

It's a small agency and we do quite often wear multiple hats. I perform the functions of a patrol supervisor whenever it is necessary, in addition to conducting investigations of narcotics trafficking, as well as other investigations when the need arises. I'm also their firearms instructor, tactics instructor.

(Id.)

three to five minutes[4] from the time that…Gowans initiated the traffic stop and called it

out on the radio." (H.T. 1/12/2023 (ECF No. 202) at 66-67, 98, 100-01.) In other words,

Keenan arrived on scene at approximately 9:51 p.m.

_____

[4]      The first page of Keenan's police report about Gowans' traffic stop of Williams
and the events described in these findings of fact provides, among other things:

        Day / Date / Time (Reported)
        Thursday, May 11, 2017 09:46 PM

        Day / Date (of Occurrence)
        Thursday, May 11, 2017 09:46 PM To: Thursday, May 11, 2017 09:46 PM

(Gov't Ex. 1 (ECF No. 202-3 at 2.) The "reported" time is the time a complainant arrived
at the police station or called 911. (H.T. 1/12/2023 (ECF No. 202) at 93); (ECF No. 194
¶ 4.) The "occurrence" time is the actual time of the incident, i.e., when the incident
started and stopped. (H.T. 1/12/2023 (ECF No. 202) at 93); (ECF No. 194 ¶ 4.) Keenan
explained:

        The dates and times listed under these entries are not always the
        same. For instance, if a resident made a 911 call on January 2, 2023 at
        10:00 a.m. and reported that he was assaulted the day before, on January
        1, 2023, and that the assault lasted for approximately one hour, between
        6:00 p.m.to 7:00 p.m., I would report the incident as follows:

        Day/Date/Time (Reported)              Day/Date (of Occurrence)
        Monday, January 2, 2023 10:00 AM      Sunday, January 1, 2023 6:00 PM
                                              To: Sunday, January 1, 2023 7:00 PM
                                              …
        In contrast, when a law enforcement officer reports a violation, the
        dates and times listed under these entries generally is the same. More
        specifically, in the case of a traffic stop, when an officer witnesses a traffic
        violation on a certain date and time and initiates a traffic stop on that basis,
        I would list the date and time of the traffic stop as both the report date and
        the occurrence date. Further, because the officer generally would have
        witnessed the traffic violation just before initiating the stop, the start and end
        times of the occurrence would be the same. In my experience, I have not
        used the times listed under the "Day/Date (of Occurrence)" to reflect the
        duration of a traffic stop.

(ECF No. 194 ¶¶ 5-6.) Gowans testified that some police officers changed the
"occurrence" end time, i.e., the time entered after "To:", and some did not. (H.T. 1/12/2023
(ECF No. 202) at 93.) The Swissvale Police Department did not have a policy or
enforcement memorandum that required the police officers to record the end time. (Id. at

FOF 30.      On May 11, 2017, Keenan was a shift supervisor for the Swissvale

Police Department. (H.T. 1/12/2023 (ECF No. 202) at 97.)

_____

94.) Gowans explained that when a police officer for the Swissvale Police Department begins an incident report, the time of occurrence is automatically generated as the time the officer initiated the incident report. If the incident occurred at a different time, the police officer needs to manually change the time of occurrence. (H.T. 1/12/2023 (ECF No. 202) at 81.)

Keenan testified that he selected the time, 9:46 p.m., from a drop-down menu. (H.T. 1/12/2023 (ECF No. 202) at 120.) The third page of Keenan's report provides: "I responded as a backup unit to a traffic stop conducted by Ofc Rob Gowans at approximately 2215[,]" i.e., 10:15 p.m. (Gov't Ex. 1 (ECF No. 204-3) at 4.) Keenan in the six affidavits of probable cause that he drafted in support of his applications for search warrants described in these findings of fact wrote: "On 05-11-17 I was working in uniform, supervising the 1500-2300 patrol shift in the Borough of Swissvale. I responded as a backup unit to a traffic stop conducted by Ofc. Rob Gowans at approximately 2215." (H.T. 1/12/2023 (ECF No. 202) at 122); (Gov't Exs. 2, 4, 7 (ECF No. 204-4, 204-6, 204-9).) According to Keenan, the foregoing language "was copied and pasted from the police report" and the actual time he arrived on scene was closer to 9:46 p.m. or 10:00 p.m., rather than 10:15 p.m. (H.T. 1/12/2023 (ECF No. 202) at 122.)

Gowans testified that it did not take Keenan twenty-nine minutes, i.e., from 9:46 p.m. to 10:15 p.m., to respond on scene. (H.T. 1/12/2023 (ECF No. 202) at 92.) As discussed above, Keenan testified that he arrived on scene "no more than three to five minutes from the time that…Gowans initiated the traffic stop and called it out on the radio." (H.T. 1/12/2023 (ECF No. 202) at 66-67, 98, 100-01.) According to Keenan, therefore, he arrived on scene at approximately 9:52 p.m. and not 10:15 p.m. Keenan testified that the discrepancy between the time provided on the first page of his report, i.e., 9:46 p.m., and the time provided on the third page of his report, i.e., 10:15 p.m., was an "embarrassing error" on his part. (H.T. 1/12/2023 (ECF No. 202) at 105-06.) He explained:

> 22:15, I don't know where I came up with that number. It was -- I think when I began typing it was a best guess, sort of a placeholder, and then I meant to go back and verify because this -- what you're seeing here, the narrative occurs on a different page of the reporting system from the initial page. So you would have to close this screen and go back and look at the times on the initial screen. What I most likely did was put this in as a best guess and then just forgot to go back and change it, to then verify what time it was. It is an embarrassing error, but it's an error on my part.

(Id.) Gowans testified that from the time he observed Williams' traffic violations to the time Keenan asked Williams to exit the SUV was five to ten minutes with "ten minutes…[being] really the max." (H.T. 1/12/2023 (ECF No. 202) at 62, 95.)

FOF 31.     Keenan described some of his experience working as a police officer in Swissvale as follows:

> During my time as a patrol officer prior to becoming a detective, I had -- Swissvale is a town with many bars. At the time that I was a patrolman, there was 13 through 15 bars in 1.5 square miles of Swissvale. So dealing with intoxicated individuals was extremely common. DUI crashes are extremely common. The volume of traffic in the area is very high.
>
> And then once I was promoted to detective, I was sent to multiple different schools, the Top Gun Academy out East, and through the district attorney's office, a lot of on-the-job training as far as narcotics trafficking and investigating criminal organizations.

(H.T. 1/12/2023 (ECF No. 202) at 99-100.)

FOF 32.     Gowans was still in his police vehicle providing and receiving information from dispatch about Williams' driver's license when Keenan arrived on scene. (H.T. 1/12/2023 (ECF No. 202) at 66-67.)

FOF 33.     Gowans told Keenan that he detected a faint odor of marijuana when speaking with Williams.[5] (H.T. 1/12/2023 (ECF No. 202) at 71.)

FOF 34.     Gowans told Keenan that the SUV was a rental vehicle, but that Gowans had not obtained the rental agreement from Williams. (Id. at 103-04.)

FOF 35.     Keenan[6] told Gowans he would ask Williams for a rental agreement to verify that Williams was the actual renter of the vehicle. (Id.)

---

[5]     Keenan's police report does not include information about Gowans telling Keenan that Gowans smelled marijuana during his interaction with Williams. (H.T. 1/12/2023 (ECF No. 202) at 87); (Gov't Ex. 1 (ECF No. 204-3).) Keenan testified that he did not remember whether Gowans told him that he smelled the faint odor of marijuana during his interaction with Williams. (H.T. 1/12/2023 (ECF No. 202) at 103.)

[6]     With respect to the need for a rental agreement, Keenan explained:

> I believe Enterprise reached out at some point around that time frame, prior to the stop, and said that they were having problems with people operating

FOF 36.    Gowans was preparing the citation when Keenan approached Williams in the SUV. (Id. at 71.)

FOF 37.    Gowans saw Keenan approach Williams in the SUV. (H.T. 1/12/2023 (ECF No. 202) at 73.) Keenan interacted with Williams. (Id.) Gowans could not hear Keenan's discussion with Williams. (Id.)

FOF 38.    Before the traffic stop, Keenan did not know or know about Williams. (H.T. 1/12/2023 (ECF No. 202) at 102.) He was not asked by any other law enforcement agency to conduct a traffic stop of Williams. (Id.)

FOF 39.    Keenan described his interaction with Williams as follows:

> I approached the driver's side of Mr. Williams' vehicle and spoke with him. I introduced myself and I spoke with him and I explained what I was asking for and that, you know, what I just told Your Honor, Enterprise has requested that we verify that operators of vehicles allowed on the rental agreement. And I asked him if he had a copy of it. He stated that he thought he did and that it would be in his email, which was on his phone. And he picked his cell phone up and he opened his email while we were talking and he began scrolling through a lengthy list of emails. **This went on, I don't know, five, seven, ten minutes while we spoke.** And Mr. Williams would wander off course for a little while, and it became clearer to me as I talked to him that, you know, despite a little bit of a communication barrier and -- that there was more going on here with his cognitive ability than just not being familiar with the surroundings. He continually -- he would stop talking and lose his train of thought, and then I would guide him back to we were looking for the rental agreement, remember? Oh, yeah, yeah. And then he would scroll back to the top of all of his emails and then he would slowly start paging down through them again looking for the -- presumably looking for the rental agreement from Enterprise.
>
> …

---

their vehicles that weren't -- were not allowed to. So they were kind of cracking down on their customer base as far as the rental agreements are concerned. They asked that police departments coming into contact with Enterprise rental cars verify that the people operating those cars were actually, in fact, on the rental agreement.

(H.T. 1/12/2023 (ECF No. 202) at 103-04.)

While I stood there speaking with him and Mr. Williams was searching for the rental agreement, I began to detect the odor of marijuana coming out of the vehicle. And I noticed that his eyes were glassy, bloodshot. His speech was already notably -- notably slow and lethargic, and he kept losing his train of thought, losing his place in his phone, and forgetting what we were doing. I kept having to bring him back on task. So that, coupled with the odor of the marijuana coming out of the car, I began to suspect that he was under the influence of marijuana.

(H.T. 1/12/2023 (ECF No. 202) at 106-07 (emphasis added).)

FOF 40.    While Williams searched his emails on his cellular telephone for a

rental agreement,[7] Keenan spoke with him "at length[,]" i.e., five to ten minutes. (H.T.

1/12/2023 (ECF No. 202) at 106-07, 131.)

FOF 41.    It was dark outside, but there were streetlights and ambient lighting

from houses and Keenan had a flashlight. (H.T. 1/12/2023 (ECF No. 202) at 133, 173.)

FOF 42.    Keenan did not shine his flashlight in Williams' direction because he

did not want to distract Williams from finding the rental agreement on his phone; rather,

Keenan shone the flashlight at the ground or directly "at what [he] was looking at." (Id. at

134.)

FOF 43.    Keenan explained:

[U]sually if I'm speaking with someone, in the dark or in a low-light scenario, like inside their car, I want to be able to see their hands and make sure of what's going on to make sure that everyone is safe. I usually take a flashlight and I just kind of hold it in front of me and point it down, so I'm not blinding anyone. But the sides – it side spill [sic], the side spill goes into the car and I can illuminate the hands and faces and details of what's going on inside the car.

---

[7]    Keenan knew that rental car companies maintain records of to whom they rent their vehicles. (H.T. 1/12/2023 (ECF No. 202) at 131.) There is a process that law enforcement can use to obtain those records. Dependent on the rental car company, law enforcement may contact the rental car company "on scene" to obtain information, but that process is not usually performed "on scene." (Id.)

(H.T. 1/12/2023 (ECF No. 202) at 173.)

FOF 44.     Within approximately thirty seconds of walking up to Williams' SUV, Keenan "lowered…[his] position so that…[he] could better hear what…[Williams] was saying." (H.T. 1/12/2023 (ECF No. 202) at 108-09, 171.) Keenan has hearing loss from his service in the United States Marine Corps. (Id. at 108.) Williams speaks with an accent, which also made it more difficult for Keenan to understand him because Keenan was not familiar with Williams or his speech. (Id.)

FOF 45.     As Keenan lowered his head to Williams' window, the odor of marijuana increased in strength and became "very pungent." (H.T. 1/12/2023 (ECF No. 202) at 109.)

FOF 46.     Keenan suspected that Williams was under the influence of marijuana. (H.T. 1/12/2023 (ECF No. 202) at 110.) He explained:

> [I]n order to further investigate his inebriation level, I asked him to step out of the vehicle. Mr. Williams complied. As per policy and is my habitual practice on a traffic stop, when I'm going to conduct -- with the intention of asking Mr. Williams to conduct the field sobriety test, and whenever I'm going to do that, I want to make sure the person that I'm dealing with isn't armed or in possession of anything that can hurt me. So I asked him if he had any weapons on him. I don't remember if he admitted it or not. But in plain view clipped to his waistband, there was a folding knife. I asked him to turn around and face away from me so I could retrieve the knife. He did so. We were very polite with one another, and Mr. Williams was very compliant. When I reached in front of him and pulled the knife out of his waistband, I looked down and in the right pocket of the track pants that he had on, there was a knotted baggie that had some marijuana in it. I could see from the -- from my position where I was standing. So I said, "Is that a bag of weed in your pocket?" And he laughed. I said, "I'm just going to put handcuffs on you real quick, just detain you. You're not under arrest." But at that point, Officer Gowans approached me and we took Mr. Williams into custody.

(H.T. 1/12/2023 (ECF No. 202) at 109.)[8]

FOF 47.    As described above, Keenan arrived on scene at approximately 9:51 p.m., spoke with Gowans, approached the SUV, and spoke with Williams. Williams scrolled through his cellular telephone looking for the rental agreement for five to ten minutes before Keenan asked Williams to step outside the SUV. Based upon the foregoing, Keenan asked Williams to step outside the SUV at or shortly after 10:01 p.m.

FOF 48.    Williams refused to undergo a field sobriety test. (H.T. 1/12/2023 (ECF No. 202) at 111.) Keenan explained that when people refused to undergo a field sobriety test, their driver's license may be suspended and "typically" it means they are intoxicated. (H.T. 1/12/2023 (ECF No. 202) at 111.)

FOF 49.    When Williams exited the SUV, Keenan saw four cellular telephones[9] inside the vehicle on the driver's seat where Williams had been sitting.[10] (H.T. 1/12/2023 (ECF No. 202) at 136.)

---

[8]    Gowans had not finished issuing Williams the citation when he saw Williams exit the SUV. (H.T. 1/12/2023 (ECF No. 202) at 73.) When Gowans saw Williams exit the SUV, he stopped writing the citation and exited his police vehicle "to go out and see what was going on[.]" (H.T. 1/12/2023 (ECF No. 202) at 73.) Gowans saw Keenen perform a "pat-down" of Williams. (H.T. 1/12/2023 (ECF No. 202) at 75, 109.) A knife was recovered from Williams' waistband and a small amount of marijuana was recovered from his pants pocket. (Id. at 75, 109.)

[9]    Two of the cellular telephones rang "almost constantly" during Keenan's interaction with Williams. (H.T. 1/12/2023 (ECF No. 202) at 136.)

[10]    At some point in the evening of May 11, 2017, Keenan saw a hotel room key in the SUV. (H.T. 1/12/2023 (ECF No. 202) at 153.) Keenan could not remember whether he saw the room key when Williams exited the SUV or during the execution of the search warrant for the SUV. (Id.)

16

FOF 50.      Keenan was confident that Williams was under the influence of marijuana and that he possessed marijuana, i.e., the baggie of marijuana that Keenan retrieved from Williams' pocket. (H.T. 1/12/2023 (ECF No. 202) at 111-12.)

FOF 51.      Once Williams was placed under arrest, Keenan performed a search incident to the arrest of Williams. (H.T. 1/12/2023 (ECF No. 202) at 76.) Gowans explained a search incident to arrest is more intrusive than the initial pat-down and verified that Williams was "not placed into a police car with any sort of firearms or other dangerous weapons." (Id. at 75-76.)

FOF 52.      After the search incident to arrest, Williams was placed into the back of Gowans' police vehicle and "belted and secured." (H.T. 1/12/2023 (ECF No. 202) at 76.)

FOF 53.      Williams never provided Keenan a rental agreement or any other verification that Williams was a lawful driver of the SUV.[11] (H.T. 1/12/2023 (ECF No. 202) at 106.)

**B. Inventory Search of Williams' SUV**

FOF 54.      Gowans explained the location at which Williams' vehicle was parked as a result of the traffic stop as follows:

> So the intersection where we stopped is -- it's an odd intersection. Monongahela comes up and kind of does an S through this area. So Monongahela, you're making a right turn and then a left turn, but you're always still on Monongahela. The intersection where this occurred, there's driveways, fire hydrants, you know, handicapped parking. It's actually a very congested intersection.

(H.T. 1/12/2023 (ECF No. 202) at 76.)

---

[11]      Keenan testified that if a driver cannot verify he or she is the lawful driver of a rental vehicle, the police officer would call the rental company and tow the vehicle. (H.T. 1/12/2023 (ECF No. 202) at 106.)

FOF 55.      Gowans was not aware of any authorized driver who could take control of the SUV to drive it away. (H.T. 1/12/2023 (ECF No. 202) at 76.)

FOF 56.      Gowans explained that based upon the location of the SUV and because there were no other authorized drivers of the SUV, the SUV had to be towed from its location and stored at the tow yard until a legal authorized driver retrieved the vehicle. (H.T. 1/12/2023 (ECF No. 202) at 76.)

FOF 57.      Pursuant to Swissvale Police Department policy,[12] an inventory search is conducted when a vehicle will be towed, among other things, to secure any

---

[12]      The Swissvale Police Department's inventory search policy is as follows:

**06. MOTOR VEHICLE INVENTORY**

**IT IS IMPORTANT TO NOTE THAT THE VEHICLE INVENTORY POLICY SHALL NOT BE UTILIZED IN LIEU OF A WARRANTLESS SEARCH OR A SEARCH WARRANT. THE PURPOSE OF THIS POLICY IS TO PROTECT VALUABLES AND PROEPRTY BELONGING TO INDIVUALS WHOSE VEHICLES ARE TWOED, IMPOUNDED OR SEIZED. COURTS WILL NORMALLY REQUIRE DEPARTMENTS TO HAVE A WRITTEN POLICY ON TOWING AND INVENTORY SEARCHES BEFORE THEY WILL ALLOW ADMISSION OF EVIDENCE DISCOVERED DURING AN INVENTORY SEARCH.**

A. It shall be the policy of the SPD that all vehicles towed, impounded, or seized are thoroughly Inventory searched for valuables.
B. The inventory should be conducted at the location from where the vehicle is towed, impounded, or seized unless limited by safety concerns or practicality. If the vehicle is not inventoried at the scene because of safety reasons, it must be inventoried upon arrival at a safe and secure location.
C. A motor vehicle inventory shall extend to all areas of the vehicle in which personal property or hazardous materials may reasonably be found, including but not limited to the passenger and engine compartments(s) trunk and glove box or other areas attached to the vehicle.
D. All closed containers found in the vehicle shall be opened and inventoried unless the contents can be determined from an examination of the exterior of the container.

valuables inside the vehicle. (H.T. 1/12/2023 (ECF No. 202) at 77); (Gov't Ex. 6 (ECF No. 204-8) at 4-14.) Gowans explained:

> We completed an inventory search, which was policy for the Swissvale Police Department. The reason that we do that is, oftentimes -- me personally, I've had drivers of vehicles file complaints that they had this in the vehicle or that in the vehicle and we towed it and now it's gone. So Swissvale specifically employed an inventory policy. And the purpose of that is to go through the vehicle and ensure that there's no jewelry or any personal items that would need removed from the vehicle and secured at the police department separate from the vehicle being at the tow yard.

(H.T. 1/12/2023 (ECF No. 202) at 77.)

FOF 58.    Keenan explained there are various reasons for conducting an inventory search:

> To protect the department and the tow company from liability; to protect the property of the owners of the vehicle from theft in the event that the vehicle's going to be stored in an unsecured facility for some reason; and to also document or to inventory so to speak, any damage to the vehicle, in order to protect from liability or, you know, false claims of damaging, that sort of thing.

---

E. Closed and locked containers shall not be forced open but should be logged on a Report as such. If a key or lock combination is available, locked containers may be opened and inventoried.

F. When possible, the owner or operator shall be asked to take possession of all valuables discovery during the inventory of the vehicle prior to impoundment. Such possession shall be noted on an Inventory Section of the Report. If the owner or operator can not take possession of the valuables discovered during the inventory, then they will be inventoried and secured within the vehicle prior to towing. The owner or operator shall be requested when possible, to verify the completeness of the inventory by signature.

G. All property found inside the vehicle will be recorded on an Inventory Section of the Report. Contraband and evidence discovered during the course of a Motor Vehicle Inventory Search shall be seized and logged as "Evidence."

H. Any damage or peculiarities pertaining to the vehicle shall also be documented.

I. All vehicles impounded shall be towed to a secure facility by an insured and bonded towing service.

(Gov't Ex. 6 (ECF No. 204-8) at 8-9.)

(H.T. 1/12/2023 (ECF No. 202) at 144.)

FOF 59.    According to Gowans, the inventory search of the SUV was

conducted by Keenan and Gowans in accordance with the Swissvale Police

Department policy. (H.T. 1/12/2023 (ECF No. 202) at 78.)

FOF 60.    Pursuant to the policy, an inventory search may not be utilized "in

lieu of a warrantless search or a search warrant[; rather,] [t]he purpose of the policy is to

protect valuables and property belonging to individuals whose vehicles are towed." (H.T.

1/12/2023 (ECF No. 202) at 145.)

FOF 61.    Before the SUV was released and the tow truck was called,

Gowans went into the backseat behind the driver's side and observed a white

cardboard shopping bag. (H.T. 1/12/2023 (ECF No. 202) at 79.) Gowans looked inside

the bag and saw a large amount of United States currency. (Id.)

FOF 62.    Gowans informed Keenan about the bag of money. (H.T. 1/12/2023

(ECF No. 202) at 79.) Keenan told Gowans to "immediately stop…what…[he] was

doing." (Id.) Gowans complied with Keenan's instructions. (Id.)

FOF 63.    Keenan explained:

We stopped what we were doing because that kind of changed the
investigation and the nature of things, and made me suspect that there was
more going on here. We stopped. I secured the car, taped the doors closed,
and had it transported to a secure facility where it was under lock and key
until I could obtain a search warrant.

(H.T. 1/12/2023 (ECF No. 202) at 114.)

FOF 64.    According to Keenan, their search of the SUV complied with the

Swissvale Police Department's inventory search policy. (H.T. 1/12/2023 (ECF No. 202)

at 147.) He explained:

20

It says I need to report what we recover from the vehicle. I recovered nothing until I obtained the search warrant, because I suspected further criminal activity at that point. So I stopped my inventory, I secured the vehicle, sealed it, stored it in a locked facility, as per our policy as a past practice, and then obtained the search warrant to retrieve its contents.

(H.T. 1/12/2023 (ECF No. 202) at 147.) Keenan recorded the item found during the

inventory search, i.e., the shopping bag of U.S. currency, in his police report.[13] (Id. at

147-48.) He explained that he did not "log into evidence" the shopping bag of U.S.

currency because he "sealed [the SUV] to obtain a search warrant." (Id. at 148.)

FOF 65.    Keenan explained that at the impound lot, there are different levels

of security:

It's the same physical address, but there are different levels of security to it, if that makes sense. There's a fenced-in area, which is the normal impound yard where they would put a car that we towed and was waiting for the owner to pick it up and there was no suspected criminal activity related to it.

But they have a garage that has – it's actually multilevel and it's under lock and key. There's only access – the only access to it is to the police and the owner of the building. And that's where we put vehicles that are being stored in anticipation of executing the search warrant on them.

(H.T. 1/12/2023 (ECF No. 202) at 174.) The SUV was stored in the area in which

vehicles are kept in anticipation of the execution of a search warrant by law

enforcement. (Id.)

FOF 66.    Keenan began to "notify...other agencies[,]" and Gowans'

participation in the traffic stop ceased; indeed, his shift ended at 11:00 p.m. that

evening. (H.T. 1/12/2023 (ECF No. 202) at 79.)

---

[13]    Keenan explained that "[t]here is no such thing as an official inventory report in the Swissvale Police Department[;] rather, "[i]t is all contained in the police report." (H.T. 1/12/2023 (ECF No. 202) at 149.)

FOF 67.       Keenan understood the first sentence of the inventory policy, i.e.,
"[i]t is important to note that the vehicle inventory policy shall not be utilized in lieu of a
warrantless search or a search warrant[,]" to mean that if he wanted to "recover
evidence of a crime,…[he] need[ed] a search warrant to do so." (H.T. 1/12/2023 (ECF
No. 202) at 149.)

### C.  Search Warrant for and Search of the SUV

FOF 68.       On May 12, 2017, Keenan applied for, and at 1:00 a.m., was issued
a search warrant for the SUV (the "SUV warrant"). (H.T. 1/12/2023 (ECF No. 202) at
115, 122); (Gov't Ex. 2 (ECF No. 171-2) at 2-5.)

FOF 69.       Keenan's affidavit of probable cause relied upon to obtain the SUV
warrant provided, in pertinent part:

- Keenan's professional experience as a police officer;

- on May 11, 2017, he was on duty as the supervising officer for the Swissvale
  Police Department;

- he responded as backup to Gowans' traffic stop of Williams conducted "at
  approximately 2215"[14] based upon Williams' failure to stop at a stop sign and
  driving with "no taillights illuminated[;]"

- Williams provided Gowans his valid Florida driver's license;

- Williams' vehicle was registered to Enterprise Rental Car Company;

- Gowans asked Keenan to speak with Williams and ask to see a copy of the
  rental agreement for the vehicle;

- Williams told Keenan he was in the business of real estate, he was in town to fix
  one of his rental properties, he was on his way back to his hotel in Penn
  Hills, and the rental agreement for the SUV was on his cellular telephone in
  his email;

---

[14]  See supra note 4.

- Keenan asked Williams at least three questions while Williams was scrolling through his cellular telephone looking for the rental agreement;

- during their conversation, Keenan "began to notice that…[Williams'] eyes were glassy and extremely bloodshot, his speech was slow and at times almost unintelligible, and that he appeared to be lethargic and having trouble maintaining focus[;]"

- Keenan "began to smell the distinct odor of marijuana coming from inside the vehicle[;]"

- Keenan asked Williams to exit the vehicle and Williams complied;

- Keenan "patted Williams down for safety" and retrieved a folding knife concealed in the waistband of Williams' pants;

- when Keenan removed the knife from Williams' waistband, he could see into Williams' pocket and observed "a bag containing a mall amount of marijuana in it[;]"

- Keenan informed Williams that he suspected Williams was driving under the influence of marijuana;

- Williams denied driving under the influence of marijuana and "refused to perform any standardized field sobriety tests[;]"

- Keenan placed Williams in custody for suspicion of driving under the influence of marijuana and for the possession of marijuana;

- Williams was placed in the back of Gowans' police vehicle;

- Keenan summoned a tow truck for the SUV;

- Keenan and Gowans began an inventory search of the SUV in anticipation of the tow truck;

- Keenan smelled the distinct odor of marijuana inside the SUV;

- Gowans observed behind the driver's seat on the floorboard "a large white paper shopping bag…[and] [i]nside the open top of the bag…several large bundles of US Currency, filling the bag over half way[;]"

- Gowans told Keenan about the white paper shopping bag filled with U.S. currency and Keenan "immediately ended the inventory, secured the vehicle, and had it towed…to a locked facility for storage[;]"

23

- when Williams exited the SUV, Keenan saw four cellular telephones on the seat under his legs;

- during Keenan's interaction with Williams, "two of the phones were ringing almost constantly[;]"

- a "door key to the Courtyard Marriot Hotel in Monroeville" was also observed with the four cellular telephones;

- based upon Keenan's experience, it is common for drug traffickers to utilize rental vehicles to transport narcotics and multiple cellular telephones;

- Keenan requested Williams' criminal history, which showed that he had multiple felony drug convictions in Arizona;

- there was probable cause to believe that Williams had committed or was committing offenses involving the illegal trafficking of controlled substances; and

- there was probable cause to believe that the SUV was used and would continue to be used in connection with Williams' illegal trafficking of controlled substances.

(Gov't Ex. 2 (ECF No. 171-2) at 2-5.)

FOF 70.      On May 12, 2017, Keenan executed the SUV warrant.  (H.T. 1/12/2023 (ECF No. 202) at 115); (Gov't Ex. 3 (ECF No. 171-3) at 2-3.) He recovered the following items from the search:

- ten large bundles of U.S. currency;

- four cellular telephones; and

- one room key.

(Gov't Ex. 3 (ECF No. 171-3) at 3.)

### D. Search Warrant for and Search of Williams' Hotel Room

FOF 71.      On May 12, 2017, after the SUV warrant was executed, Keenan applied for, and at 2:15 p.m., was issued a search warrant for Williams' hotel room, i.e., room 416 of the Courtyard Marriot in Monroeville, Pennsylvania, (the "hotel room

warrant"). (H.T. 1/12/2023 (ECF No. 202) at 116, 123); (Gov't Ex. 4 (ECF No. 171-4));

(Gov't Ex. 5 (ECF No. 171-5).)

FOF 72.    The affidavit of probable cause upon which Keenan relied to obtain

the hotel room warrant contained the same information as the affidavit of probable

cause relied upon to obtain the SUV warrant with the following additional information:

- Williams' wallet was seized when Keenan searched him incident to arrest;

- $850.00, six debit cards, and one credit card were found inside the wallet;

- Keenan—based upon his experience—knew that "persons involved in the movement of large amounts of funds related to illegal activity frequently hold multiple accounts with multiple financial institutions in order to better conceal their proceeds from investigators[;]"

- during the search of the SUV (which was conducted earlier that day), Keenan smelled the odor of marijuana and seized four cellular telephones and a large white shopping bag "containing ten large, thick bundles of various denominations and US [sic] currency[;]"

- at or around the time Keenen executed the search warrant on the SUV, Keenan was informed by another law enforcement officer, i.e., "Detective Hetherington," that Hetherington went to the Courtyard Marriot hotel at 3962 William Penn Highway in Monroeville, Pennsylvania, spoke with employees at the front desk, and learned that room 416 of the hotel was rented in Williams' name through May 12, 2017;

- "Detective Currillo of [the] Pittsburgh Police" told Keenan that Williams was the subject of a narcotics investigations in the Pittsburgh area and was "identified as a major source for the influx of narcotics into Allegheny County[;]"

- on February 21, 2017, there was a search warrant executed at 2020 Sonny Street, where approximately 1,000 pounds of marijuana was recovered and a confidential informant told Churrillo that Williams was the source and owner of the marijuana;

- in April 2016, a reliable confidential informant provided information to Churrillo identifying Williams as "a major source of marijuana and cocaine in the Pittsburgh area[;]"

– in 2016, a confidential informant provided information "that resulted in a search warrant being executed at 341 Orange St [sic] in Penn Hills[,]" Churrillo "seized large amounts of marijuana, cocaine, [and] several handguns[,]" and the confidential informant identified Williams "as the source and supplier of the narcotics and firearms recovered[;]"

– there was probable cause to believe that Williams has committed and was committing offenses involving the illegal trafficking of controlled substances; and

– there was probable cause to believe that room 416 of the Courtyard Marriot in Monroeville, Pennsylvania, was being used in connection Williams' illegal trafficking of controlled substances.

(Gov't Ex. 4 (ECF No. 171-4).)

FOF 73.    On May 12, 2017, Keenan executed the hotel room warrant on room 416 of the Courtyard Marriot in Monroeville, Pennsylvania. (Gov't Ex. 5 (ECF No. 171-5).) The following items were recovered during the search:

– eight bundles of United States currency;

– two gold watches;

– one gold chain with pendant;

– two gold rings;

– one pair of diamond earrings;

– one gold and diamond bracelet;

– one iPad; and

– one folder of various "documents/indicia[.]"

(Gov't Ex. 5 (ECF No. 171-5).)

**E. Keenan's Report of the Traffic Stop**

FOF 74.    Keenan prepared a police report with respect to Gowans' traffic stop of Williams and Keenan's arrest of Williams ("Keenan's report"). (H.T. 1/12/2023

(ECF No. 202) at 71-72; Gov't Ex. 1 (ECF No. 204-3) at 2-7).) Keenan's report was assigned to him on May 11, 2017, and it was approved by "Greg Geppert" on May 14, 2017. (Gov't Ex. 1 (ECF No. 204-3) at 4.)  According to Gowans, Keenan's report "accurately reflects the incidents that happened that night." (H.T. 1/12/2023 (ECF No. 202) at 72.)

  FOF 75.  Gowans did not create any written documentation of his reasons or findings for conducting the traffic stop. (H.T. 1/12/2023 (ECF No. 202) at 89.)

  FOF 76.  Keenan's police report with respect to Gowans' traffic stop of Williams provided, in pertinent part:

- on May 11, 2017, he was on duty as the supervising officer for the Swissvale Police Department;

- he responded as backup to Gowans' traffic stop of Williams conducted "at approximately 2215"[15] based upon Williams' failure to stop at a stop sign and driving with "no taillights illuminated[;]"

- Williams provided Gowans his valid Florida driver's license;

- Williams' vehicle was registered to Enterprise Rental Car Company;

- Gowans asked Keenan to speak with Williams and ask to see a copy of the rental agreement for the SUV;

- Williams told Keenan he was in the business of real estate, he was in town to fix one of his rental properties, he was on his way back to his hotel in Penn Hills, and the rental agreement for the SUV was on his cellular telephone in his email;

- Keenan asked Williams at least three questions while Williams was scrolling through his cellular telephone looking for the rental agreement;

- during their conversation, Keenan "began to notice that…[Williams'] eyes were glassy and extremely bloodshot, his speech was slow and at times almost unintelligible, and that he appeared to be lethargic and having trouble maintaining focus[;]"

---

15  See supra note 4.

– Keenan "began to smell the distinct odor of marijuana coming from inside the vehicle[;]"

– Keenan asked Williams to exit the vehicle and Williams complied;

– Keenan "patted Williams down for safety" and retrieved a folding knife concealed in the waistband of Williams' pants;

– when Keenan removed the knife from Williams' waistband, he could see into Williams' pocket and observed "a bag containing a small amount of marijuana in it[;]"

– Keenan informed Williams that he suspected Williams was driving under the influence of marijuana;

– Williams denied driving under the influence of marijuana and "refused to perform any standardized field sobriety tests[;]"

– Keenan placed Williams in custody for suspicion of driving under the influence of marijuana and for the possession of marijuana;

– Williams was placed in the back of Gowans' police vehicle;

– Williams was eventually transported to the Allegheny County Jail by an officer "Susalla[;]"

– Keenan summoned a tow truck for the SUV;

– Keenan and Gowans began an inventory search of the SUV in anticipation of the tow truck;

– Keenan smelled the distinct odor of marijuana inside the SUV;

– Gowans observed behind the driver's seat on the floorboard "a large white paper shopping bag…[and] [i]nside the open top of the bag…several large bundles of US Currency, filling the bag over half way[;]"

– Gowans told Keenan about the white paper shopping bag filled with U.S. currency and Keenan "immediately ended the inventory, secured the vehicle, and had it towed…to a locked facility for storage[;]"

– when Williams exited the SUV, Keenan saw four cellular telephones on the seat under his legs;

– during Keenan's interaction with Williams, "two of the phones were ringing almost constantly[;]"

– a "door key to the Courtyard Marriot Hotel in Monroeville" was also observed with the four cellular telephones;

– based upon Keenan's experience, it is common for individuals involved in the narcotics trade to utilize rental vehicles to transport narcotics and multiple cellular telephones;

– Keenan requested Williams' criminal history, which showed that he had multiple felony drug convictions in Arizona;

– based upon the information contained in Keenan's report, he applied for and was granted a search warrant for the SUV;

– on May 12, 2017, "Detective Churrilla of Pittsburgh Police" contacted Keenan with respect to Williams;

– Churrilla informed Keenan that Williams "was the subject of multiple narcotics related investigations" in the Pittsburgh area and was identified "as a major source for the influx of narcotics into Allegheny County[;]"

– on February 21, 2017, there was a search warrant executed at 2020 Sonny Street, where approximately 1,000 pounds of marijuana was recovered and a confidential informant told Churrillo that Williams was the source and owner of the marijuana;

– in April 2016, a reliable confidential informant provided information to Churrillo identifying Williams as "a major source of marijuana and cocaine in the Pittsburgh area[;]"

– in 2016, a confidential informant provided information "that resulted in a search warrant being executed at 341 Orange St [sic] in Penn Hills[,]" Churrillo "seized large amounts of marijuana, cocaine, [and] several handguns[,]" and the confidential informant identified Williams "as the source and supplier of the narcotics and firearms recovered[;]"

– Keenan relied upon the foregoing information to apply for and obtain search warrants for the four cellular telephones seized from the SUV and room 416 of the Courtyard Marriot; and

– law enforcement executed the search warrant on room 416 and recovered: 8 additional bundles of United States currency, two men's watches, a gold chain and pendant, two gold rings, a pair of diamond earrings, a gold and diamond bracelet, an iPad, and a folder of documents, paperwork, indicia of ownership, and records.

(ECF No. 171-1 at 4-6.)

FOF 77.        Keenan filed charges against Williams for driving under the influence of marijuana in violation of 75 Pa. Cons. Stat. § 3802. (H.T. 1/12/2023 (ECF No. 202) at 112-13); (Gov't Ex. 12 (ECF No. 204-11.) On May 17, 2018, Williams pleaded guilty to those charges.[16] (Id.); (Gov't Ex. 12 (ECF No. 204-11).)

### F.  Search Warrants for and Search of the Electronic Devices

FOF 78.        On May 12, 2017, Keenan applied for and was issued four search warrants—one for each cellular telephone—for the *contents* of the four cellular telephones seized from the SUV (the "first content warrants"). (H.T. 1/12/2023 (ECF No. 202) at 117-18); (Gov't Ex. 7 (ECF No. 171-7).)

FOF 79.        Keenan applied for the first content warrants at approximately the same time he applied for the hotel room warrant,[17] and, therefore, the iPad had not been seized from room 416 at the time Keenan applied for the first content warrants.

FOF 80.        The affidavit of probable cause relied upon to obtain the first content warrants was nearly identical to the affidavit of probable cause relied upon the obtain the search warrant for the SUV. (Gov't Ex. 7 (ECF No. 171-7).)

FOF 81.        The first content warrants issued for the *contents* of the four cellular telephones provided: "This Warrant shall be served as soon as practicable and shall be

---

[16]    Williams was also charged for possession of marijuana, driving without taillights, and failing to stop at a stop sign. Those charges were withdrawn as part of Williams' plea agreement. (H.T. 1/12/2023 (ECF No. 202) at 139-40.)

[17]    The hotel room warrant was signed by the issuing judge on May 12, 2017, at 2:15 p.m. (ECF No. 171-4 at 1.) The first content warrants were signed by the issuing judge on May 12, 2017, respectively, at 2:20 p.m., 2:25 p.m., 2:30 p.m., and 2:35 p.m. (ECF No. 171-7 at 1, 11, 21, 31.)

served only between the hours of 6AM to 10PM but in no event later than…2:30 PM,

o'clock [on] May 14, 2017." (Gov't Ex. 7 (ECF No. 171-7) at 1.)

FOF 82.    According to Keenan, he "personally confirm[ed]" that the devices

were password protected, and, therefore, he was unable to access the devices. (H.T.

1/12/2023 (ECF No. 202) at 164.) Keenan explained:

> I picked up the device, secured it as evidence, applied for a search
> warrant for the device, returned to where the evidence was, looked at the
> device, and determined that it was pass-code protected. Then I took the
> device to a forensic examiner, who then made attempts to access the
> devices.

(H.T. 1/12/2023 (ECF No. 202) at 165.)

FOF 83.    The Swissvale Police Department did not have the technology to

extract data from cellular telephones. (H.T. 1/20/2023 (ECF No. 203) at 19.)

FOF 84.    According to Keenan, he turned over the four cellular telephones

and the iPad to a forensic scientist named "Matt…Rosenblum, Rosenthal, something of

that nature" to access the devices. (H.T. 1/12/2023 (ECF No. 202) at 164, 166.)

FOF 85.    Keenan testified that he learned that the forensic scientist was

unable to access the devices, and Keenan "took possession of the phones back from"

the forensic scientist. (H.T. 1/12/2023 (ECF No. 202) at 167-68.)

FOF 86.    Keenan did not execute the first content warrants for the contents

of the four cellular telephones seized from the SUV.

FOF 87.    Keenan "held on to" the four cellular telephones until William

Flaherty ("Flaherty"), a task force officer assigned to the Drug Enforcement

Administration by the Allegheny County District Attorney's Office, retrieved them from

him. (H.T. 1/12/2023 (ECF No. 202) at 170.)

FOF 88.        Michael Rosenberg ("Rosenberg"), a mobile device computer forensics examiner for the Allegheny County Police Department, was called to testify by Williams. (H.T. 1/20/2023 (ECF No. 203) at 5.)

FOF 89.        As a computer forensics examiner for the Allegheny County Police Department, Rosenberg extracts data from computers, cellular telephones, tablets, and "most electronic devices." (H.T. 1/20/2023 (ECF No. 203) at 6.)

FOF 90.        Law enforcement provides Rosenberg devices to be searched. (H.T. 1/20/2023 (ECF No. 203) at 6-7.) Law enforcement provides Rosenberg "either a search warrant or a consent to search" a particular device. (Id.)

FOF 91.        In 2017, a person could turn on a cellular telephone that was not password protected to "review the data and…visibly see it." (H.T. 1/20/2023 (ECF No. 203) at 23.) A person could not, however, "extract the data" from the cellular phone. (Id. at 23.)

FOF 92.        In 2017, Rosenberg had access to "Cellebrite." (H.T. 1/20/2023 (ECF No. 203) at 22.) Cellebrite was technology used by "most law enforcement agencies…in the United States" to perform "standard extractions" and "bypass locks." (Id. at 22.) In 2017, however Cellebrite could not unlock iPhones. (Id.)

FOF 93.        In 2017, Rosenberg was not aware of any other law enforcement agency that had the technology to access the password-protected iPad seized from Williams' hotel room. (H.T. 1/20/2023 (ECF No. 203) at 24.) In 2018, Rosenberg learned that "some agencies" had acquired the software that could have accessed the password-protected iPad. (Id.)

FOF 94.    From 2017 to 2019, the Allegheny County Police Department acquired more technology to extract data from cellular telephones. (H.T. 1/20/2023 (ECF No. 203) at 20.) Rosenberg's ability to extract data from electronic devices has, therefore, increased "[t]remendously[.]" (Id.)

FOF 95.    In 2019, technology existed that permitted Rosenberg to access devices, e.g., a cellular telephone, even those devices which were password protected. (H.T. 1/20/2023 (ECF No. 203) at 11.) Rosenberg first used that kind of technology in late 2018 or early 2019. (Id.)

FOF 96.    Rosenberg was aware that the technology used to access password-protected devices existed prior to late 2018 or early 2019 and reached out to other law enforcements agencies "to see if…[he] could use it." (H.T. 1/20/2023 (ECF No. 203) at 11.)

FOF 97.    Rosenberg did not have any record of Keenan approaching him about extracting device data in 2017. (H.T. 1/20/2023 (ECF No. 203) at 24.) According to Rosenberg, if Keenan asked Rosenberg to extract the data off the four cellular telephones and iPad in 2017, Rosenberg would have "examined the phones, turned them on, saw that they were unlocked, and extracted the data to the phones that…[he] could have." (Id.)

FOF 98.    Rosenberg identifies the make and model of a device and plugs the device into the Allegheny County Police's software to start extraction of the data from the device. (H.T. 1/20/2023 (ECF No. 203) at 7.)

FOF 99.     Rosenberg creates a written report of his work, and, if data is extracted from a device, "an image" of the device is "provided back to the submitting officers." (H.T. 1/20/2023 (ECF No. 203) at 7.)

FOF 100.     If Rosenberg cannot "get into" a device, he does not write a report. (H.T. 1/20/2023 (ECF No. 203) at 7.) He explained:

> If I can actually do something with the device itself, I will create a record. Sometimes communications or conversations happen over the phone with detectives, when they ask me if I can get into said phone or not, and I'll tell them over the phone. In that case, I don't actually write a report for this.

(Id. at 7-8.)

FOF 101.     If Rosenberg physically takes custody of a device and has it in his possession, he will write a report. (H.T. 1/20/2023 (ECF No. 203) at 8.)

FOF 102.     Flaherty testified on behalf of the government. (H.T. 1/20/2023 (ECF No. 203) at 27.)

FOF 103.     In 2019, Flaherty applied for five search warrants: four to search each of the four cellular telephones seized from the SUV, and one to search the iPad seized from Williams' hotel room in May 2017 (the "second content warrants"). (H.T. 1/20/2023 (ECF No. 203) at 27.)

FOF 104.     Flaherty's affidavit of probable cause provided, among other things:

– Flaherty's training and experience, including specific experience investigating drug trafficking crimes;

– that drug traffickers rely heavily upon the use of cellular telephones to conduct their illicit activities;

– an investigation conducted in 2017 led law enforcement to believe a third party, Shayanya Thomas, transported cocaine on behalf of Williams, and Williams was storing that cocaine at the house of his girlfriend, Kristen Hylton;

– the details of the May 11, 2017, traffic stop of Williams conducted by Gowans and the events that occurred after the traffic stop as reported by Keenan,

including the searches conducted pursuant to search warrants of the SUV and room 416;

– that on August 29, 2017, law enforcement executed a search warrant on Williams' hotel room, i.e., Room 219 of the Extended Stay America in Monroeville, Pennsylvania, and recovered seventeen kilograms of cocaine, $192,854.00 in U.S. currency;

– Williams was arrested and charged in this case based upon the August 29, 2017, search and seizure;

– on March 31, 2018, law enforcement in Arizona seized five kilograms of cocaine from a vehicle registered to Williams' wife, Cassandra Williams; and

– based upon the foregoing, Flaherty had probable cause to believe that evidence of the commission of a federal felony would be found in the four cellular telephones and the iPad seized from Williams on May 12, 2017.

(ECF No. 204-10.)

FOF 105.    With respect to Keenan's understanding about the password protection on the four cellular telephones and law enforcement's technology to access those devices, Flaherty's affidavit of probable cause provided:

On May 12, 2017, Detective Keenan applied for and was granted search warrants for the cellular telephones located in the rental vehicle that WILLIAMS was operating, as well as the Courtyard Marriott room 416. Detective Keenan could not access the information in the cellular telephones because the cellular telephone were password protected and the technology did not then exist to bypass the passwords. That technology now exists.

(ECF No. 204-10 ¶ 29.)

FOF 106.    With respect to drug traffickers' use of electronic devices, e.g., cellular telephones and tablets like an iPad, Flaherty's affidavit of probable cause provided:

I am aware that evidence of drug, firearm, and money laundering crimes can often be found in electronic media, including cellular telephones, laptop computers, cameras, and tablet devices. Such evidence can be found throughout those items, such as in text messages, contact lists indicating

the names and numbers of associates, call/text logs indicating calls/texts made to and received from associates, online search history files, word processing documents, and photograph and video gallery files. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging and photographing, can now be performed from many cell phones. In addition, as noted above, those involved in drug and firearm trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of such trafficking. Moreover, the particular numbers of, and the particular numbers dialed by, particular cellular telephones can be evidence of drug trafficking, particularly in light of the fact that it is a practical necessity that drug traffickers communicate with each other, as well as with their customers and suppliers, by telephone. Such numbers can confirm identities of particular associates and the occurrence of certain events.

(ECF No. 204-10 ¶ 7.)

FOF 107.    Flaherty did not believe it was advantageous to wait until 2019 to apply for and execute search warrants on those devices, i.e., it was not part of any strategy or plan. (H.T. 1/20/2023 (ECF No. 203) at 26-27.)

FOF 108.    Flaherty understood that in 2017, the technology did not exist to gain access to cellular telephones that were password-protected. (H.T. 1/20/2023 (ECF No. 203) at 28.) By 2019, however, he believed that the technology had advanced to permit law enforcement to access cellular telephones that were password protected. (Id.)

FOF 109.    Flaherty believed that the four cellular telephones and iPad at issue in this case were all password protected. (H.T. 1/20/2023 (ECF No. 203) at 28.) Flaherty would be surprised to learn that the devices were not password protected. (Id.)

FOF 110.     Flaherty did not ask Keenan to see the devices seized from Williams in 2017 or otherwise confirm whether the devices were password protected. (H.T. 1/20/2023 (ECF No. 203) at 29.)

FOF 111.     In July 2017, Flaherty took custody of currency and jewelry seized from Williams. (H.T. 1/20/2023 (ECF No. 203) at 30.)

FOF 112.     In 2019, Flaherty took custody of the four cellular telephones and iPad seized from Williams by Keenan. (H.T. 1/20/2023 (ECF No. 203) at 30.)

FOF 113.     Flaherty provided Rosenberg the four cellular telephones and iPad for extraction. (H.T. 1/20/2023 (ECF No. 203) at 9.)

FOF 114.     On August 5, 2019, Rosenberg created a report with respect to the four cellular telephones seized from the SUV and the iPad seized from Williams' hotel room. (H.T. 1/20/2023 (ECF No. 203) at 9; Def. Ex. B.)

FOF 115.     With respect to one of the cellular telephones seized from the SUV, i.e., a gold Apple iPhone marked as "Exhibit N-26" ("cellphone N-26"), at or around the time Flaherty applied for the search warrants for the four cellular telephones and iPad in 2019, Flaherty obtained the password for cellphone N-26 from Tetrault. (H.T. 1/20/2023 (ECF No. 203) at 31-32.) Flaherty provided the password to Rosenberg. (Id.) Rosenberg, therefore, did not need special technology to access the device. (Id.)

FOF 116.     Another cellular telephone seized from the SUV, i.e., a white LG cellular telephone listed as "Exhibit N-28," was not password protected. (H.T. 1/20/2023 (ECF No. 203) at 12.) Rosenberg, therefore, accessed the device without using any special technology. (Id.)

FOF 117.      Another cellular telephone seized from the SUV, i.e., a black Samsung cellular telephone listed as "Exhibit N-29," was not password protected. (H.T. 1/20/2023 (ECF No. 203) at 13.) Rosenberg, therefore, accessed the device without using any special technology. (Id.)

FOF 118.      Rosenberg did not remember whether another cellular telephone seized from the SUV, i.e., a black Samsung cellular telephone listed as "Exhibit N-30" ("cellphone N-30"), was password protected. (H.T. 1/20/2023 (ECF No. 203) at 14.) Rosenberg, however, was able to access the device without using any special technology. (Id.)

FOF 119.      According to Rosenberg, even if cellphone N-30 was password protected, as early as 2017, he had the technology to bypass any password protection on that specific make and model of phone. (H.T. 1/20/2023 (ECF No. 203) at 14.)

FOF 120.      The iPad seized from Williams' hotel room, i.e., a black Apple iPad listed as "Exhibit N-27," was password protected. (H.T. 1/20/2023 (ECF No. 203) at 15.) Rosenberg used his special technology, i.e., "Graykey[,]" to access the device without knowing the passcode for the device. (Id.)

## IV.   Conclusions of Law

### A.  Traffic Stop of Williams on May 11, 2017

COL 1.      The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. CONST. AMEND. IV.

COL 2.      The government must prove, by a preponderance of the evidence, that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005).

COL 3.        Evidence obtained from an investigatory stop made without reasonable suspicion may be suppressed as "fruit of the poisonous tree."  United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006) (quoting Wong Sun v. United States, 371 U.S. 471, 487–88 (1963)).

COL 4.        A basic premise of the search and seizure doctrine is that seizures and searches undertaken without judicial oversight and a warrant issued upon probable cause are "per se unreasonable," subject only to a few specifically established exceptions.  Katz v. United States, 389 U.S. 347, 357 (1967).

COL 5.        The Supreme Court established one such exception in Terry v. Ohio, 392 U.S. 1, 30 (1968), holding that a police officer may conduct a brief, investigatory stop when the officer, accounting for his professional experience, has a reasonable, articulable suspicion that criminal activity may be afoot. The reasonable suspicion standard delineated in Terry applies equally to routine traffic stops.  United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006).

COL 6.        The government has the initial burden to prove that a Terry stop is based on reasonable suspicion.  Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

COL 7.        Reasonable suspicion is an "elusive concept," but it unequivocally demands that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417–18 (1981).

COL 8.        Courts "afford significant deference to a law enforcement officer's determination of reasonable suspicion."  United States v. Foster, 891 F.3d 93, 104 (3d Cir. 2018).

COL 9.    Although the Supreme Court has not specifically defined the phrase "reasonable suspicion," the "essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account."  Cortez, 449 U.S. at 418.  Seemingly innocent factors that may elude an untrained person can support reasonable suspicion based on an officer's training and experience.  Foster, 891 F.3d at 104.

COL 10.    Stopping an automobile based upon at least articulable and reasonable suspicion that either a vehicle or an occupant is in violation of the law is not unreasonable under the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 663 (1979). The foremost method for police officers to enforce traffic and vehicle safety regulations is by acting upon those observed violations. Id. at 659.

COL 11.    A police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation.  United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004).

COL 12.    One district court has explained:

"[I]t is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations." United States v. Moorefield, 111 F.3d 10, 12 (3d Cir. 1997). "[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006); United States v. Lewis, 672 F.3d 232, 237, 56 V.I. 871, 879 (3d Cir. 2012) ("[P]retextual traffic stops supported  by reasonable suspicion do  not  run  afoul  of  the  Fourth Amendment.").

United States v. Cook, No. 3:CR-16-312, 2021 WL 1534980, at *6 (M.D. Pa. Apr. 19, 2021).

COL 13.      Reasonable suspicion can be based upon an officer's mistaken

understanding or knowledge of the state's applicable traffic laws.  Heien v. North

Carolina, 574 U.S. 54, 60-61 (2014).

COL 14.      Under Pennsylvania law, "[f]ailing to stop at a stop sign is a

violation of the Motor Vehicle Code." United States v. Lee, No. CRIM.A. 05-216, 2006

WL 494423, at *3 (E.D. Pa. Mar. 30, 2006) (citing 75 PA. CONS. STAT. § 3323(b)).[18]

COL 15.      A driver's failure to have the taillights of his or her vehicle

illuminated between sunset and sunrise violates the Pennsylvania Motor Vehicle Code.

United States v. Cook, No. 3:CR-16-312, 2021 WL 1534980, at *6 (M.D. Pa. Apr. 19,

2021) (citing 75 PA. CONS. STAT. § 4302).[19]

---

[18]      Section 3323(b) provides:

**(b) Duties at stop signs.--**Except when directed to proceed by a police
officer or appropriately attired persons authorized to direct, control or
regulate traffic, every driver of a vehicle approaching a stop sign shall stop
at a clearly marked stop line or, if no stop line is present, before entering a
crosswalk on the near side of the intersection or, if no crosswalk is present,
then at the point nearest the intersecting roadway where the driver has a
clear view of approaching traffic on the intersecting roadway before
entering. If, after stopping at a crosswalk or clearly marked stop line, a driver
does not have a clear view of approaching traffic, the driver shall after
yielding the right-of-way to any pedestrian in the crosswalk slowly pull
forward from the stopped position to a point where the driver has a clear
view of approaching traffic. The driver shall yield the right-of-way to any
vehicle in the intersection or approaching on another roadway so closely as
to constitute a hazard during the time when the driver is moving across or
within the intersection or junction of roadways and enter the intersection
when it is safe to do so.

75 PA. CONS. STAT. § 3323(b).

[19]      Section 4302 provides:

**(a) General rule.--**The operator of a vehicle upon a highway shall display
the lighted head lamps and other lamps and illuminating devices

COL 16.    The evidence of record in this case shows that it is more likely than not that:

- at or around 9:45 p.m. on May 11, 2017, i.e., after it became dark outside, Gowans saw that the SUV failed to stop at the stop sign on Monongahela Avenue, where it intersects with the I-376 Eastbound off-ramp for the Swissvale Exit, in Swissvale, Pennsylvania (H.T. 1/12/2023 (ECF No. 202) at 59-60), and

- Gowans observed that the SUV did not have its "taillights on" as it proceeded through the intersection (id. at 60.)

COL 17.    Gowans' observations that the SUV did not stop at the stop sign and did not have illuminated taillights provided him reasonable suspicion that the driver of the SUV violated §§ 3323(b) and 4302 of the Pennsylvania Motor Vehicle Code.

---

required under this chapter for different classes of vehicles, subject to exceptions with respect to parked vehicles, at the following times:

(1) Between sunset and sunrise.

(2) Any time when the operator cannot discern a person or vehicle upon the highway from a distance of 1,000 feet due to insufficient light or unfavorable atmospheric conditions, including rain, snow, sleet, hail, fog, smoke or smog.

(3) Any time when the vehicle's windshield wipers are in continuous or intermittent use due to precipitation or atmospheric moisture, including rain, snow, sleet or mist.

**(b) Signal lights.--**Stop lights, turn signals and other signaling devices shall be lighted as prescribed in this title.

**(c) Applicability.--**This section shall not apply to motorcycles.

75 PA. CONS. STAT. § 4302.

Gowans, therefore, was permitted to conduct a traffic stop of the SUV. <u>Bonner</u>, 363 F.3d at 216; <u>Cook</u>, 2021 WL 1534980, at *6 .

COL 18.      Williams argues, however, that this court should discredit Gowans' testimony about the traffic stop because the government did not present any evidence corroborating Gowans' observations upon which the traffic stop was based. According to Williams, if the court discredits Gowans' testimony, there is no evidence of record that Gowans had reasonable suspicion to conduct the traffic stop.

COL 19.      Williams argues that the court should discredit Gowans' testimony because Gowans did not make a written record of the traffic stop, he discarded the citation, no other officers observed Williams' traffic violations, and there was no dashboard camera or body camera footage of the traffic stop. (ECF No. 205 at 26-27.)

COL 20.      The court, however, finds that Gowans' testimony about his observations of the SUV before the traffic stop, i.e., the SUV did not stop at the stop sign and did not have taillights illuminated, was credible even without consideration of corroborating testimony.

COL 21.      First, Gowans did not know Williams or know of Williams prior to conducting the traffic stop; indeed, there was no evidence of record to show that Gowans was asked by another law enforcement officer to conduct a traffic stop of Williams.

COL 22.      Second, there is no requirement that Gowans' testimony about the traffic stop be corroborated before this court finds the testimony credible and a basis upon which to find that Gowans had reasonable suspicion to believe that the driver of the SUV, i.e., Williams, violated the Pennsylvania Motor Vehicle Code. Under those

circumstances, whether another law enforcement officer saw Williams' traffic violations or whether there was dashboard camera or body camera footage are not determinative of Gowans' credibility in this case.

COL 23.    With respect to Williams' argument that Gowans did not create a written report of his observations, Gowans credibly testified that—after he found the large white shopping bag behind the driver's seat of the SUV and Keenan stopped the inventory search—Gowans' role in the traffic stop and arrest of Williams ceased. Keenan, therefore, wrote the police report about the traffic stop and arrest. Whether Gowans had any written record of the traffic stop is not, therefore, determinative of Gowans' credibility.

COL 24.    Williams argues that Gowans "inexplicably" discarded the citation about Williams' traffic violations. Gowans, however, credibly testified that he began to write Williams a citation for the violations of sections 3323(b) and 4302, but did not complete the citation because, pursuant to his understanding of the Pennsylvania Rules of Criminal Procedure:

> [W]hen someone is charged criminally, summary traffic offenses get added on to the criminal charges later. So you wouldn't -- you wouldn't cite someone for a summary traffic violation and then charge them criminally on a separate document.

(H.T. 1/12/2023 (ECF No. 202) at 61.) Williams was charged with driving under the influence of marijuana in violation of 75 PA. CONS. STAT. § 3802, possessing marijuana, and violating sections 3323(b) and 4302. Williams pleaded guilty to driving under the influence of marijuana. The other charges, including the charges based upon violations of sections 3323(b) and 4302 were withdrawn, pursuant to his plea agreement with the state prosecutors. Under those circumstances, Williams' argument that Gowans

"inexplicably" discarded the citation lacks merit, is belied by the record, and is not a basis upon which to find that Gowans' testimony about the traffic stop is unworthy of belief.

COL 25.    Based upon the foregoing, the government satisfied its burden to show that Gowans' traffic stop of the SUV, which was driven by Williams, was reasonable because it was based upon Gowans' reasonable suspicion that Williams violated sections 3323(b) and 4302 of the Pennsylvania Motor Vehicle Code.

COL 26.    Williams' motion to suppress will, therefore, be denied with respect to his argument that Gowans lacks reasonable suspicion to conduct a traffic stop of the SUV driven by Williams.

### B.  The timing of the traffic stop

COL 27.    " '[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.' " United States v. Hurtt, 31 F.4th 152, 159 (3d Cir. 2022) (quoting Rodriguez v. United States, 575 U.S. 348, 350 (2015)).

COL 28.    The court "must consider the 'mission' of the traffic stop and any related safety concerns or incidental activities when evaluating whether officers took an unreasonable amount of time to complete it." United States v. Simmons, No. 1:22-CR-175, 2023 WL 157992, at *4 (M.D. Pa. Jan. 11, 2023) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

COL 29.    "Tasks ordinarily tied to the mission of a traffic stop include: 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of

insurance.'" United States v. Eddings, No. CR 21-117, 2023 WL 1775705, at *8 (W.D.

Pa. Feb. 6, 2023) (quoting Rodriguez, 575 U.S. at 355).

COL 30.      On the other hand, " '[a]n unreasonable extension occurs when an

officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to

investigate other crimes.' " Hurtt, 31 F.4th at 159 (quoting United States v. Green, 897

F.3d 173 (3d Cir. 2018)).

COL 31.      The court in Simmons explained;

> The Court of Appeals for the Third Circuit employs a two-step analysis to determine whether police officers violated the Fourth Amendment by needlessly prolonging a lawfully initiated traffic stop. See Green, 897 F.3d at 179. First, we must pinpoint "when the stop was measurably extended"—i.e., when the "Rodriguez moment" occurred. See id. (internal quotations marks and citations omitted). Second, we must determine whether the investigating officers possessed reasonable suspicion to extend the stop at the Rodriguez moment. See id. Events that occurred after the Rodriguez moment cannot inform our determination. See Hurtt, 31 F.4th at 159 (citing Green, 897 F.3d at 182). " '[U]nrelated inquiries' resulting in even a de minimis extension [of the traffic stop] are unlawful if not supported by reasonable suspicion." See id. at 160 (citing Rodriguez, 575 U.S. at 375). The purpose of this two-step inquiry is to determine "whether the mission of the traffic stop was continuously carried out before the discovery of evidence giving rise to a reasonable suspicion of criminality." See id. at 159. If investigators possessed reasonable suspicion of criminal activity at or before the Rodriguez moment, no Fourth Amendment violation has occurred. See Garner, 961 F.3d at 271.

Simmons, 2023 WL 157992, at *4.

COL 32.      "[I]f the investigating officer had reasonable suspicion prior to

the Rodriguez moment, then there is no Fourth Amendment violation." United States v.

Robertson, No. CR 18-264, 2020 WL 3574368, at *9 (W.D. Pa. June 29, 2020) (citing

United States v. Garner, 961 F.3d 264, 271-72 (3d Cir. May 29, 2020)).

COL 33.      Here, the evidence of record shows that:

– Gowans' traffic stop of the SUV began at or around 9:46 p.m.;

– Gowans notified dispatch of his location via the radio and provided dispatch the SUV's registration, license plate number, and a brief description of the SUV;

– dispatch opened an "incident" in the dispatch system and ran the vehicle to obtain the registration information;

– Gowans learned from dispatch that the SUV was a rental vehicle;

– when Gowans contacted dispatch, he was automatically provided police backup with respect to the stop via Swissvale Police Department Policy;

– Gowans exited his police vehicle and approached the SUV;

– Gowans introduced himself to the driver of the SUV, informed the driver of the reasons he was pulled over, and  requested the driver's license, registration, and proof of insurance;

– Gowans requested the driver to produce a rental agreement for the SUV because the vehicle was a rental vehicle;

– Williams did not provide Gowans proof of insurance or a rental agreement for the SUV, or otherwise demonstrate to Gowans that he had the authority to operate the SUV;

– Gowans returned to his police vehicle;

– Gowans, via the radio, provided dispatch Williams' driver's license number;

– Gowans did not remember how long it took for dispatch to provide information about Williams based upon Williams' driver's license, but when a driver's license is from out of state and not issued by Pennsylvania, it can take dispatch a longer time to retrieve information about the driver;

– dispatch responded to Gowans and confirmed that Williams had a valid driver's license issued by the state of Florida, and, therefore, he was permitted to operate a motor vehicle in the state of Pennsylvania;

– Gowans was still in his police vehicle providing and receiving information from dispatch about Williams' driver's license when Keenan arrived on scene;

– Keenan testified[20] that he arrived on scene approximately three to five minutes after Gowans initially contacted dispatch, but in his police report and six affidavits of probable cause, he reported that he arrived on scene at approximately 10:15 p.m.,[21] i.e., 29 minutes after Gowans initiated the traffic stop;

– according Gowans, it did not take Keenan twenty-nine minutes to arrive on scene as backup;

– Keenan testified that his estimate that he arrived on scene at 10:15 p.m. was an embarrassing error;

– Gowans told Keenan that the SUV was a rental vehicle, but that Gowans had not obtained the rental agreement from Williams;

– Gowans was preparing the citation when Keenan approached Williams in the SUV;

---

[20]     Williams argues that this court should not rely upon any testimony by Keenan because of the discrepancy between Keenan's testimony and Rosenberg's testimony with respect to whether Keenan provided Rosenberg the four cellular telephones for examination in 2017. Based upon this court's observations, however, Keenan testified truthfully about his arrival on scene at Gowans' traffic stop of the SUV driven by Williams and the creation of his police report and affidavits of probable cause in support of the search warrants he obtained for the SUV, room 416, and the contents of the four cellular telephones. The witnesses were sequestered during the suppression hearing and Keenan's testimony was in large part corroborated by Gowans' testimony and the documentary and circumstantial evidence presented by the parties. Keenan also testified that he tried "**the** device" and it was password protected. He did not testify that he tried all the devices. Under those circumstances, any discrepancies in the testimonies by Keenan and Rosenberg with respect to the four cellular telephones did not render all testimony by Keenan unworthy of belief. Washington v. Napolitano, 29 F.4th 93, 116 (2d Cir.), cert. denied, 143 S. Ct. 485 (2022) (explaining that judges "are not required to accept the statements of witnesses in an all-or-nothing fashion"); United States v. Forsythe, 141 F.3d 1171 (8th Cir. 1998) (explaining that a district court may credit a witness' testimony "in whole or in part"); Hill v. Wetzel, No. 12-CV-2185, 2015 WL 12745810, at *25 (E.D. Pa. Apr. 22, 2015), report and recommendation adopted in part, 279 F. Supp. 3d 550 (E.D. Pa. 2016) (recognizing that it was an accurate statement of the law to instruct the jury that they could determine the witness' testimony was believable "in whole or in part").

[21]     See supra note 4.

–   Keenan approached the driver's side of the SUV and spoke with Williams;

–   Keenan introduced himself, explained that the rental car company requested that the Swissvale Police Department verify that operators of vehicles allowed on the rental agreement, and asked Williams to provide a copy of the rental agreement;

–   Williams responded that he thought he had the rental agreement on his cellular telephone in his email;

–   within approximately thirty seconds of walking up to Williams' SUV, Keenan lowered his position to hear and understand Williams, who spoke with an accent;

–   as Keenan lowered his head to Williams' window, the odor of marijuana increased in strength and became very pungent;

–   for approximately five to ten minutes, Williams scrolled through his cellular telephone while continuing to talk to Keenan;

–   during this time, Williams continually stopped talking and lost his train of thought;

–   Keenan continually redirected Williams to the task at hand, i.e., Williams looking for the rental agreement on his cellular telephone;

–   during their interaction, Keenan noticed that Williams' eyes were glassy and bloodshot and that his speech was slow and lethargic;

–   Keenan suspected that—based upon the odor of marijuana emanating from the SUV—Williams was under the influence of marijuana;

–   five to ten minutes after speaking with Williams, Keenan asked Williams to step outside the vehicle to investigate whether Williams was driving under the influence of marijuana;

–   Gowans had not finished issuing Williams the citation when he saw Williams exit the SUV, which he estimated was ten minutes after he conducted the traffic stop;

–   Williams never provided Keenan a rental agreement or any other verification that Williams was a lawful driver of the SUV;

–   when Gowans saw Williams exit the SUV, he stopped writing the citation and exited his police vehicle;

49

- Gowans saw Keenan perform a search of Williams' person and seize a knife from Williams' waistband and a small amount of marijuana from his pants pocket;

- Williams refused to undergo a field sobriety test;

- Keenan was confident that Williams was under the influence of marijuana and that he possessed marijuana, i.e., the baggie of marijuana that Keenan retrieved from Williams' pocket;

- after a search incident to arrest, Williams was secured in the back of Gowans' police vehicle;

- Gowans intended to issue Williams a traffic citation because he did not stop at the stop sign and a verbal warning for the taillight violation; and

- Gowans never issued Williams a citation because Keenan charged him with, among other things, driving under the influence of marijuana, and the summary traffic charges were added to Keenan's charging document.

COL 34.     Based upon the foregoing, there is evidence of record, i.e., the testimony by Gowans and Keenan, that backup is automatically provided by the Swissvale Police Department once a police officer calls out a traffic stop, Swissvale is a small community, Keenan arrived on scene approximately three to five minutes after Gowans initiated the traffic stop, Keenan spoke with Williams for approximately five to ten minutes, and Keenan ordered Williams to exit his vehicle ten minutes after Gowans initiated the traffic stop. In other words, there is evidence of record that the traffic stop was initiated at 9:46 p.m., Keenan arrived on scene at approximately 9:51 p.m., and Williams was asked to exit his vehicle because Keenan suspected he was driving under the influence of marijuana by approximately 10:01 p.m.

COL 35.     On the other hand, there is evidence via the police report and the six affidavits of probable cause that Keenan arrived on scene at 10:15 p.m., i.e., twenty-nine minutes after Gowans conducted the traffic stop, engaged Williams in conversation while

he searched for the rental agreement for ten minutes, and then asked him to exit the vehicle at approximately 10:25 p.m. Thus, the traffic stop arguably lasted for more than thirty-nine minutes, i.e., from at least 9:46 p.m. to 10:25 p.m.

COL 36.    The court finds that the testimony by Keenan and Gowans with respect to the timing of the traffic stop, i.e., the time at which Keenan arrived on scene, is more credible than the evidence of the police report and affidavits of probable cause and shows it is more likely than not that Keenan arrived on scene approximately five minutes after Gowans initiated the traffic stop, i.e., at or about 9:51 p.m. Keenan in the report wrote that he arrived *approximately* at 10:15 p.m., which signifies to the court that the time reported was an estimate; indeed, Keenan testified that 10:15 p.m. was only an estimate of the time he arrived on scene and that he forgot to verify the time and correct the police report, the language of which was copied and used in the six affidavits of probable cause. Keenan signed six affidavits of probable cause on May 12, 2017, i.e., the day following Williams' arrest, and, therefore, it is credible that he copied and pasted the language from the police report to the six affidavits of probable cause for which time was of the essence. For example, Keenan knew that room 416 of the Courtyard Marriot was rented in Williams' name only through May 12, 2017.

COL 37.    The temporal length of the traffic stop, however, is not necessarily determinative of the reasonableness of the traffic stop. Mitchell v. City of Indianapolis, No. 118CV00232SEBTAB, 2020 WL 1532201, at *15 (S.D. Ind. Mar. 31, 2020) (explaining that the temporal length of the stop, i.e., four minutes, was "not determinative of the reasonableness of the action under the circumstances"); Coles v. Carlini, 162 F. Supp. 3d 380, 391 (D.N.J. 2015) (explaining that "an investigatory traffic stop violates the Fourth

Amendment if it 'exceed[s] the time needed to handle the matter for which the stop was made,' even if the stop is prolonged by only a few minutes") (quoting Rodriguez, 375 U.S. at 350).

COL 38.      As discussed above, to determine whether the temporal length of the traffic stop of Williams was reasonable, the court must consider: (1) at what point the stop was measurably extended, i.e., the Rodriguez moment; and (2) whether Gowans or Keenan possessed reasonable suspicion to extend the stop at that point.

COL 39.      Keenan measurably extended[22] the traffic stop when he asked Williams to step outside the vehicle to investigate whether Williams was under the influence of marijuana. Even before that point, however, Keenan had reasonable suspicion that Williams committed the crime of driving under the influence of marijuana.

COL 40.      First, Keenan knew Gowans conducted a traffic stop of Williams, i.e., Williams drove the SUV, and Williams was sitting behind the steering wheel of the vehicle.

---

[22]      The Third Circuit Court of Appeals " 'call[s] the time at which a stop is measurably extended—'when tasks tied to the traffic stop are completed or reasonably should have been completed'—the ' 'Rodriguez moment.' " Eddings, 2023 WL 1775705, at *9 (quoting United States v. Burrus, 845 F. App'x 187, 189 (3d Cir. 2021)). At the time Keenan removed Williams from the SUV, the tasks tied to the traffic stop, including inspection of the rental agreement to confirm Williams was a lawful operator of the SUV, had not been completed because Williams had not provided Gowans or Keenan a copy of the rental agreement or any other document to show that he was a lawful occupant of the vehicle. See United States v. Langley, No. 3:15-CR-155, 2017 WL 4444208, at *8 (M.D. Pa. Oct. 5, 2017) (explaining that examining a rental agreement is a task tied to the mission of a traffic stop). Because Williams' lack of focus during his search for the rental agreement caused a delay in the traffic stop, Keenan's approximately ten-minute conversation with Williams did not give rise to the Rodriguez moment. Under those circumstances, the latest Rodriguez moment was when Keenan asked Williams to exit the SUV. The earliest Rodriguez moment was when Keenan smelled the odor of marijuana and noticed Williams' glassy and bloodshot eyes, slow and lethargic speech, and difficulty staying focused.

COL 41.     Second, as Keenan lowered himself to Williams to hear and understand what he was saying, he smelled an increasingly pungent odor of marijuana emanating from the vehicle.

COL 42.     Third, Keenan—who used a flashlight to illuminate his immediate surroundings—saw that Keenan's eyes were bloodshot and glassy.

COL 43.     Fourth, Keenan noticed that Williams' speech was slow and lethargic and that he had continual difficulty staying on task and engaging with Keenan.

COL 44.     Based upon the foregoing, which was credibly testified to during the suppression hearing,[23] Keenan had reasonable suspicion to believe that Williams

---

[23]     Williams argues that Keenan's testimony that he smelled the odor of marijuana emanating from the SUV and observed Williams' bloodshot and glassy eyes, slow and lethargic speech, and difficulty focusing was not credible. As discussed above, however, Williams pleaded guilty to driving under the influence of marijuana. Williams' guilty plea "does not…factor directly into the probable cause calculus," but it supports the court's conclusion that Keenan's testimony was credible with respect to Keenan smelling the pungent odor of marijuana emanating from the SUV and observing Williams' bloodshot and glassy eyes, slow and lethargic speech, and difficulty focusing. United States v. Harrison, Crim. A. No. 17-59, 2018 WL 1325777, at *1 (D. Del. Mar. 15, 2018) (explaining that the defendant's statements about marijuana use made post-arrest supported the court's conclusion that the testimony by the arresting officer that he smelled marijuana when he opened the defendant's car door was credible).

With respect to Williams' argument that that the only marijuana found on scene was the small baggie of marijuana on Williams' person, which "would not be sufficient to emanate a smell of marijuana from the vehicle." (ECF No. 208 at 8.) One district court has explained:

> And the fact that no evidence was introduced that marijuana, burnt or otherwise, was found in the vehicle or on Defendants' persons does not refute the officers' testimony. The evidence introduced at the hearing does not foreclose consideration that burnt marijuana might have recently been in the vehicle or in Defendants' possession while in the vehicle. Officer Torbush testified that, with the odor of burnt marijuana, although he has found residue, generally if burnt, no marijuana is left so that a subsequent search does not locate any marijuana. (Tr. at 63-64). In Salley, 341 Fed. Appx. 498, the defendant challenged the finding of the trial court that the officer's testimony was credible that he smelled the odor of burnt marijuana

committed the crime of driving the SUV while under the influence of marijuana before he

measurably extended the traffic stop by removing Williams from the SUV.

COL 45.    Under those circumstances, the traffic stop was not unreasonably

prolonged in violation of the Fourth Amendment. Robertson, 2020 WL 3574368, at *9

---

because there was no evidence that the defendant actually possessed or
was using marijuana. Id. at 499, 501 & n.4. The court rejected the
defendant's argument based on the lower court's finding, following a
rigorous cross-examination, that the officer's testimony was credible. Id. at
501. Likewise, in United States v. Dericho, 2015 WL 5687766 (M.D. Fla.
September 25, 2015), the court rejected the defendant's argument that the
officer's testimony that he smelled burnt marijuana was not credible
because no marijuana or related paraphernalia was found during the search
of his vehicle. Id., at **17-18. In that case, the officer "testified that a lack of
actual marijuana or related items in the vehicle is not necessarily
inconsistent with smelling the odor" because the marijuana could have been
smoked in the vehicle earlier or the smell could have been on the
defendant's clothing. Id., at *18. See also United States v. George, 2010
WL 431783, at *8 (E.D. Mo. February 2, 2010) (rejecting the defendant's
challenge to the officers' testimony as to the odor of marijuana based on no
other evidence of drug possession or use, the court stated, "in common
experience, the pungent odor of any smoked item, even cigarette smoke[,]
can linger in a vehicle for quite some time and, thus, a mild odor of burnt
marijuana could be smelled by the officers for a significant period of time
after the marijuana had been smoked")….Similarly in this case, failure to
find actual marijuana does not undermine the officers' credibility.

United States v. Brounson, No. 115CR00366ELRJFK, 2016 WL 4472983, at *9 (N.D.
Ga. May 23, 2016), report and recommendation adopted, No. 115CR00366ELRJFK,
2016 WL 4472971 (N.D. Ga. Aug. 23, 2016). Based upon the foregoing, the court does
not find that, because Keenan retrieved only a baggie of marijuana from Williams'
person at the scene, Keenan's testimony that he smelled the odor of marijuana
emanating from the vehicle is unworthy of belief.

(explaining that law enforcement does not violate the Fourth Amendment when reasonable suspicion exists before the <u>Rodriguez</u> moment).[24]

COL 46.    Williams argues, however, that Gowans unreasonably delayed the traffic stop by waiting twenty-nine minutes for Keenan's arrival. As discussed above, the court finds that Keenan arrived on scene in response to Gowans contacting dispatch three to five minutes after Gowans contacted dispatch at 9:46 p.m., rather than the twenty-nine minutes reflected in Keenan's police report and six affidavits of probable cause. In those three to five minutes, Gowans made contact with Williams and asked for his driver's license, registration, proof of insurance, and rental agreement for the vehicle, and returned to his police vehicle with Williams' Florida driver's license to write him a citation for failing to stop at the stop sign. Gowans' conduct in the three to five minutes was tied directly to the purpose of the traffic stop and lawful under the Fourth Amendment. <u>Eddings</u>, 2023 WL 1775705, at *8.

---

[24]    Williams in his proposed findings of fact and conclusions of law relies upon a "DL26 form" that he argues he signed on May 11, 2017, when he refused to perform a sobriety test. (ECF No. 205 ¶ 37.) According to Williams, the DL26 form shows that he signed the document at "2327 hrs" or 10:37 p.m., which further corroborates his argument that Gowans waited 29 minutes for Keenan to arrive on scene and Keenen arrived on scene at 10:15 p.m.  As the government points out, however, the DL26 form was not made a part of the record in this case, and, therefore, the government did not have an opportunity to question any of the witnesses about it. The court cannot rely upon a document that was not presented to the court.

     In any event, even if the court considered the DL26 form, the <u>Rodriguez</u> moment occurred prior to that time. Keenan testified that Williams was looking for the rental agreement and Keenan waited with Williams while Williams was doing so. During that time, Keenan developed reasonable suspicion to believe that Williams was under the influence of marijuana (the strong smell of marijuana and Williams' bloodshot and glassy eyes and slowed and lethargic speech), i.e., the <u>Rodriguez</u> moment. As the government argues, there is no evidence of record about where Williams was located when he signed the DL26 form, e.g., at the scene of the traffic stop, at the police station, or in jail. Under those circumstances, the DL26 form as described by Williams is not material to this court's decision to deny the motion to suppress.

COL 47.     Williams also argues that Keenan "further delayed the traffic stop unreasonably by asking Williams to retrieve the rental car agreement from his email on his phone." (ECF No. 205 at 31.) When Keenan asked Williams to step outside the SUV because he suspected Williams was under the influence of marijuana, however, the tasks tied to the traffic stop, e.g., checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration, proof of insurance, and rental agreement, had not been completed because Williams did not produce to Gowans or Keenan the rental agreement to show that he was a valid operator of the SUV. The Court of Appeals for the Tenth Circuit has recognized that "[a] driver's inability to produce a rental agreement may justify continued detention for the purpose of investigating his authority to drive the vehicle." United States v. Frazier, 30 F.4th 1165, 1177 (10th Cir. 2022). Under those circumstances, Keenan did not extend the traffic stop when he requested the rental agreement from Williams; rather, his request was a reasonable part of Gowans' original traffic stop. Keenan asking Williams to provide a copy of the rental agreement and permitting Williams approximately ten minutes to scroll through his cellular telephone to locate the rental agreement was reasonable.

COL 48.     Williams argues that Keenan could have shortened the duration of the traffic stop by contacting the rental car company himself to determine whether Williams was a lawful driver of the SUV. Keenan, however, testified that although there is a process that law enforcement can use to obtain records from certain rental car companies, that process is not usually performed on the scene of a traffic stop. There is no evidence of record to suggest that the rental car company at issue here, Enterprise Rental Car, provided records to law enforcement on-scene at a traffic stop. Williams told

Keenan he had the rental agreement in his email. Under those circumstances, it was reasonable for Keenan to request Williams locate the rental agreement on his cellular telephone; indeed, even if it was possible for Gowans or Keenan to contact the rental car company for the information, it arguably would have been quicker for Williams to locate the rental agreement on his cellular telephone. Based upon the foregoing, the court cannot conclude that Keenan's request for Williams to locate the rental agreement on his cellular telephone was an unlawful extension of the traffic stop or unreasonable.

COL 49.　　Gowans initiated the traffic stop at 9:46 p.m., Keenan arrived on scene at approximately 9:51 p.m., and Keenan asked Williams to exit the SUV because he suspected Williams was under the influence of marijuana at approximately 10:01 p.m. It was reasonable for Gowans and Keenan to ask Williams to produce a copy of the rental agreement to confirm Williams was a lawful operator of the SUV, but—even after searching his cellular telephone for ten minutes—Williams was unable to provide a copy of the rental agreement to them. By the time Keenan had reasonable suspicion that Williams committed the crime of driving under the influence of marijuana (after smelling the odor of marijuana emanating from the SUV and observing Williams' bloodshot and glassy eyes, slowed and lethargic speech, and inability to stay focused on the task at hand), Williams had not produced a copy of the rental agreement. Under those circumstances, the permissible tasks associated with an ordinary traffic stop had not been completed; rather, Keenen developed reasonable suspicion during the lawful course of the traffic stop, which permitted him to continue the traffic stop to investigate whether Williams committed the crime of driving under the influence of marijuana.

COL 50.     The motion to suppress will be denied with respect to Williams' argument that Keenan unlawfully prolonged the traffic stop in violation of the Fourth Amendment.

### C.  The Warrantless Search of the SUV

COL 51.     "'Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies.'" United States v. Mundy, 621 F.3d 283, 287 (3d Cir. 2010) (quoting California v. Acevedo, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991)).

COL 52.     The initial search of the SUV conducted by Gowans and Keenan, pursuant to which Gowans saw the white shopping bag containing bundles of United States currency, was conducted without a warrant. Williams argues that under those circumstances the search was unreasonable and all evidence obtained from that search should be suppressed.

COL 53.     The government argues, however, that the initial search of the SUV was reasonable because the search satisfied three exceptions to the warrant requirement: (1) the inventory search exception; (2) the automobile exception; and (3) the search incident to arrest exception.

COL 54.     It is undisputed that the initial search of the SUV was conducted without a warrant. Whether the government satisfied its burden to show by a preponderance of the evidence that one of the exceptions to the warrant requirement applies will be discussed below. United States v. Gilliam, No. 3:17-CR-258, 2020 WL 4570060, at *21 (M.D. Pa. Aug. 7, 2020) (explaining that the government has the burden to show by a preponderance of the evidence that suppression is unwarranted) (citing

Taylor v. Alabama, 457 U.S. 687, 690 (1982); United States v. Dupree, 617 F.3d 724, 738–39 (3d Cir. 2010); United States v. Pelullo, 173 F.3d 131, 138 (3d Cir. 1999)).

### 1. The inventory search exception.

COL 55.     "The Supreme Court has determined that one exception to the warrant requirement is for inventory searches of lawfully seized automobiles." Mundy, 621 U.S. at 287 (citing Colorado v. Bertine, 479 U.S. 367, 371 (1987)).

COL 56.     "Inventory procedures serve three 'strong governmental interests': '[1] to protect an owner's property while it is in the custody of the police, [2] to insure against claims of lost, stolen, or vandalized property, and [3] to guard the police from danger.'" Mundy, 621 F.3d at 287 (quoting Bertine, 479 U.S. at 372).

COL 57.     The court of appeals in Mundy explained:

> Lawful inventory searches must be "conducted according to standardized criteria" or established routine, consistent with the purpose of a non-investigative search. Id. at 374 n. 6, 107 S.Ct. 738. This requirement "tend[s] to ensure that the intrusion w[ill] be limited in scope to the extent necessary to carry out the caretaking function." Opperman, 428 U.S. at 375, 96 S.Ct. 3092. The criteria or routine must limit an officer's discretion in two ways: first, as to whether to search the vehicle, and second, as to the scope of an inventory search. Salmon, 944 F.2d at 1120-21 (citing Florida v. Wells, 495 U.S. 1, 4-5, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990); Bertine, 479 U.S. at 374 & n. 6, 375-76, 107 S.Ct. 738). These limitations ensure that officers performing these caretaking functions are " 'not [ ] allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of a crime.' " Id. at 1120 (quoting Wells, 495 U.S. at 4, 110 S.Ct. 1632 (quotation marks omitted)); see also Wells, 495 U.S. at 4, 110 S.Ct. 1632 ("[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.").

Mundy, 621 F.3d at 287-88.

COL 58.     Williams argues that the warrantless search of the SUV during which Gowans observed a white shopping bag filled with United States currency behind the driver's seat of the SUV was not a proper inventory search because the search did not

comply with the Swissvale Police Department's inventory policy. For example, neither Gowans nor Keenan made a sufficient inventory list of the items found inside the SUV and they did not seize and log the evidence found during the inventory search.

COL 59.      The evidence of record shows, however, that—once Williams was arrested and there were no authorized drivers of the SUV—Keenan determined that the SUV would be towed to an impound lot, pursuant to paragraph A of the Swissvale Police Department inventory policy. Gowans and Keenan *began* an inventory search of the SUV at the scene of the traffic stop in accordance with paragraph B of the policy. Once Gowans found the white shopping bag filled with United States currency, however, Keenan ended the inventory search. Keenan explained that at that point he believed the white shopping bag filled with United States currency was evidence of a crime, and, therefore, he wanted to obtain a search warrant to search the vehicle.

COL 60.      As Keenan pointed out, the Swissvale Police Department inventory policy explicitly provides that "the vehicle inventory policy shall not be utilized in lieu of a warrantless search or a search warrant." (Gov't Ex. 6 (ECF No. 204-8) at 8-9.) To safeguard any property located inside the SUV, Keenan sealed the SUV, had it towed to locked facility, and recorded the items observed during the inventory search in his police report.

COL 61.      Based upon the foregoing, Gowans and Keenan acted reasonably when they began the inventory search pursuant to the Swissvale Police Department inventory policy, saw the white shopping bag filled with United States currency, and stopped the inventory search to obtain a search warrant because Keenan suspected evidence of a crime would be found inside the SUV.

COL 62.      Under those circumstances, the inventory search exception to the warrant requirement is applicable in this case. Williams' motion to suppress will, therefore, be denied with respect to the initial warrantless search of the SUV.

### 2.  The Automobile Exception

COL 63.      "The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.' " United States v. Burton, 288 F.3d 91, 100 (3d Cir. 2002) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)).

COL 64.      Pursuant to the automobile exception, " '[i]f probable cause justifies the search ..., it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.' " Id. (quoting United States v. Ross, 456 U.S. 798, 825 (1982)).

COL 65.      "[P]robable cause does not dissipate after the automobile is immobilized because the exception does not include an exigency component." Id. (citing Maryland v. Dyson, 527 U.S. 465, 466 (1999)).

COL 66.      Under those circumstances, "the government can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search." Id.

COL 67.      In other words, "if the police have probable cause to justify a warrantless seizure of an automobile on a public roadway, they may conduct either an immediate or a delayed search of the vehicle." California v. Acevedo, 500 U.S. 565, 570 (1991).

COL 68.      The Third Circuit Court of Appeals has explained:

"The automobile exception to the [Fourth Amendment's] warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.' " United States v. Burton, 288 F.3d 91, 100 (3d Cir.2002) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996)). We have recognized that "[i]t is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." United States v. Ramos, 443 F.3d 304, 308 (3d Cir.2006) (citing United States v. Humphries, 372 F.3d 653, 658 (4th Cir.2004); United States v. Winters, 221 F.3d 1039, 1042 (8th Cir.2000)); see also United States v. Staula, 80 F.3d 596, 602 (1st Cir.1996) ("[W]hen a law enforcement officer detects the odor of marijuana emanating from a confined area, such as the passenger compartment of a motor vehicle, that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area."). Given the District Court's finding that Officers Maley and Lindsley, who both had encountered marijuana on the job on numerous occasions, smelled burnt marijuana coming from Ushery's car, the police had probable cause to search the car.

United States v. Ushery, 400 F. App'x 674, 675–76 (3d Cir. 2010).

COL 69.     One district court has explained that the automobile exception may apply to law enforcement's search of a vehicle when the law enforcement officer's testimony shows that the smell of marijuana was *particularized* to the defendant's vehicle and the smell of marijuana was *articulable*. United States v. Harrison, Crim. A. No. 17-59, 2018 WL 1325777, at *2 (D. Del. Mar. 15, 2018).

COL 70.     In Harrison, the court found that the testimony of two law enforcement officers showed that "the smell of marijuana was particularized to….[the defendant's] vehicle." Id. The court explained:

Richey testified that first time he smelled the marijuana odor was when Stagg opened the door to Harrison's SUV and he smelled the odor coming from within the vehicle. (Tr. 15:3–6.) He did not smell the marijuana upon approaching the vehicle before the door was opened and he did not observe any other cars or pedestrians near the vehicle that could have been a source for the smell. (Tr. 8:25–9:6, 11:15–16).

Id.

COL 71.    The court in <u>Harrison</u> also found that the testimony of the police officers showed that the smell of marijuana was *articulable*. The court explained:

> Richey was familiar with the smell because his experience as an officer required him to come into contact with marijuana in various forms "several hundred times." (Tr. 6:9–17, 7:15–17.) Further, only after smelling the marijuana did Barrett and Richey conduct a search of the vehicle. (Tr. 13:21–22.) This search properly included the plastic grocery style bags located in the rear cargo area of the vehicle. (Tr. 9:21–10:11); *see United States v. Ross*, 456 U.S. 798, 809 (1982) ("In its application of *Carroll*, this Court in fact has sustained warrantless searches of containers found during a lawful search of an automobile.") Therefore, the automobile exception to the Fourth Amendment's warrant requirement is satisfied because the smell of marijuana was particularized and articulable, thus establishing the requisite probable cause to conduct a search of Harrison's entire vehicle and bags within.

Id. at *3.

COL 72.    Based upon the foregoing, the court in <u>Harrison</u> found the warrantless automobile search of the defendant's vehicle did not violate the Fourth Amendment because the automobile exception applied to the facts of that case. Id. at *4.

COL 73.    Here, before the initial search of the SUV during which Gowans saw the white shopping bag filled with United States currency:

– Gowans and Keenan knew Williams drove the SUV;

– Gowans smelled the odor of marijuana when he was in proximity to the SUV;

– Keenan—who had considerable experience with intoxicated drivers—smelled the pungent odor of marijuana emanating from the SUV and noticed that the odor increased the closer Keenan was positioned to the SUV and Williams;

– Keenan observed that Williams' eyes were glassy and bloodshot;

– Keenan observed that Williams' speech was slow and lethargic;

63

- Keenan observed that Williams had difficulty focusing on retrieving the rental agreement from his email;

- Williams had a baggie of marijuana on his person; and

- Williams refused to take a field sobriety test, which based upon Keenan's experience meant that Williams believed he was intoxicated.

COL 74.    The foregoing evidence shows that the smell of marijuana was particularized because the odor grew stronger as Keenan got closer to the SUV; indeed, Gowans also smelled the odor of marijuana during his interaction with Williams in the SUV.

COL 75.    The smell of marijuana was articulable because Keenan testified that as he positioned himself closer to Williams in the SUV, the odor became "very pungent." He also testified that he was very familiar with conducting traffic stops involving individuals driving under the influence and he had "a lot" of training with respect to narcotics trafficking. (H.T. 1/12/2023 (ECF No. 202) at 99-100.)

COL 76.    Based upon the foregoing evidence of record, at the time Gowans and Keenan conducted the initial warrantless search of the SUV, Keenan's smell of marijuana emanating from the SUV and his observations that led him to believe that Williams was under the influence of marijuana constituted probable cause to search the SUV for evidence of a crime.[25] United States v. Ramos, 443 F.3d 304, 308 (3d Cir.

---

[25]    Williams in his response argues that a finding that Keenan had probable cause to believe that the SUV contained evidence of crimes was belied by Keenan's testimony that "after he discovered marijuana in Mr. Williams' pocket" he did not have any reason to believe that Williams had additional marijuana with him. (ECF No. 208 at 7.) The portion of Keenan's testimony cited by Williams, however, provides:

Q. I guess my question was, just to be more specific, prior to asking him to get out of the vehicle, did you have a suspicion that he was then in possession of marijuana?

2006) ("It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause.")

COL 77.    A search of the SUV was, therefore, reasonable under the Fourth Amendment because it qualified for the automobile exception to the warrant requirement.

COL 78.    Under those circumstances, even if the initial search of the SUV during which Gowans found the white shopping bag was not an inventory search, it was lawful under the automobile exception to the warrant requirement.

COL 79.    Williams' motion to suppress will, therefore, be denied with respect to Williams' argument that the initial search of the SUV during which Gowans found the white shopping bag filled with United States currency violated his Fourth Amendment rights.[26]

_____

       A. I was suspicious that he was under the influence of it. I don't believe that I suspected he had -- it's common for someone who is smoking marijuana while driving to have more on them, but I didn't have any discernible reason to suspect he had m]ore with him.

(H.T. 1/12/2023 (ECF No. 202) at 110.) Pursuant to the foregoing quotation, Keenan testified that *before* he asked Williams to exit the vehicle, he did not have reason to believe Williams had marijuana with him. Keenan, however, found marijuana on Williams' person *after* Williams exited the vehicle. Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (explaining that "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause"); United States v. Donahue, 764 F.3d 293, 302 (3d Cir. 2014) (explaining the probable cause inquiry is "entire objective" and probable cause may exist to conduct a search even if the officer conducting the search does not believe he has probable cause to do so); United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) (recognizing that the district court reviewing whether an officer had probable cause to make a warrantless arrest must "determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense was being committed").

[26]    The court having found that the initial warrantless search of the SUV was reasonable because it qualified as an inventory search and for the automobile exception

### D.  Searches of the Four Cellular Telephones and iPad

COL 80.      Williams argues that the "two-year and three-month" delay between (a) the 2017 seizure of the four cellular telephones from Williams' vehicle and iPad from his hotel room, and (b) the 2019 searches of those devices pursuant to the second content warrants, was unreasonable and requires the suppression of the evidence obtained from those devices. (ECF No. 205 at 42 (citing United States v. Smith, 967 F.3d 198 (2d Cir. 2020).) According to Williams, the court must consider the factors set forth in Smith to determine whether the delay between the government's seizure of the four cellular telephones and the iPad in 2017 and Flaherty obtaining and executing the second content warrants in 2019 was reasonable under the Fourth Amendment. (Id.)

COL 81.      The government argues that Smith and the other decisions relied upon by Williams are inapplicable to this case because in the decisions cited by Williams, the government seized the devices in issue without a warrant. In this case, however, law enforcement had warrants to seize the four cellular telephones from the SUV, i.e., the SUV warrant, and the iPad from Williams' hotel room, i.e., the hotel room warrant. (ECF No. 204 at 34-44.)

COL 82.      The Supreme Court of the United States has recognized that "a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons." Segura v. United States, 468 U.S. 796, 812 (1984).

---

to the warrant requirement, need not address whether the search also qualified for the search incident to arrest exception to the warrant requirement.

COL 83.     The Third Circuit Court of Appeals has explained: "To determine whether [a] seizure became unreasonable, this Court 'must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Stabile, 633 F.3d 219, 235 (3d Cir. 2011) (quoting United States v. Place, 462 U.S. 696 703 (1983)).

COL 84.     Similarly, the Court of Appeals for the Second Circuit in Smith instructed that courts should balance the following factors to determine whether the government's lawful seizure of property became unreasonable in light of the government's delay in obtaining a search warrant for the property: (1) the length of the delay; (2) the importance of the seized property to the defendant; (3) whether the defendant had a reduced property interest in the seized item; and (4) the strength of the government's justification for the delay. Smith, 967 F.3d at 206.

COL 85.     The first, second, and third Smith factors consider  "the nature and quality of the intrusion on the individual's Fourth Amendment interests[,]" and the fourth factor considers "the importance of the governmental interests alleged to justify the intrusion[.]" Stabile, 633 F.3d at 235.

COL 86.     To the extent the government argues this case is distinguishable from Stabile and Smith because the four cellular telephones and iPad were seized pursuant to a warrants, i.e., the SUV warrant and the hotel room warrant, and the four cellular telephones had evidentiary value without consideration of the contents of those devices, those issues are proper considerations in the balancing of the intrusion on Williams' rights against the government's reasons for the intrusion. See e.g., In re Application for Search Warrant, 527 F.Supp.3d 179 (D.Conn. 2020).

COL 87.      Generally, "the burden is on the defendant who seeks to suppress evidence." United States v. Johnson, 63 F.3d 242, 245, (3d Cir. 1995). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." Id.

COL 88.      Here, the four cellular telephones and iPad were seized pursuant to warrants, i.e., the SUV warrant and the hotel room warrant, and those devices were searched pursuant to warrants, i.e., the second content warrants. Williams, therefore, maintains the burden to show that the government's conduct in this case was unreasonable.

COL 89.      As discussed above, Williams argues that consideration of the Smith factors shows that his Fourth Amendment interests outweigh the government's justifications for the two-year and three-month delay between the seizure of the four cellular telephones and iPad and Flaherty obtaining and executing the second contents warrants on those devices. The court will assume the analysis set forth in Stabile and Smith is applicable to this case and consider each of the Smith factors below to determine whether Williams satisfied his burden to show that his Fourth Amendment interests outweigh the governmental interests alleged to justify the intrusion on his property.

**(1) The length of the delay[27]**

---

[27]      "Delay is delay, and the effect on the target is the same, whatever or whoever causes that delay." In re Application for Search Warrant, 527 F.Supp.3d 179 (D.Conn. 2020) ("It makes no difference to the person subjected to a seizure whether state, locale, federal, or a combination of various law enforcement officials hold that property once it is seized. The deprivation is the same.").

COL 90.     The government concedes that a two-year and three-month delay between the seizure of property and the government obtaining and executing the second content warrants "can be objectively viewed as a long delay." (ECF No. 204 ¶ 179.)

COL 91.     Under those circumstances, Williams satisfied his burden to show that this factor weighs in favor of a finding that the two-year and three-month delay in this case rendered the continued seizure of the four cellular telephones and iPad and the contents of those devices unreasonable in violation of the Fourth Amendment.

### (2) The importance of the seized property to the defendant

COL 92.     "In the 21st century, most Americans are heavily reliant on electronic devices for both personal and business needs, and in the COVID-19 era, that reliance has only increased." In re Application, 527 F.3d at 184 (citing Smith, 967 F.3d at 208).

COL 93.     Courts have explained, however, that when a defendant fails to request the return of his or her devices after their seizure by law enforcement, this factor may weigh in favor of a finding that the devices' importance to a defendant was diminished. Id. at 185; United States v. Payne, Crim. A. No. 19-170, 2021 WL 9978616, at *14  (W.D.N.Y. Dec. 29, 2021) ("[D]efendant has not submitted an affidavit establishing the unique importance of this device to him, nor did he present any evidence at the hearing regarding that importance."); United States v. Adams, Crim. A. No. 20-12, 2021 WL 10265208, at *12 (W.D.N.Y. Aug. 16, 2021) ("Adams introduced no evidence in these proceeding[s] demonstrating that he used the phone to store personal data and communications or that it was uniquely important to him for some other reason.").

COL 94.     Courts have also recognized that the possession of multiple cellular telephones—without an additional showing about the importance of any one of those

cellular telephones—"reduces the possibility that 'any one of…[the] devices was uniquely important to [the defendant], either as a means of communication with others or as a vehicle to store an 'immense amount of personal data.'" United States v. Wells, Crim. A. No. 20-633, 2023 WL 2223474, at *5 (S.D.N.Y. Feb. 23, 2023) (quoting United States v. Green, Crim. A. No. 18-121, 2021 WL 1877236, at * 5 (W.D.N.Y. Feb. 3, 2021)).

COL 95.     Williams argues generally that "[e]lectronic information stored on *any individual's* cellular devices—including Mr. Williams'—is important." (ECF No. 205 at 43 (emphasis added).) The evidence shows that Williams possessed multiple cellular telephones, and Williams did not present evidence that he requested the return of his devices or that those devices were of specific importance to him. Under those circumstances, Williams did not satisfy his burden to show that this factor weighs in his favor.

### (3) Whether the defendant had a reduced property interest in the seized devices and their contents

COL 96.     This factor warrants separate consideration of the four cellular telephones and iPad.

### i.     Four cellular telephones

COL 97.     The evidence of record shows that Williams had a reduced property interest in the four cellular telephones because: (a) the cellular telephones have evidentiary value separate from their contents; (b) law enforcement had probable cause to believe the cellular telephones contained evidence of a crime; and (c) Williams has been incarcerated since August 2017, and, therefore, was unable to use the four cellular telephones or access their contents. Williams did not present evidence to show that despite the foregoing circumstances, his property interest in the four cellular telephones

remained intact, i.e., his property interest in the four cellular telephones was not diminished.

COL 98.    First, "[i]t is well settled that the government is permitted to seize evidence for use in investigation and trial, but that such property must be returned once criminal proceedings have concluded, unless it is contraband or subject to forfeiture." United States v. Chambers, 192 F.3d 374, 376 (3d Cir. 1999).[28] The possession of multiple cellular telephones is evidence of drug trafficking. United States v. Wright, 534 F. Supp. 3d 416, 425 (M.D. Pa. 2021) ("A relationship between use of multiple cell phones and drug trafficking is well recognized."). Williams faces multiple charges involving drug trafficking in this case. Thus, the government's continued seizure of the four cellular telephones and their contents is lawful because the cellular telephones have evidentiary value apart from their contents and this case has not concluded. Under those circumstances, Williams' property interest in those cellular telephones and their contents is significantly diminished.[29] In other words, the government's continued possession of the cellular telephones and their contents for two years and three months was reasonable because the cellular telephones have evidentiary value apart from whatever contents are

---

[28]    The court of appeals in Chambers recognized that "[a] person aggrieved by the deprivation of property may file a motion under Rule 41(e), Fed.R.Crim.P....to request the return of that property." Chambers, 192 F.3d at 376.

[29]    The cellular telephones and iPad were seized in May 2017 and held by the Swissvale Police Department. In August 2017, Williams was indicted and arrested in this case. In October 2018, Williams filed his pretrial motions with respect to the original indictment. His first motions to suppress were resolved by the court on May 17, 2019. There is no evidence or argument that Williams requested the return of the cellular telephones or iPad from May 2017 to May 2019. By May 28, 2019, law enforcement obtained additional evidence against Williams pursuant to which it intended to file a superseding indictment against him. The government filed the superseding indictment against Williams on August 27, 2019.

found on the cellular telephones and the law permits the government to continually seize evidence against the defendant for use at trial.

COL 99.    Second, "[a]n individual has a diminished interest in his seized property where law enforcement has probable cause to believe that the property contains evidence of criminal activity." Adams, 2021 WL 10265208, at *13; United States v. Carey, No. 3:CR-18-037, 2020 WL 59607, at *2 (M.D. Pa. Jan. 6, 2020) ("States have a stronger interest in seizures made on the basis of probable cause than in those resting solely on reasonable suspicion."). In Adams, the cellular telephones at issue were seized pursuant to a warrant with evidence of drug trafficking, e.g., a large quantity of narcotics. The court explained that because the law enforcement had probable cause to believe the defendant was using the cellular telephones for drug trafficking, and, thus, there was probable cause to believe evidence of drug trafficking would be found on the phone, the defendant had a reduced property interest in the cellular telephones. Id.

COL 100.    Here, on May 12, 2017, Williams' four cellular telephones were seized (along with a shopping bag of United States currency) pursuant to the SUV warrant, which was issued based upon probable cause that the cellular telephones were evidence of a crime. On the same day, several hours later, Keenan obtained the first content warrants based upon probable cause that evidence of Williams' drug trafficking would be found on those devices. In 2019, the content of those devices was seized pursuant the second content warrants, which were issued based upon probable cause that evidence of Williams' drug trafficking would be found on those devices. In re Application, 527 F.Supp. 3d at 187 ("[S]eizure of the devices at issue by warrant…coupled with the fact that a warrant was issued by a Superior Court Judge prior to the seizure

permitting search of the devices, result in this factor weighing strongly in favor of issuance of the search warrant.").

COL 101.    Third, courts have recognized that when a defendant is incarcerated, his or her property interest in cellular telephones and their contents is greatly diminished because the defendant cannot use the devices while incarcerated. The court in In re Application explained:

> [T]he Fourth Amendment seeks to protect individuals from unreasonable seizures. When property is seized, the Amendment seeks to preserve an individual's right and ability to possess and use her or his own property against unreasonable interference. **Where the individual has little desire or ability to use or possess the seized property, the need for this protection is greatly diminished.**

In re Application, 527 F.Supp. 3d at 185 (emphasis added). Another district court has explained:

> Although Carey undoubtedly has some interest in the cell phones, his interest was minimal at best given his immediate arrest and detention at the Lackawanna County Prison, where he is not permitted to use or possess cell phones. Furthermore, it does not appear, and Carey does not argue, that he requested the return of his cell phones at any time until the present motion, over two years after their seizure, which undermines his claim that his Fourth Amendment rights were impacted.

United States v. Carey, No. 3:CR-18-037, 2020 WL 59607, at *2 (M.D. Pa. Jan. 6, 2020).

COL 102.    The cellular telephones were seized in May 2017, and Williams was indicted and incarcerated in this case by August 2017. Williams remains incarcerated. Under those circumstances, any property interest he had in the devices and their contents beginning in May 2017, significantly diminished by August 2017 and remains diminished nearly six years later. Williams did not present any evidence to the contrary.

COL 103.    The continued seizure of Williams' cellular telephones necessarily involved the continued seizure of the contents of the cellular telephones. Law

enforcement in this case seized the devices pursuant to the SUV warrant, which was issued based upon probable cause that evidence of drug trafficking would be found in the SUV. Law enforcement also obtained search warrants to seize the contents of those devices, i.e., Keenan's first content warrants obtained in 2017, and Flaherty's second content warrants seized in 2019. Williams could not use the cellular telephones or access their contents while incarcerated from August 2017 to the present day. Under those circumstances, Williams' property interest in the cellular telephones and the contents of the cellular telephones is greatly diminished. Williams, therefore, did not satisfy his burden to show that this factor weighs in his favor.

### ii.    iPad

COL 104.    The iPad differs in one important respect from the cellular telephones, i.e., the possession of one iPad—ignoring its contents and other evidence of drug trafficking—does not offer the same independent evidentiary support to prove that Williams was engaged in drug trafficking.

COL 105.    Like the cellular telephones in this case, however, the iPad was seized pursuant to a warrant based upon probable cause, i.e., the hotel room warrant, and a search warrant based upon probable cause was issued for the contents of the iPad, i.e., one of the second content warrants. Law enforcement found the iPad in room 416 with eight bundles of United States currency, i.e., evidence of drug trafficking. Flaherty explained in his affidavit of probable cause in support of the issuance of the second content warrants:

> **I am aware that evidence of drug, firearm, and money laundering crimes can often be found in electronic media, including** cellular telephones, laptop computers, cameras, and **tablet devices.** Such **evidence can be found throughout those items, such as in** text

messages, contact lists indicating the names and numbers of associates, call/text logs indicating calls/texts made to and received from associates, **online search history files, word processing documents, and photograph and video gallery files. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear.** Actions such as internet searching or emailing, in addition to calling and text messaging and photographing, can now be performed from many cell phones. In addition, as noted above, those involved in drug and firearm trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of such trafficking. Moreover, the particular numbers of, and the particular numbers dialed by, particular cellular telephones can be evidence of drug trafficking, particularly in light of the fact that it is a practical necessity that drug traffickers communicate with each other, as well as with their customers and suppliers, by telephone. Such numbers can confirm identities of particular associates and the occurrence of certain events.

(ECF No. 204-10 ¶ 7 (emphasis added).)

COL 106.    As noted above, Williams was incarcerated in this case beginning in August 2017. Thus, to the extent he had a property interest in the iPad and its contents in May 2017 when the iPad was seized from room 416, that property interest was significantly diminished beginning in August 2017 when Williams was incarcerated because he cannot use or access the iPad or its contents while incarcerated.

COL 107.    Ignoring the iPad's contents, the four cellular telephones, and the other evidence of drug trafficking, the iPad standing alone arguably may not have independent evidentiary value to prove that Williams was engaged in drug trafficking. Law enforcement, however, obtained a search warrant—the hotel room warrant—based upon probable cause to seize, among other things, the iPad. In 2019, Flaherty obtained a search warrant to seize the contents of the iPad, i.e., one of the second content warrants, based upon probable cause to believe that the iPad contained evidence of Williams' illegal drug trafficking activity. As noted, Williams has been incarcerated since August 2017.

Under those circumstances, while Williams' property interest in the iPad arguably could be stronger than Williams' property interest in the four cellular telephones, his property interest in the iPad and its contents is diminished.

COL 108.    Based upon the foregoing, Williams' property interest in the four cellular telephones is significantly diminished, and his property interest in the iPad is diminished. Williams did not satisfy his burden to show that this factor weighs in his favor.

**(4) The strength of the government's justification for the delay**

COL 109.    As discussed above, Williams' interest in possessing the cellular telephones, iPad and the contents of those devices must be weighed against the importance of the government's interest used to justify the intrusion on Williams' rights to possess those items.

COL 110.    The court will consider separately the three cellular telephones that were searchable in 2017, cellphone N-26, and the iPad to determine whether Williams satisfied his burden with respect to this factor, i.e., the strength of the government's justification for the delay.

**i.    The three cellular telephones that were searchable in 2017**

COL 111.    According to Williams, he proved at the suppression hearing that the government's purported reason for the two-year and three-month delay, i.e., technology did not exist in 2017 to extract information from the four cellular telephones, was false.

COL 112.    With respect to the three cellular telephones for which Rosenberg had the technology to extract information in 2017, the government presented Keenan's testimony that he provided those cellular telephones to Rosenberg in 2017 and Rosenberg could not access those devices at that time. Williams at the suppression

hearing, however, called Rosenberg to testify. Rosenberg's testimony, which this court finds credible, contradicted Keenan's testimony that he provided those cellular telephones to Rosenberg.

COL 113.    Based upon the evidence of record, the court finds that Keenan powered on N-26, learned it was password protected, and erroneously assumed all the devices were password protected. Thus, Williams proved by a preponderance of the evidence that Keenan's belief that all the devices were password protected and there did not exist technology to bypass all the devices was erroneous.[30]

COL 114.    Arguably, therefore, Williams satisfied his burden to show that this factor, i.e., the strength of the government's justification for the delay, weighs in favor of a finding that the government's conduct was unreasonable with respect to the three cellular telephones that were searchable in 2017. The burden would shift to the government to show that this factor weighs in its favor.

COL 115.    According to the government, it has "an extremely strong interest in investigating and prosecuting international drug traffickers." (ECF No. 204 ¶ 184.) The government's purported reason for the two-year and three-month delay between the seizure of the four cellular telephones, the iPad, and the contents of those devices and Flaherty obtaining and executing the second content warrants for those devices is "the Government believed that it lacked the technology to get into the cellular telephones or the iPad." (ECF No. 204 ¶ 185.)

COL 116.    As discussed above, three of the four cellular telephones were searchable in 2017. Keenan's belief that those three cellphones were not searchable

---

[30]    See supra note 20.

because they were password protected was government error. The Court of Appeals for the Second Circuit has explained that a delay in obtaining a search warrant caused by governmental error may be considered reasonable. United States v. Howe, 545 F. App'x 64, 66 (2d Cir. 2013).

COL 117.    In Howe, a state law enforcement officer applied for a search warrant to search, among other things, the defendant's laptop. The state law enforcement officer—due to a "copy and paste error"—did not list the laptop on the list of items to be searched on the actual search warrant signed by the issuing magistrate judge. None of the state law enforcement officer's superiors, the magistrate judge, or the law enforcement officers who thereafter conducted *two* forensic searches of the laptop recognized the error. The defendant was subsequently charged by federal authorities, was arrested, provided statements to law enforcement, and filed a suppression motion arguing that his statements were the "fruit of the poisonous tree" of the state law enforcement officers' warrantless laptop searches. Thirteen months after the laptop was seized, federal law enforcement obtained a valid search warrant for the contents of the laptop. United States v. Howe, No. 09-CR-6076L, 2012 WL 414766, at *3 (W.D.N.Y. Feb. 2, 2012), report and recommendation adopted, No. 09-CR-6076L, 2012 WL 1565708 (W.D.N.Y. May 1, 2012), aff'd in part, 545 F. App'x 64 (2d Cir. 2013).

COL 118.    A magistrate judge in a report and recommendation with respect to the motion to suppress filed in the federal case, which was adopted by the district court, found that the thirteen-month delay between the seizure of the laptop and the valid federal search warrant was not unreasonable.  Id.

COL 119.    On appeal, the court of appeals affirmed, and explained:

> In this case, Howe was deprived of his laptop for a long period of time, approximately thirteen months. During that time, Howe's possessory

interest in the laptop was diminished by the fact that Weegar had viewed a folder on that computer containing the lascivious thumbnail image described earlier. That image provided the government with a strong interest in retaining the laptop and not returning it to Howe. In addition, the seizure of the laptop did not restrain Howe's liberty interests. **Importantly, the magistrate judge found that the government's delay in seeking the federal warrant was due to error, rather than a lack of diligence in pursuing a search warrant. Thus, this is not a case in which the government provided no explanation for its delay and did not show any sense of urgency in obtaining a search warrant. Rather, the government's diligence in this case was exhibited by Weegar, who swore out an application for a state warrant to search Howe's residence and the laptop the day after the computer was seized. The delay in seeking the federal search warrant was based, at least in part, on Weegar's belief, albeit erroneous, that he had obtained a state warrant to search the laptop. While the thirteen-month delay in seeking the federal warrant was lengthy, it was not constitutionally infirm on the facts of this case.**

Howe, 545 F. App'x at 66 (emphasis added).

COL 120.    Here, in 2017, Keenan obtained the first content warrants for the contents of the four cellular devices. Keenan applied for the first content warrants at approximately the same time he applied for the hotel room warrant. The government, therefore, did not have in its possession the iPad at the time Keenan applied for and received the first content warrants. Keenan did not execute the first content warrants because he knew cellphone N-26 was password protected, erroneously assumed the other three cellular telephones were password protected, and believed that law enforcement did not have the technology to bypass the password protection at that time.[31]

---

[31]    The government has a reason for the two-year and three-month delay with respect to all the devices, i.e., Keenan's erroneous belief that all the devices, including the three cellphones that were searchable in 2017, were password protected. This case is, therefore, distinguishable from cases in which the government did not proffer any reason for its delay. See In re Application, 527 F.Supp.3d at 188 (explaining that where

Two years and three months later, Flaherty applied for, was issued, and executed the second content warrants for the four cellular telephones and iPad based, in part, on Keenan's error.

COL 121.    Keenan's failure to examine the other three cellular telephones for password protection may be evidence of a lack of diligence, but Keenan's error in this case is not more egregious than the law enforcement officers' error in <u>Howe</u>. Multiple law enforcement officers in <u>Howe</u> failed to verify that the search warrant listed the laptop in the places to be searched before conducting *two searches* of that device.

COL 122.    As discussed above and detailed in Flaherty's affidavit of probable cause, after Williams' May 2017 arrest, the government continued to build its case against Williams. He was indicted in this case in August 2017, he filled pretrial motions that were resolved by May 2019, and law enforcement filed a superseding indictment against him in August 2019 based upon their continued investigations of him.

COL 123.    The evidence of record shows that: (a) Keenan obtained the first content warrants for the cellular telephones in 2017; (b) Keenan believed (albeit erroneously) that because cellphone N-26 was password protected, *all* the devices, including the three cellular telephones that were searchable in 2017, were password protected and could not be searched; and (c) the government exercised diligence in its continued investigation against Williams during the two-year and three-month delay. Under those circumstances, the government satisfied its burden to show that despite Keenan's error, this factor—with respect to the three cellular telephones that were

---

the government does not offer any reason for the delay, this factor weighs against a finding of reasonableness).

searchable in 2017—weighs in favor of the conclusion that the government acted reasonably in this case.

### ii.    Cellphone N-26

COL 124.    Williams argues that the government had the password to the N-26 cellphone, and, therefore, Rosenberg did not require special technology to extract information from the device.

COL 125.    Evidence of record showed that in or around June 2019, Tetrault provided the password for that cellular telephone to Flaherty to provide to Rosenberg.[32] Williams, however, did not present any testimony or evidence to show how or when law enforcement obtained the password for that device. Rosenberg did not have the technology to unlock that kind of device if it was password protected until late 2018 or early 2019.

COL 126.    Based upon the foregoing, Williams did not satisfy his burden to show that—with respect to cellphone N-26—this factor, i.e., the strength of the government's justification for the delay, weighs in favor of a finding that the government's conduct in this case was unreasonable.

### iii.    iPad

---

[32]    As described above, the evidence of record shows that at or around the time Flaherty applied for the search warrants for the four cellular telephones and iPad in 2019, Flaherty obtained the password for cellphone N-26 from Tetrault. (H.T. 1/20/2023 (ECF No. 203) at 31-32.) Williams did not point to any evidence of record to show that the government had the password for N-26 earlier than 2019, and, therefore, Rosenberg could have extracted N-26's contents before that time.

COL 127.    The evidence shows that the iPad was password protected and Rosenberg did not obtain the technology to unlock that kind of device until late 2018 or early 2019. Williams did not present any evidence to rebut or contradict this evidence.

COL 128.    Based upon the foregoing, Williams did not satisfy his burden to show that—with respect to the iPad—this factor, i.e., the strength of the government's justification for the delay, weighs in favor of a finding that the government's conduct in this case was unreasonable.

**(5) Whether Williams was prejudiced by the two-year and three-month delay**

COL 129.    The court in Smith did not consider whether the defendant in that case was prejudiced by the delay. Some courts considering the Smith factors, however, consider whether the defendant was prejudiced by the delay. United States v. Berroa, No. 19-CR-10164-ADB, 2021 WL 149254, at *6 (D. Mass. Jan. 15, 2021) ("Although the Smith court did not include prejudice among the reasonableness factors, the Court believes it is relevant to the analysis.").

COL 130.    Here, Williams did not show that he was prejudiced by the two-year and three-month delay between the seizures of the four telephones and iPad pursuant to search warrants, i.e., the SUV warrant and hotel room warrant, and the execution of Flaherty's second content warrants for the contents of those devices. The government's continued seizure of the four cellular telephones as evidence of Williams' drug trafficking was lawful, Williams did not present evidence that he requested their return, and he has been incarcerated since August 2017. Similarly, Williams did not present evidence that he requested the return of the iPad, and he has been unable to use or access the iPad because of his incarceration. The contents of those devices have been

or will be produced to Williams well in advance of trial and in a timely manner to provide Williams an adequate time to prepare his defense; indeed, trial dates have not been set in this matter. Based upon the foregoing, Williams did not satisfy his burden to show that he suffered any prejudice despite the long delay between the seizure of the devices and Flaherty obtaining search warrant for their contents.

### (6) Conclusion with respect to the <u>Smith</u> factors

COL 131.    In balancing the factors, the court in <u>In re Application</u> considered the purpose of the Fourth Amendment, i.e., "to protect individuals from unreasonable searches and seizures." <u>In re Application</u>, 527 F.Supp.3d at 187. The court explained that despite the unreasonable delay, "the actual impact of that delay on the rights and property interests of the target and his spouse was not significant…[and] a judge had authorized both seizures <u>and</u> searches of…[the] devices, based on probable cause, even before the seizures were made." <u>Id.</u>

COL 132.    Here, Williams satisfied his burden with respect to the length of the delay because the government recognized that the delay of two-years and three-months was objectively long. That factor is important in the analysis and weighs against a finding that law enforcement's conduct in this case was reasonable.

COL 133.    On the other hand, Williams did not present evidence that he requested the return of the four cellular telephones or the iPad, or to show those devices or their contents were specifically important to him.

COL 134.    The evidence of record also showed that Williams' property interest in the devices was greatly diminished because: (a) the government lawfully continued to seize the cellular telephones as evidence of Williams' drug trafficking; (b) the

government seized all the devices pursuant to search warrants, i.e., the SUV warrant and the hotel room warrant; (c) Keenan obtained the first content warrants for the contents of the four cellular telephones shortly after they were seized; (d) Flaherty obtained the second content warrants based upon probable cause that the cellular telephones and iPad, all of which were seized with large bundles of United States currency, contained evidence of Williams' drug trafficking; and (e) Williams has been incarcerated since August 2017, and, therefore, could not use the devices or access their contents. Williams did not present evidence to show that despite the foregoing circumstances, his property rights in the devices remained intact.

COL 135.    The government's interest in this case is the investigation of drug trafficking. The government's proffered reason for the delay is that Keenan believed all the devices were password protected and technology did not exist to bypass the password protection. As discussed above, Keenan's error in believing that three of the four cellular telephones were password protected does not render the government's conduct unreasonable. The government's continued investigation of Williams after the seizure of the devices, which resulted in a superseding indictment being filed in this case, shows that the government exercised diligence despite the long delay and weighs in favor of finding the searches of the devices were reasonable.

COL 136.    As discussed above, "[t]o determine whether [a] seizure became unreasonable, this Court 'must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Stabile, 633 F.3d at 235 (quoting Place, 462 U.S. at 703). The only Smith factor that weighs in favor of the conclusion that the 2019

searches of the four cellular telephones and iPad were unreasonable is the length of the delay. The long delay, however, is outweighed by the other <u>Smith</u> factors. If prejudice is also considered, Williams did not show any prejudice caused by the delay.[33] In other words, based upon the circumstances of this case, the governmental interests alleged to justify the intrusion outweigh Williams' Fourth Amendment interests against the intrusion.

COL 137.    The court, therefore, concludes that the two-year and three-month delay in obtaining and executing the second content warrants was reasonable and did not violate Williams' Fourth Amendment rights. The motion to suppress will be denied with respect to this issue.

### (7) The exclusionary rule

COL 138.    The Third Circuit Court of Appeals has explained:

> "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." 555 U.S. at 144, 129 S.Ct. 695. As a result, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." <u>Id.</u> Simple, isolated negligence is insufficient to justify suppression. <u>See</u> <u>Davis</u>, 131 S.Ct. at 2427–28.

<u>United States v. Wright</u>, 777 F.3d 635, 638 (3d Cir. 2015).

COL 139.    The Supreme Court has explained:

> When a probable-cause determination was based on reasonable but mistaken assumptions, the person subjected to a search or seizure has not necessarily been the victim of a constitutional violation. The very phrase "probable cause" confirms that the Fourth Amendment does not demand all possible precision. And whether the error can be traced to a mistake by a state actor or some other source may bear on the analysis.

---

[33]    Even if the court did not consider whether Williams was prejudiced by the length of the delay, the court would still conclude that the conduct of law enforcement in this case was reasonable.

Herring v. United States, 555 U.S. 135, 139 (2009).

COL 140.     First, Keenan's error in not checking all the devices was an isolated incident of negligence. He credibly testified that he believed all the devices were password protected.[34] Even if Keenan examined each device, however, law enforcement would have searched the contents of the three cellular telephones for which Rosenberg had the technology to extract information in 2017 rather than in 2019, and the search of N-26 and the iPad would have taken place at a later date when law enforcement obtained the passwords for those devices or the technology to bypass the passwords. Law enforcement, however, would not have returned Williams' devices to him at an earlier point in time because the government may continue to seize evidence against a defendant until the case is resolved.

FOF 121.     Second, the evidence of record does not show that Flaherty's reliance on Keenan's understanding that all the devices were password protected was unreasonable, i.e., reckless, grossly negligent, or intentionally violative of Williams' Fourth Amendment rights.  (ECF No. 204-10 ¶ 29.) Williams argues that Flaherty *should have known* that the relevant technology existed, but the evidence presented by Williams, i.e., the testimony of Rosenberg, shows that relevant law enforcement agencies in this case did not have the necessary technology with respect to the N-26 and iPad in 2017; indeed, Rosenberg testified that in 2017 he was not aware of any other law enforcement agency that had the technology to access the password-protected iPad seized from Williams' hotel room, and in 2018, "some agencies" had

---

[34]     See supra note 20.

acquired the software that could have accessed the password-protected iPad. (H.T. 1/20/2023 (ECF No. 203) at 24.) There was no evidence presented about whether Rosenberg could use that software or otherwise access it long before 2019.

COL 141.    Flaherty also testified that the two-year and three-month delay was not a strategic decision to gain any advantage over the defense, which supports a finding that there would be no "appreciable deterrent value" in applying the exclusionary rule in this case. Green, 2021 WL 1877236 at *8 (the law enforcement officer testified that "the delay in seeking the warrant was not a strategic attempt to gain footing over…[the defendant], and the Court can discern no apparent advantage in waiting to search the contents of the cell phones").

COL 142.    Based upon the foregoing, law enforcement's conduct in this case was not deliberate, reckless, or grossly negligent conduct, or recurring or systemic negligence, that warrants the application of the exclusionary rule; rather, Keenan's understanding that the iPad and N-26 were password protected and law enforcement did not have the technology to bypass the password protection was correct, and his error with respect to the other three cellular telephones was an isolated incident of negligence. Under those circumstances, even if the two-year and three-month delay rendered the searches for the contents of the four cellular telephones and iPad unreasonable and violative of Williams' Fourth Amendment rights, the evidence seized from those devices would not be excluded.

**V.    Conclusion**

87

For the reasons set forth in these findings of fact and conclusions of law, the motion to suppress evidence (ECF No. 171) filed by Williams will be denied. The court will schedule a conference to set dates for trial. Appropriate orders will be entered.

**BY THE COURT**,

Dated: May 12, 2023                    **/s/ JOY FLOWERS CONTI**
Joy Flowers Conti
Senior United States District Court Judge