### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 17-246 |
| | ) | |
| RACOCO WILLIAMS, | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

## I.   Introduction

Defendant Racoco Williams ("Williams" or "defendant") was convicted after a jury trial of all 6 counts charged in the superseding indictment, including participating as a principal administrator in a continuing criminal enterprise involving 150 kilograms or more of cocaine, in violation of 21 U.S.C. § 848(b).  By statute, that conviction mandates a sentence of life imprisonment.

In this opinion, the court will address two posttrial motions filed by counsel on behalf of Williams: (1) a motion for new trial pursuant to Federal Rule of Criminal Procedure 33 (ECF No. 303); and (2) a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 (ECF No. 304), with a brief in support (ECF No. 305).  The government filed responses in opposition to the motions (ECF Nos. 310, 311).  Williams filed reply briefs (ECF Nos. 312, 313).  The motions are ripe for decision.

There was a third posttrial motion filed by separate counsel[1] on behalf of Williams.  That motion is also fully briefed (ECF Nos. 302, 308, 309) and will be resolved in a separate opinion and order.

---

[1] At a hearing on November 28, 2023, Williams agreed to the appointment of separate counsel for the limited purpose of the motion at ECF No. 302 (ECF Nos. 294, 295), which seeks to compel the

II.      **Factual and Procedural Background**

The court will not recite the factual and procedural history in full, but only as necessary to provide context for the pending motions.  On August 29, 2017, Williams was arrested after police executed a search warrant at his hotel room located in the Extended Stay America Hotel in Monroeville, Pennsylvania, and seized (among other things) 17 kilograms of cocaine.  The application and affidavit for the search warrant were signed by Brianna Maria Tetrault ("Tetrault")[2], a special agent with the Department of Homeland Security (ECF No. 303-1).

The application stated that it was submitted in support of a warrant to search "for controlled substances, including marijuana." *Id.*  The probable cause set forth in the affidavit included: (1) on August 29, 2017, "PSP Troopers walked by room 219 and based on their training and experience identified the smell of marijuana emanating from the door to that room." *Id.* ¶ 7; (2) troopers noticed that the outside window to that hotel room was open and believed the occupant was attempting to air out the smell of marijuana, *id.*; (3) a trooper encountered Williams in the hotel lobby and smelled marijuana on his person and learned that Williams was staying in room 219, *id.* ¶ 8; (4) Williams renewed his room for one more day, which was consistent with Tetrault's experience that persons involved in illicit activities did not have a set period to stay at a hotel, *id.* ¶ 9; (5) Tetrault had (a) participated in a controlled delivery and anticipatory search warrant at a home in Carnegie, Pennsylvania, on April 13, 2017, in which 6 kilograms of cocaine and $78,500 were recovered and one of the individuals interviewed during that operation overheard "Q" discuss a possible delivery to that residence, and (b) was "aware through numerous narcotics investigations that Williams goes by the street name of 'Q,'" *id.* ¶

_____

government to reoffer its plea proposal.  Trial counsel remain Williams' counsel of record and filed the posttrial motions considered in this opinion.
[2] Her married name is Brianna Coleman.

11; and (6) Tetrault was aware of drug-related arrests of Williams in Arizona in 2012 and 2014, *id.* ¶ 12.

On September 13, 2017, Williams was charged in the original indictment in this case with one count of possession with intent to distribute 5.0 kilograms or more of cocaine.  On October 1, 2018, Williams filed (among other things) a motion to suppress evidence, with brief in support (ECF Nos. 56, 57), in which he argued that the statement in the affidavit that the troopers smelled marijuana emanating from hotel room 219 was a deliberate falsehood, in violation of *Franks v. Delaware*, 438 U.S. 154, 171 (1978) ("*Franks*").  Williams' theory was that law enforcement was motivated to make this false claim because they wanted to apprehend Williams on more serious charges, but the larger investigation failed to produce probable cause to search the hotel room for the more serious charges (ECF No. 57 at 8).

The court held a *Franks* hearing (over the course of 3 days).  The court performed an *in camera* review of the communications between the troopers and Tetrault to determine whether Williams was entitled to any further discovery and the court determined that no further discovery was required. *Id.* at 11-12. The government acknowledged that the agents suspected Williams was a huge cocaine dealer, but did not have probable cause to seek a warrant until the two troopers smelled the marijuana (Tr., ECF No. 78 at 10-11)  The court observed it was clear from the record that the troopers were looking for serious drugs, more than the marijuana. *Id.* at 8; ECF No. 64 at 62 ("I don't think there's any dispute here that they were following [Williams] for purposes of an investigation that was related to cocaine trafficking").  The affidavit included references to the broader investigation into more serious drug dealing activities.  (ECF No. 303-1).

Williams' attorney thoroughly cross-examined the troopers about the credibility of their statements that they smelled marijuana emanating from room 219 and their alleged real purpose to manufacture probable cause so they could investigate other drug activity.  *See, e.g.*  ECF No. 78 at 98 (Defense counsel: "The plan was to develop probable cause to get a judge to sign the warrant, correct?"  Answer:  "No."); *see* ECF No. 64 at 54-109.

On May 17, 2019, the court issued Findings of Fact and Conclusions of Law denying the motion to suppress. (ECF No. 79.)  The court acknowledged the evidence presented in favor of Williams' position (i.e., his affidavit denying any marijuana use in room 219, no indication of marijuana being smoked in the room when executing the search, no complaints of marijuana odors at the hotel).  The court also recognized Williams' argument that the affiant's focus on marijuana was inaccurate and misleading because the agents' real purpose was to search for evidence of major drug trafficking.  (ECF No. 79 at 45).

The court, considering the record before it, rejected Williams' arguments and found that the troopers' testimony about smelling marijuana emanating from room 219 was truthful.  (ECF No. 79 at 44 n. 17, 54-55)  There were numerous reasons for the court's finding, including: (a) the broader scope of the investigation was disclosed in the affidavit; (b) the evidence recovered from hotel room 219 (including marijuana residue and rolling papers) contradicted the affidavits provided by Williams and the investigator; (c) the troopers' testimony was detailed and consistent; (d) the troopers had training in detecting the odor of marijuana; (e) the troopers smelled marijuana on both August 28 and 29, 2017, which became stronger as they neared hotel room 219; (f) neither room 217 nor the maintenance closet – the enclosed areas closest to room 219 - smelled of marijuana; (g) the troopers testified about smelling masking agents and incense sticks were found in room 219; (h) one of the troopers smelled marijuana when Williams entered

4

the hotel lobby on August 29, 2017; (i) the window to room 219 was open, which was abnormal; and (j) one of the troopers observed that when Williams was in the hotel lobby on the morning of August 29, 2017, his eyes were bloodshot and watery (ECF No. 79 at 50-53).

The court concluded that Tetrault "did not omit from the affidavit material information about the original purpose of the investigation of defendant" and denied the *Franks* motion (ECF No. 79 at 46-47).

On August 27, 2019, a grand jury returned a superseding indictment against Williams charging him with:

– **Count I**: possession with the intent to distribute 5 kilograms or more of cocaine on April 13, 2017, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii);

– **Count II**: possession with the intent to distribute 5 kilograms or more of cocaine on August 29, 2017, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii);

– **Count III**: conspiracy to distribute 5 kilograms or more of cocaine and a quantity of marijuana from 2012 to March 2018, in violation of 21 U.S.C. § 846;

– **Count IV**: participating in a continuing criminal enterprise as principal administrator that involves 150 kilograms or more of cocaine, from 2012 through March 2018, in violation of 21 U.S.C. § 848(b);

– **Count V**: conspiracy to commit money laundering from 2012 through August 2017, in violation of 18 U.S.C. § 1956(h); and

– **Count VI**: interstate travel or transmission in aid of racketeering from 2012 through August 2017, in violation of 18 U.S.C. § 1952(a)(3).

(ECF Nos. 95-96.)

On August 18, 2023 (3 days prior to trial), the government produced Jencks Act materials that revealed that Tetrault was working with a confidential informant ("CI") in the days leading up to the search of room 219 in August 2017.   At trial, the government did not call the CI as a witness.  Defense counsel attempted to cross-examine Tetrault about why information about the

CI was not included in the search warrant affidavit.  The government objected on the basis of relevance because the CI was not a witness and surveillance footage, which had been provided to the defense and was used by the defense during cross-examination of Tetrault, showed that the CI did not bring anything into the hotel or take anything away from the hotel.  (ECF No. 283 at 78-79; G357I, G357J). The court sustained the government's objection to those defense questions, but advised defense counsel that the court would authorize a subpoena to compel the CI's testimony.  The court permitted the defense to ask whether the government was aware that anyone other than Williams had a key to the hotel room (ECF No. 289 at 128-134) and the defense did so.  The witness testified that law enforcement had been given a key, but she was unaware whether the women seen on the video surveillance system ever had access to a key to Williams' room.  (ECF No. 289 at 138-139).

There was an 11-day jury trial in August and September, 2023.  The prosecution called 27 witnesses and introduced hundreds of documentary exhibits. (See Witness and Exhibit List, ECF No. 269).  The official trial transcripts are electronically filed at ECF Nos. 281-293.  The jury convicted Williams on all 6 counts of the superseding indictment.

## III.    Discussion

### A.  Motion for new trial

In the pending motion for new trial (ECF No. 303), Williams argues: (1) the government's failure to disclose the existence of a CI who provided information during an interview with Tetrault on August 28, 2017, that allegedly triggered the search of the hotel room on August 29, 2017, violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*"), and *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("*Giglio*"); (2) Tetrault recklessly omitted

information about the CI from the affidavit in support of that search warrant, in violation of *Franks*; and (3) restrictions on defense counsel's cross-examination of the troopers at the 2018 hearing on Williams' motion to suppress evidence and of Tetrault at trial violated his 6th Amendment Confrontation Clause rights. Williams argues that the CI was the real reason for the search warrant (ECF No. 303 at 15).

The government contends that Williams is attempting to relitigate his motion to suppress evidence of the August 29, 2017 search of his hotel room (ECF No. 56). The government argues that it did not commit a *Brady* or *Franks* violation and had no duty to disclose the existence of a CI at the time of the search. The government argues that the court's limitations on defense counsel's cross-examination at the suppression hearing and trial were proper.

In reply, Williams represents that he is not seeking to relitigate his suppression motion and does not contend that the government should have disclosed the identity of the CI. Williams explains his Rule 33 motion is based on the "central tenet" that the more certain law enforcement officers were about Williams having cocaine in room 219, the more motivated they would be to fabricate probable cause to enter that hotel room (ECF No. 313 at 1).

1.   Standard for Rule 33 motions

Federal Rule of Criminal Procedure 33 provides, in relevant part: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Unlike a Rule 29 motion, a district court evaluating a Rule 33 motion does not view the evidence in the light most favorable to the government, but exercises its own judgment in assessing the government's case. *United States v. Silveus*, 542 F.3d 993, 1004 (3d Cir. 2008) (citing *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)).

Rule 33 motions, however, face a high hurdle.  Rule 33 motions are not favored and should be "granted sparingly and only in exceptional cases." *Id.* (citation omitted).  A district court can order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* at 1004-05 (citation omitted).  In *United States v. Moten*, 617 F. App'x 186 (3d Cir. 2015), the court explained that "[a] new trial is required on the basis of cumulative errors only when 'the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" *Id.* at 195 (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)).  Courts should exercise great caution before setting aside a verdict reached after a fully conducted jury trial.  *United States v. Kelly*, 539 F.3d 172, 182 (3d Cir. 2008).

2.  Alleged *Brady* violation

Williams contends that the government failed to disclose, prior to the suppression hearing, the existence of a CI who provided information to Tetrault in the days leading up to the search of room 219 on August 29, 2017, in violation of *Brady* and *Giglio*.

To establish a *Brady* violation, a defendant must show: "(1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material."  *United States v. Walker*, 657 F.3d 160, 185 (3d Cir. 2011).  In *Giglio,* the Supreme Court extended the disclosure obligation in *Brady* to encompass impeachment evidence relating to the credibility of a government witness. *Giglio*, 405 U.S. at 154.  In this case, Williams argues the existence of the CI had impeachment value, because it increased the agents' incentive to manufacture probable cause to search room 219.

In *Walker*, the court explained the materiality requirement as follows:

> Information is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. However, this does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The touchstone of materiality is a 'reasonable probability' of a different result. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

*Walker*, 657 F.3d at 185 (punctuation and citations omitted).

In *Walker*, the court emphasized that impeachment evidence is <u>not</u> material if it is merely cumulative:

> While we have recognized that "undisclosed *Brady* material that would have provided a *different* avenue of impeachment is material, even where the witness is otherwise impeached," *Lambert v. Beard*, 633 F.3d at 134 (emphasis added), " 'impeachment evidence, if cumulative of *similar* impeachment evidence used at trial ... is superfluous and therefore has little, if any, probative value,'" *Id.* at 133 (emphasis in original) (quoting *Conley v. United States*, 415 F.3d 183, 189 (1st Cir. 2005)).

*Id.* at 186 (emphasis in original).  In *Walker*, the court held there was no *Brady* violation where the government failed to disclose information about a drug incident involving a cooperating witness.  The defense argued the evidence would help to impeach the witness because he would have a motive to lie to please the prosecution.  The court rejected this argument and pointed out that the witness "was already impeached by defendants with respect to his self-interested motivation in agreeing to testify against defendants" based on the dismissal of two other drug charges. *Id.* at 186.

The court explained:

> The value of additional impeachment by reference to possession of 0.18 grams of crack cocaine in March 2007 is of "little, if any, probative value" because it is impeachment by the same avenue already taken by the defendants, namely Rhoades's motivation for testifying against the Walkers as part of a bargained-for

reduction in criminal penalties. Defendants had already thoroughly attacked Rhoades's credibility on account of prosecutorial inducements used to secure Rhoades's testimony against defendants, and thus this avenue of impeachment does not provide a "reasonable probability" of a different outcome. *See Tankleff v. Senkowski*, 135 F.3d 235, 251 (2d Cir. 1998) ("When a witness's credibility has already been substantially called into question in the *same respects* by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim.").

*Id.* (emphasis added in *Walker*).

The same analysis is applicable here. The alleged omission of the existence of a CI is cumulative. That evidence challenges the witnesses' testimony in the "same respects" as that presented by the defense at the suppression hearing, i.e., that evidence is relevant to the troopers' incentive to falsify the statements in the affidavit because they suspected Williams was a major drug trafficker.

The affidavit of probable cause presented to the magistrate judge outlined some (although not all) of the agents' efforts to investigate more serious drug trafficking by Williams. Among other things, the affidavit recounted Williams' 2012 and 2014 convictions in Arizona and the April 2017 seizure of 6 kilograms of cocaine and $78,500 in cash (ECF No. 303-1). The magistrate judge – from the affidavit - was able to evaluate the agents' incentive to falsely manufacture probable cause to search room 219 because they suspected Williams of serious drug trafficking.

To effectuate the Fourth Amendment's strong preference for searches conducted pursuant to a warrant, a magistrate's determination of probable cause is paid great deference by reviewing courts. *Illinois v. Gates*, 462 U.S. 213, 236 (1983); *accord United States v. Desu*, 23 F.4th 224, 235 (3d Cir. 2022) ("When a defendant files a motion to suppress evidence, a district court ensures that 'a substantial basis' existed for the magistrate judge's probable cause determination."); *United States v. Ninety–Two*

*Thousand Four Hundred Twenty–Two Dollars and Fifty–Seven Cents*, 307 F.3d 137, 146 (3d Cir. 2002) (when a warrant is issued and later challenged, "a deferential standard of review is applied in determining whether the magistrate [judge's] probable cause decision was erroneous."). Even if the affidavit included the existence of information Tetrault learned from a CI, there was probable cause to issue the search warrant.

A similar analysis applies to the outcome of the *Franks* suppression hearing. The court was acutely aware of the defense theory that the agents suspected Williams was engaged in serious drug trafficking, but were unable to develop probable cause to search the room. Indeed, the government readily conceded that the agents harbored suspicions about serious drug dealing, but lacked probable cause. Williams' motion asserted that the troopers' testimony that they smelled marijuana was a deliberate falsehood, perpetrated to manufacture probable cause to search the hotel room. The troopers who testified at the suppression hearing were cross-examined about their motivation to manufacture probable cause to justify a search of room 219.

The court, knowing the agents' incentive and considering all the evidence presented by Williams and the government at the suppression hearing, found that the troopers testified truthfully about smelling marijuana emanating from room 219 on August 29, 2017 (for the reasons summarized above, *infra* at 4-5, and set forth in its opinion, ECF No. 79). There is no reasonable probability that, had the evidence about the existence of a CI been disclosed to the defense (and introduced into evidence at the suppression hearing), the result of the proceeding would have been different. *Walker,* 657 F.3d at 185.

11

In sum, because the evidence was cumulative, it was not material, and there was no *Brady* violation.[3]

3.   Alleged *Franks* violation

This aspect of Williams' Rule 33 motion is, in essence, a motion for reconsideration of the court's ruling on his *Franks* suppression motion.  Williams argues that Tretault's affidavit was recklessly misleading because it omitted a reference to the existence of a CI.  Williams argues that if the magistrate judge had known about the existence of the CI, the magistrate judge would have differently assessed the claim about the odor of marijuana.  In his initial suppression motion based on *Franks* and supporting brief (ECF Nos. 56, 57), Williams similarly argued that Tretault's affidavit was inaccurate and misleading because it failed to articulate the full scope of the investigation against him.  The court, however, considered the record before it, which included references in the affidavit to the broader investigation into more serious drug trafficking by Williams, and rejected that argument and denied Williams' motion to suppress on the basis of a *Franks* violation.

"The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or omission of material information) in a search-warrant affidavit." *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012).  As noted, the court held a *Franks* hearing in this case.  At a *Franks* hearing, a defendant must prove his allegations by a preponderance of the evidence in order for a judge to suppress evidence obtained as a result of the warrant. *Desu*, 23 F.4th at 234 (quoting *Franks*, 438 U.S. at 156).

---

[3] The court does not reach the government's alternative argument that it was entitled to withhold information about the existence of a CI under the "informer's privilege."

The court set forth the applicable law in its opinion denying Williams' motion to suppress, and incorporates that discussion here:

> COL 3. Under *Franks*, when a warrant is obtained based upon a false statement made in a supporting affidavit, the fruits of the search warrant must be excluded if the remaining material, following the excision of the falsity, is independently insufficient to support a finding of probable cause. *United States v. Frost*, 999 F.2d 737, 742-43 (3d Cir. 1993) (citing *Franks*, 438 U.S. at 155-56).
>
> COL 4. If the falsity is based upon an omission rather than a misstatement of facts, the court must remove the falsehood "by supplying the omitted information to the original affidavit" and determine if the affidavit with the added information contains probable cause. *Sherwood v. Mulvihill*, 113 F.3d 396, 400 (3d Cir. 1997).
>
> COL 5. If probable cause exists after the affidavit has been "corrected," then the deficiency, i.e., the falsity or omission, is not material. *United States v. Yusuf*, 461 F.3d 374, 383-84 (3d Cir. 2006).

ECF No. 79.

The falsity prong of the *Franks* test may be satisfied by a reckless omission from the affidavit. Agents are obligated to disclose known facts that "[a]ny reasonable person would have known ... was the kind of thing the judge would wish to know" in making a probable cause determination." *See Wilson v. Russo,* 212 F.3d 781, 787 (3d Cir. 2000). There is no blanket rule, however, that all information must be presented to a judge who issues an arrest warrant. *Id.* ("We cannot demand that police officers relate the entire history of events.").

Here, for the reasons set forth in its prior opinion (ECF No. 79) and above, the omission of the existence of a CI was not material where the affidavit did disclose there was a broader investigation into more serious drug dealing by Williams and did not constitute a *Franks* violation. Notably, Williams did not argue the affidavit was insufficient on its face. The court, in resolving the *Franks* test, recognizes that probable cause still existed after adding the alleged missing information about the CI to the affidavit. As the court explained above, the missing

13

information is relevant to the agents' veracity and their incentive to falsify the warrant, but there already was information in the affidavit about the broader investigation.  Based upon the record before it, and acknowledging that incentive, the court found (for the reasons summarized above, *infra* at 4-5, and set forth in ECF No. 79) that the troopers testified truthfully about the smell of marijuana emanating from room 219. *Id.* at 50.  The court also explained that, in any event, Williams failed to show that Tretault (the affiant) had any basis to doubt the veracity of the troopers' statements that they smelled marijuana. ECF No. 79 at 48.

The court commented in its prior opinion that officers may investigate smaller crimes, even if those smaller crimes are mere pretext for investigating a larger crime:

> COL 23. In any event, law enforcement officers may investigate smaller crimes (possession of marijuana) in the course of an investigation of larger crimes (distribution of controlled substances) even if the smaller crimes are "merely pretext" for the investigation of the larger crime. *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) ("[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime."); *United States v. Vires*, No. 4:12-CR-00306-17 KGB, 2014 WL 12687442, at *5 (E.D. Ark. Dec. 8, 2014), aff'd, 656 F. App'x 266 (8th Cir. 2016); *Ferguson v. United States*, No. CIV. 11-0154, 2012 WL 5398809, at *9 (W.D. Pa. Nov. 2, 2012).

ECF No. 79 at 47.  The affidavit, even adding the information about the CI, supported the existence of probable cause to issue the search warrant.

In summary, the court adheres to its determination there was no *Franks* violation.

4.   Alleged 6th Amendment violations

Williams argues that the court violated his rights under the confrontation clause of the 6th Amendment by limiting questions about the CI during the suppression hearing and at trial.

The 6th Amendment provides, in relevant part:  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

U.S. Const. amend. VI.  This right, however, is not limitless.  The Supreme Court explained in

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986):

> It does not follow, of course, that the Confrontation Clause of the 6th Amendment
> prevents a trial judge from imposing any limits on defense counsel's inquiry into
> the potential bias of a prosecution witness. On the contrary, trial judges retain wide
> latitude insofar as the Confrontation Clause is concerned to impose reasonable
> limits on such cross-examination based on concerns about, among other things,
> harassment, prejudice, confusion of the issues, the witness' safety, or interrogation
> that is repetitive or only marginally relevant.

*Id.* at 679.  A judge's restriction on defense counsel's questions "will not constitute reversible

error unless it is so severe as to constitute a denial of the defendant's right to confront witnesses

against him and it is prejudicial to [his/her] substantial rights."  *United States v. Oliva*, 790 F.

App'x 343, 351 (3d Cir. 2019) (citation omitted).

In this case, the CI was not referenced in the search warrant affidavit and was not called

as a witness at trial.  Questions about the CI, therefore, had marginal – if any – relevance.  As

explained above, questions about the CI provided only cumulative information about the agents'

alleged motivation to manufacture probable cause to enter room 219.

At the suppression hearing, the court gave the defense ample room to probe that

motivation (ECF No. 78).[4]  The government conceded that the agents believed that Williams was

a major narcotics trafficker, but had been unable to develop probable cause until troopers

smelled marijuana emanating from room 219. (ECF No. 78 at 10-11).

At trial, during the defense cross-examination of Tetrault, the jury heard that Tetrault

learned from a CI on August 28, 2017, that Williams was at the Extended Stay Hotel.  (ECF No.

289 at 105-106).  The government lodged an objection about disclosure of the CI's name and the

court held an extensive sidebar about the extent of questioning that would be permitted about the

---

[4] One of the troopers, Daniel Beatty, testified as a witness at trial (ECF Nos. 283, 284) and the defense
could have probed his motives to falsely testify, but did not do so.

CI.  (ECF No. 289 at 106-134).  The court reviewed documents provided by the government, permitted the defense to ask about persons having keys to Williams' room and explained that it would sign a subpoena for the defense to call the CI as a witness in its case.  (ECF No. 289 at 132-134).  The court granted the government's motion to strike questions to Tetrault about a CI, without prejudice to the defense being able to call the CI as a witness. *Id.* at 134.  The defense did not call the CI as a witness.

After the conclusion of the evidentiary part of the trial, in addition to a general instruction to the jury about how to evaluate the credibility of witnesses, ECF No. 290 at 98-100, the court specifically instructed the jury about the credibility of law enforcement witnesses, stating that "it is quite legitimate for defense counsel to try to attack the believability of a law enforcement witness on the ground that his or her testimony may be colored by a personal or professional interest in the outcome of the case."  (ECF No. 290 at 101).

Williams argues that questions about the CI would have impacted the jurors' evaluation of law enforcement credibility and motivations throughout the investigation (ECF No. 303 at 28).  This argument, however, is simply an attempt to reargue the court's denial of the *Franks* suppression motion.  To repeat, the court was well aware of the defense's argument about the agents' motivation to falsify evidence in order to manufacture probable cause to search room 219, but, (as explained above) upon consideration of the record before it, the court found that the troopers' testimony about smelling marijuana was truthful.  In denying Williams' motion to suppress evidence, the court explained that Williams failed to show that Tretault (the affiant) had any basis to doubt the veracity of the troopers' statements that they smelled marijuana. (ECF No. 79 at 48).  Questions at trial about a CI who was not called as a witness were not relevant; the only potential relevance was to show that the larger investigation into serious drug trafficking

may have impeachment value, but that value was minimal in light of the other evidence about the larger investigation which served as a basis to cross-examine the government witnesses in an effort to impeach them.  Any potential "probative value [was] substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Here, the jury would have heard evidence about a CI who was not a witness, which would have caused the jury to be confused or to speculate about why the witness did not testify, and there would have been a needless presentation of cumulative evidence.

Williams' reliance on *United States v. Chandler*, 326 F.3d 210, 222 (3d Cir. 2003) (holding the court improperly limited cross-examination about the benefits of plea bargains entered into by testifying cooperators), is misplaced.  In *Chandler*, unlike here, the defense was precluded from cross-examining cooperating informants who testified at trial and whose testimony "was essential in showing that [the defendant] was criminally involved." *Id.* at 224.  In this case, the issue about the CI was raised during the cross-examination of Tretault, the government agent, and the information was relevant only to the credibility of statements made by troopers to Tretault and described in a search warrant affidavit.  The court advised the defense that the court would sign a subpoena for the defense to call the CI as a witness and permitted the defense to ask Tetrault whether the government was aware of anyone else who had a key to Williams' hotel room.  If Tetrault testified that the CI had a key, the court explained it would reevaluate the extent of the cross-examination.  (ECF No. 289 at 131-132).  Tetrault responded that the troopers had a key, but she did not know of anyone else who had a key.   (ECF No. 289 at 139).  Williams did not present any evidence that Tretrault had reason to doubt the troopers' statements that they smelt marijuana emanating from room 219 on August 29, 2017.

Even if the jury heard the testimony about the existence of a CI, the court, given the other evidence of record, cannot find that the jury would have formed a significantly different impression of Tretault's credibility.  *United States v. Mussare*, 405 F.3d 161, 169 (3d Cir. 2005).

    5.   Summary of Rule 33 motion

For the reasons set forth above, Williams' motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 (ECF No. 303) will be DENIED.

**B.  Motion for judgment of acquittal**

Pursuant to Federal Rule of Criminal Procedure 29, Williams seeks a judgment of acquittal.  Williams contends that the government failed to prove any of the 6 charges against him beyond a reasonable doubt.  The government argues that the jury's verdict should be upheld.

    1.   Standard for Rule 29 motions

"The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Serafini*, 233 F.3d 758, 770 (3d Cir. 2000). In reviewing a jury verdict for sufficiency of the evidence, "we determine whether there is substantial evidence that, when viewed in the light most favorable to the government, would allow a rational trier of fact to convict." *United States v. Lore*, 430 F.3d 190, 203–04 (3d Cir. 2005); *accord United States v. John-Baptiste*, 747 F.3d 186, 201 (3d Cir. 2014) (courts must "affirm the judgment if there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt").

In *United States v. Smith*, 294 F.3d 473 (3d Cir. 2002), the court explained:

> When deciding whether a jury verdict rests on legally sufficient evidence it is not for us to weigh the evidence or to determine the credibility of the witnesses. Rather, we must view the evidence in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt; *see also Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (an inquiry into the sufficiency of the evidence does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt).

*Id.* at 478 (emphasis in original) (punctuation and citations omitted).  In *Smith*, the Third Circuit Court of Appeals reversed a district court's granting of a Rule 29 motion, because "the District Court drew inferences favorable to the defense and substituted its conclusions for those of the jury." *Id.*

A finding of insufficiency should be "'confined to cases where the prosecution's failure is clear.'" *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). "Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).

The government's case can "be proven entirely by circumstantial evidence." *John-Baptiste*, 747 F.3d at 204 (reversing district court's grant of Rule 29 motion).  The jury's "verdict can be supported by direct or circumstantial evidence, and reasonable inferences can be drawn from both types of evidence." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013) (en banc). In a drug conspiracy case, "although the prosecution must prove the defendant's knowledge of the conspiracy's specific objective, that knowledge need not be proven by direct evidence." *Id.*  "There is no requirement ... that the inference drawn by the jury be the only inference possible or that the government's evidence foreclose every possible innocent

explanation." *Id.* (citation omitted).  The evidence must be reviewed as a whole, not in isolation. *Id.* at 430. The court emphasized:  "It is up to the jury—not the district court judge or our Court—to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld." *Id.* at 432.


    2.   Credibility of witnesses

        a.   Standard

The court is not permitted to supersede the jury's evaluation of a witness' credibility. *United States v. Reyeros*, No. CR 00-822 (WGB), 2005 WL 8167915, at *1 (D.N.J. Mar. 30, 2005), *aff'd*, 537 F.3d 270 (3d Cir. 2008) ("The Court must presume that the jury properly evaluated the credibility of witnesses, properly found the facts, and drew justifiable inferences from the evidence.") (citations omitted).

In *United States v. Williams*, No. CRIM. A. 94-196, 1997 WL 805256 (E.D. Pa. Dec. 17, 1997), the court summarized the high standard for finding a witness' testimony to be incredible:

> In order to establish that the testimony of a witness is incredible as a matter of law, "the testimony must be unbelievable on its face, physically impossible for the witness to observe, or contrary to the laws of nature." *United States v. Emerson*, 128 F.3d 557 (7th Cir.1997) (quoting *United States v. Davis*, 15 F.3d 1393, 1398 (7th Cir.1994)). The lack of credibility of a witness will not render such testimony incredible as a matter of law "even where the testimony is totally uncorroborated and came from an admitted liar, convicted felon, large-scale drug dealing, paid government informant." *Id.*

*Id.* at *2 (explaining the witness testimony was not "incredible" where "the incidents and events he described of his personal knowledge could have occurred, and it was up to the jury to decide if they, in fact, did occur.").

b.   Argument

Williams argues that "there was no basis for the jury to accept any of [Wendell] Caldwell's testimony as credible."  (ECF No. 305 at 14).  Williams characterizes Caldwell as a "repeat jail-house informant" and recounts various reasons to doubt Caldwell's credibility, i.e.: Caldwell falsely told Williams that he (Caldwell) was a paralegal; he was facing 10 years in prison and wanted to testify against Williams in exchange for a plea deal; and he lied to his probation officer.  This evidence was presented to the jury during the thorough cross-examination of Caldwell.  (Tr., ECF No. 287 at 22-56).

The jury was specifically instructed that the government was permitted to present the testimony of witnesses who had reached a plea bargain with the government in exchange for their testimony, but the jury should "consider the testimony of any such witness with great care and caution."  (ECF No. 290 at 101-102).  The jury was separately instructed that it should consider the testimony of informers with great care and caution.  (ECF No. 290 at 102-103).

Caldwell's testimony was not "incredible" as a matter of law.  It was not unbelievable on its face; Caldwell admittedly interacted and had conversations with Williams; and his testimony was not contrary to the laws of nature.  As the government pointed out, certain aspects of Caldwell's testimony were corroborated by other evidence (ECF No. 310 at 14-15).  The jury had before it the evidence Williams now points to in support of its argument that Caldwell was not credible.  Viewing the evidence in the light favorable to the government, the jury, however, had a basis to credit Caldwell's testimony.  This court, under applicable law, is not permitted to second-guess the jury.  The jury heard the challenges to Caldwell's credibility and was instructed to treat his testimony with great care and caution, but when the evidence is viewed in favor of the government, the jury had a basis to find his testimony credible.

Williams' reliance on *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993), *as amended* (Apr. 30, 1993), *aff'd,* 511 U.S. 485 (1994), is misplaced.  In *Custis*, the court recognized that a "rare case" might justify granting a new trial "solely on the basis of newly discovered impeachment evidence."  *Id.* (citing *United States v. Taglia,* 922 F.2d 413, 415–16 (7th Cir.1991)).  The requisite exceptional circumstances are quite narrow:  (1) the government's case must rest "**entirely** on the uncorroborated testimony of a single witness"; (2) who was **discovered after trial**; (3) to be "utterly unworthy" of being believed; (4) "because he had lied consistently in a **string** of previous cases."  *Id.* (emphasis added).  In *Custis* and *Taglia*, the requirements for the exception were not met.

The narrow exception is not met in this case either.  The government's case against Williams did not rest "entirely" on Caldwell's uncorroborated testimony.   The doubts about Caldwell's credibility were not only discovered prior to trial, they were actually presented to the jury in this case.  When the evidence is viewed in the light favorable to the government, the court is constrained to conclude that the jury had a basis to determine that Caldwell's testimony was worthy of being believed.

### 3.   Counts of conviction

Williams alleges insufficiency of the evidence with respect to all counts of conviction. He focuses primarily on the most serious charge, i.e., participating in a continuing criminal enterprise as principal administrator that involves 150 kilograms or more of cocaine, from 2012 through March 2018, in violation of 21 U.S.C. § 848(b) (count IV), which carries a mandatory sentence of life imprisonment.  The court is mindful of the seriousness of that conviction and the penalty attached to it, and carefully reviewed the evidence of record and the arguments raised by

Williams.  The standards of review, however, do not impose more rigorous scrutiny due to the severity of the punishment.  The court will address the Rule 29 motion with respect to count IV first and then address the remaining counts of conviction.

       a.   Count IV

In count IV of the superseding indictment, the government alleges:

> From in and around 2012, and continuing thereafter to in and around March 2018, in the Western District of Pennsylvania and elsewhere, the defendant, Racoco Williams, did unlawfully, knowingly and intentionally engage in a continuing criminal enterprise in that the defendant, Racoco Williams, unlawfully, knowingly and intentionally violated Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(ii), and 846, as alleged in counts 1, 2, and 3 of the superseding indictment, which violations were part of a continuing series of violations of the Controlled Substances Act, Title 21, United States Code, Section 801, et. Seq., undertaken by the defendant, Racoco Williams, in concert with at least 5 other persons with respect to whom the defendant, Racoco Williams, occupied a position of organizer, supervisor, or any position of management, from which such continuing series of violations the defendant, Racoco Williams, obtained substantial income and resources.

> Furthermore, Racoco Williams is charged with being a principal administrator, organizer, supervisor or leader of the criminal enterprise, which involved possession with intent to distribute and distribution of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and the amount of a mixture and substance containing a detectable amount of cocaine involved was 150 kilograms or more, in violation of Title 21, United States Code, Section 848(b)."

(Superseding Indictment, ECF No. 95).

With respect to count IV, the jury was instructed that the government must prove each of the following elements beyond a reasonable doubt:

1.     that Racoco Williams violated the Controlled Substances Act as charged in counts 1, 2, and 3 of the superseding indictment;

2.     that such violations were part of a continuing series of violations of the Controlled Substances Act. These violations must be connected together as a series of related or ongoing activities, as distinguished from isolated and disconnected acts. You

must unanimously agree on which of at least three of these underlying violations has been proved;

3.      that Racoco Williams committed these violations in concert (or by common design or plan) with 5 or more other persons. The 5 other persons need not have acted at the same time or in concert with each other. You need not unanimously agree on the identity of any other persons acting in concert with the defendant, so long as each of you finds that there were 5 or more such persons;

4.      that Racoco Williams acted as organizer, supervisor or manager of those 5 or more other persons;

5.      the defendant obtained a substantial amount of money or other property from the series of violations;

6.      that Mr. Williams was the principal administrator, organizer, or leader of the enterprise or was one of several such principal administrators, organizers, or leaders; and

7.      that the weight or quantity of a mixture or substance which contains a detectable amount of cocaine involved in the conspiracy as charged in Count Three of the Superseding Indictment was 150 kilograms or more.

(ECF No. 290).

Williams argues that the government failed to prove three of these elements: (1) the violations involved 150 kilograms or more of cocaine; (2) Williams acted in concert with 5 or more individuals; and (3) that the individuals acted subject to Williams' supervision, management or organizational direction (ECF No. 305 at 16).

The continuing criminal enterprise statute "is aimed at drug ring managers or 'kingpins', and it defines their role in terms of supervising others while engaged in three or more drug felonies." *United States v. Chagra*, 653 F.2d 26, 28 (1st Cir. 1981).

The leadership and quantity elements are set forth in 18 U.S.C. § 848(b), which provides, in relevant part:

Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a), if—

**(1)** such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and
**(2)(A)** the violation referred to in subsection (c)(1) involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title.

Section 841(b)(1)(B) lists several different controlled substances (heroin, cocaine, cocaine base, PCP, LSD, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, marijuana and methamphetamine). As relevant to this case, §841(b)(1)(B)(ii) refers to 500 grams or more of a mixture or substance containing a detectable amount of cocaine. To trigger liability under § 848(b), therefore, the violation must involve at least 150 kilograms of cocaine (300 times 500 grams).

The "in concert" element is set forth in § 848(c), which provides:

**(c) "Continuing criminal enterprise" defined**
For purposes of subsection (a), a person is engaged in a continuing criminal enterprise if--
    **(1)** he violates any provision of this subchapter or subchapter II the punishment for which is a felony, and
    **(2)** such violation is a **part of a continuing series of violations** of this subchapter or subchapter II--
        **(A)** which are undertaken by such person **in concert** with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
        **(B)** from which such person obtains substantial income or resources.

(Emphasis added).

There must be a continuing series of violations. The violations must be of "this subchapter," i.e., subchapter I of the Controlled Substances Act, 21 USC §§ 801-904).[5] *See United States v. Galecki*, 89 F.4th 713, 734 (9th Cir. 2023) ("A 'continuing series' for purposes of the second element means 'three or more federal narcotics violations.'"). In other words,

---

[5] Subchapter II of the Controlled Substances Act, 21 U.S.C. §§ 951-971, governs import and export of controlled substances.

some of the continuing series of violations of the drug laws could involve marijuana, so long as the government proved the quantity element of 150 kilograms of cocaine.

Five or more persons must be involved in the continuing series of violations.  In *United States v. Kuehner*, No. 1:22-CR-120, 2023 WL 1422310 (E.D. Va. Jan. 31, 2023), the court explained that the number of persons acting in concert "may be tallied by considering the predicate felony violations together as a whole.") *Id.* at *9 (discussing similar "in concert" language in child porn statute).  The court noted that the Third Circuit concluded that the "in concert" requirement of the child porn statute "refers to the series of offenses cumulatively, rather than individually." *Id.* (citing *United States v. El-Battouty*, 38 F.4th 327, 329 (3d Cir. 2022)).

The Supreme Court explained that "Congress intended the word 'concert' to have its common meaning of agreement in a design or plan." *Rutledge v. United States*, 517 U.S. 292, 300 n. 10 (1996) (citing *Jeffers v. United States,* 432 U.S. 137, 148–149 (1977)).  Thus, five persons must engage in cooperative action and agreement to violate the drug laws.  *Id.*

Each person, however, need not know all the details of the enterprise.  *See Galecki*, 89 F.4th at 734-35 ("It is not necessary, for purposes of the third 'in concert with' element, that the defendant act in concert with five or more persons at the same time, or that five or more persons be engaged in any single criminal transaction.") (punctuation and citations omitted).  In *United States v. Johnson*, 54 F.3d 1150 (4th Cir. 1995), the court explained:

> As to the numerical requirement of five or more participants, the Government need not prove that the five individuals were supervised and acted in concert at the same time, or even that they were collectively engaged in at least one specific offense. The Government also need not show that the defendants had personal contact with the five persons because organizational authority and responsibility may be delegated.

*Id.* at 1155 (punctuation and citations omitted).

The court will review the evidence with respect to each element.

> i.  150 kilograms of cocaine

Based upon the record, the jury could have reasonably concluded that the violations involved more than 150 kilograms of cocaine.  According to Caldwell, Williams claimed the volume of his drug trafficking was 50 to 100 kilograms of cocaine per month (ECF No. 286 at 15) and he was losing two to three million dollars due to his incarceration.  (ECF No. 286 at 21).

The 150 kilogram threshold would be met, based on the low end of Caldwell's testimony, during the four months between April 13, 2017 (when 6 kilograms of cocaine was seized from Hylton's home) through August 29, 2017 (when 17 kilograms of cocaine was seized from Williams' hotel room) (50 kilograms times 4 months = 200 kilograms).[6]  The seizures and the testimony about how frequently the women transported suitcases at Williams' direction from various cities in other states to Pittsburgh corroborate Caldwell's testimony about the quantity of cocaine attributable to Williams during that time period.

There was evidence of hundreds of suitcases involved in the trips taken by the various women.  The suitcase seized in April 2017 contained 6 kilograms of cocaine.  (ECF No. 283 at 31).  The two suitcases seized from room 219 in August 2017 contained 17 kilograms of cocaine.  (ECF No. 283 at 44, 48-49).  Caldwell testified that Williams told him those suitcases originally contained 25 kilograms of cocaine, but Williams removed 8 kilograms of cocaine prior to the search and seizure.  (ECF No. 287 at 18-20).  The jury could reasonably infer from Caldwell's testimony that the other suitcases being transferred from various cities in other states to

---

[6] Even reducing or eliminating the monthly quantity after Williams was incarcerated in August 2017, the amount comfortably exceeds the threshold.

Pittsburgh contained similar (or even far lesser) amounts of cocaine, the 150 kilogram threshold would have been easily met.

There was other circumstantial evidence that Williams was involved in large scale trafficking beyond the amounts seized by the government that would corroborate Caldwell's testimony. The government presented testimony from an expert witness, Karen Springmeyer, about large scale drug trafficking organizations. Among other things, the expert testified that original sources produce cocaine in kilogram quantities, which are compressed into bricks with a hydraulic press with a visible logo or image (ECF No. 289 at 161-162); drug traffickers try to maintain a low inventory and turn it over quickly (ECF No. 290 at 11-12); seizures of large amounts of cash and cocaine at the same time indicate that some of the cocaine was sold (*id*. at 13-14); and a mid-level drug dealer would have a difficult time recovering from the seizure of 6 kilograms of cocaine and $178,000 in cash (*id.* at 15). The expert opined that only a high-level dealer would be able to absorb a loss of $100,000 one month, another loss of over $100,000 the next month and be able to possess 17 kilograms of cocaine and $190,000 in cash and $156,000 in jewelry 3 months later. (ECF No. 290 at 22).

The record must be viewed as a whole and the evidence must be considered in the light most favorable to the government. There was substantial evidence of record which supports the jury's determination that the offense exceeded the 150 kilograms of cocaine threshold.

### ii.   Number of participants

The government was required to prove beyond a reasonable doubt that Williams acted in concert with 5 or more other individuals. Williams cites *Jeffers*, 432 U.S. at 147-48, for the proposition that a defendant cannot "act in concert" with an "innocent dupe." The Supreme

Court explained that "Congress intended the word 'concert' to have its common meaning of agreement in a design or plan." *Id.* at 149.  Williams argues that the women who transported suitcases (i.e., the couriers or mules), even if they suspected their activities were illegal, did not have the requisite state of mind.

The was substantial evidence to support the jury's determination that Williams acted in concert with 5 or more people in committing the "continuing series of violations" of the drug laws. 18 U.S.C. § 848(c); *El-Battouty*, 38 F.4th at 329 ("in concert" requirement "refers to the series of offenses cumulatively, rather than individually.").  As explained above, the government does not need to prove that the 5 individuals acted in concert at the same time or that they collectively engaged in the same specific offense.  *Johnson*, 54 F.3d at 1155.  Count III of the indictment charged a conspiracy to distribute both cocaine and marijuana.  The court will briefly review the evidence with respect to certain of those people relied upon by the government to prove this element of the offense.

Kristen Hylton ("Hylton") was Williams' girlfriend and lived at the residence in Carnegie, Pennsylvania, from which 6 kilograms of cocaine were seized in April 2017.  Hylton testified that the cocaine was provided by Williams.  (ECF No. 287 at 151).  During the April 2017 search, agents found $78,500 in cash in Hylton's purse (ECF No. 283 at 29).  Hylton counted Williams' money (ECF No. 287 at 121-123).  Hylton testified at trial that she pleaded guilty to aiding and abetting cocaine distribution with Williams (ECF No. 287 at 140).  The jury could reasonably conclude that Hylton acted in concert with Williams.

Hylton testified that Che, Bego, Prof, Prongo and Ajji[7] were members of a "brotherhood" with Williams.  These persons got drugs from Williams and distributed the drugs to others.

---

[7] The names of the first four individuals, respectively, are Luumba Green, Aaron Thompson, Lockie Blair and Fred Thompson.  (ECF No. 310 at 11).  Ajji's real name is not in the record.

(ECF No. 287 at 115, 127-129).  They sold drugs for a living. *Id.*  Hylton testified that Che, Bego, Prof, Prongo and Ajji used codewords – "White Lady" referred to cocaine and "greens" referred to marijuana.  (ECF No. 287 at 119).  Williams was the supplier of cocaine and marijuana to Che, Prof, Ajji, Prongo, and "all the guys."  (ECF No. 287 at 120).  Based on Hylton's testimony, the jury could reasonably conclude that Williams acted in concert with Hylton and each of these 5 persons to violate the drug laws. *See United States v. Claxton*, 685 F.3d 300, 309 (3d Cir. 2012) ("[A]n admitted-conspirator's trial testimony regarding who was or was not [her] coconspirator, ... remains highly pertinent to the question of the defendant's knowing complicity in the crime.").  Williams' motion for acquittal did not address the role of these 5 persons.

Hylton testified that Heavenly Fairley was the "runner" for the organization and performed such tasks as wiring money or providing money to a confederate who got arrested. (ECF No. 287 at 126-127.)  The jury could reasonably conclude that Williams acted in concert with Heavenly Fairley, even if she received her instructions through an intermediary.

Shatanya Thomas ("Thomas") testified that she knew she was doing something illegal from her very first trip taking suitcases for Williams.  (ECF No. 284 at 22).  Thomas took numerous trips for Williams over 5 years and received $2,500 per trip, less expenses (ECF No. 284 at 21, 23).  Thomas pleaded guilty to conspiring with Williams (ECF No. 284 at 51-52).  The jury could have reasonably concluded that Thomas acted in concert with Williams and was not an innocent dupe. *See Caraballo-Rodriguez*, 726 F.3d at 425 ("knowledge of the specific objective contemplated by the particular conspiracy . . . can be demonstrated by actual knowledge or willful blindness.").

There were additional women who transported suitcases at Williams' direction.  One of them, Shellsie Hackett, testified that Williams had separate groups of people in each of the cities to which she traveled to facilitate Williams' drug trafficking (ECF No. 288 at 27).

In sum, there was substantial evidence to support the jury's determination that Williams acted in concert with 5 or more persons.

### iii.   Leadership role

Williams did not directly challenge the evidence showing that he was a leader or organizer.  Instead, his primary argument was that the government did not prove that the couriers had the requisite mental state, and thus, were not acting at Williams' direction (ECF No. 305 at 23).  As discussed above, the jury could have concluded that the couriers, who testified, were not innocent dupes, but acted in concert with Williams.

The court, upon review of the trial record, concludes that there was substantial evidence sufficient to show that Williams was a principle administrator, organizer or leader of the enterprise.  *See* ECF No. 285 at 99 (Myllie Blanton testified Williams is the "shot caller," "the big boss"); ECF No. 285 at 82 (Myllie Blanton testified she understood she was working for Williams, because when she asked questions of other members, they told her they had to check with Williams); ECF No. 287 at 129-130 (Hylton testified Williams was in charge); ECF No. 283 at 50 (Thomas testified that Williams was the person who gave the orders).

In sum, there was substantial evidence adduced at trial for the jury to find each of the elements of count IV beyond a reasonable doubt.

b.   Counts I and II

Counts I and II will be addressed together, because each involved the same kind of offense (albeit on different dates).  In count I of the superseding indictment, the government alleged that "on or about April 13, 2017, in the Western District of Pennsylvania, the defendant, Racoco Williams, did knowingly, intentionally, and unlawfully possess with intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii)." (ECF No. 95).

In count II of the superseding indictment, the government alleged that "on or about August 29, 2017, in the Western District of Pennsylvania, the defendant, Racoco Williams, did knowingly, intentionally, and unlawfully possess with intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii)." (ECF No. 95).

For each offense, the jury was instructed that the government must prove each of the following elements beyond a reasonable doubt:

1.     that Racoco Williams possessed 5 kilograms or more of a mixture or substance containing a controlled substance;

2.     that Racoco Williams possessed the 5 kilograms or more of the controlled substance knowingly or intentionally;

3.     that Racoco Williams intended to distribute the controlled substance;

4.     that the controlled substance was cocaine.

(ECF No. 290).

Count I involved the April 13, 2017 seizure of cocaine from Hylton's residence in Carnegie, Pennsylvania. Williams argues that he did not own or live at that home and was not present at the time of the seizure. Thomas testified that she took a domestic flight and transported the suitcases from which the cocaine was recovered to Pittsburgh in checked luggage. Two days prior to the seizure, Williams met her at the Pittsburgh airport; drove her to the Carnegie location and carried a suitcase she had transported inside the residence (ECF No. 284 at 56-59). The evidence showed that Thomas identified the suitcase and the luggage tag on the suitcase, which contained her phone number. (ECF No. 284 at 105-106; Exh. 125). Hylton testified that the 6 kilograms of cocaine seized in April 2017 were provided by Williams. (ECF No. 287 at 151). There was substantial evidence adduced for the jury to find that Williams knowingly and constructively possessed the cocaine and, given the quantity (6 kilograms), he intended to distribute it.

Count II involved the 17 kilograms of cocaine recovered on August 29, 2017, from room 219 at the Extended Stay hotel. Wiilliams argues he was not present in the hotel room at the time of the search and fingerprints from the items seized from the room did not match his fingerprints. Williams points out that other people had access to the room, including (from a blurry photo from the hotel surveillance system) a woman carrying a similar suitcase.[8] The government introduced evidence that Williams had stayed in room 219 for 3 days (August 27-29, 2017); was videotaped carrying items later found in the search; and had a key card to the room in his hand when arrested. Caldwell testified that Williams told him the suitcases in the hotel room were brought by a courier who was a day late and originally contained 25 kilograms of cocaine,

---

[8] The government argues that photos show the courier bringing the suitcase to the hotel (Exh. 357K-M; ECF No. 283 at 73-74), and introduced extraction reports showing the timing of telephone calls and text messages to and from Williams' phone to a New York number on the relevant dates and times (Exh. 766, 769; ECF No. 289 at 82-83, 88).

but Williams removed 8 kilograms of cocaine prior to the search and seizure.  (ECF No. 287 at

18-20).  There was substantial evidence for the jury to find that Williams knowingly and

constructively possessed the cocaine in his hotel room and, given the quantity (17 kilograms), he

intended to distribute it.

       c.   Count III

In count III of the superseding indictment, the government alleged:

> From in and around 2012, and continuing thereafter to in and around March 2018, in the Western District of Pennsylvania and elsewhere, the defendant, Racoco Williams, did knowingly, intentionally and unlawfully conspire with persons both known and unknown to the grand jury, to distribute and possess with intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii), and a quantity of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D).

(ECF No. 95).

The jury was instructed that the government must prove each of the following elements

beyond a reasonable doubt:

> 1.    that two or more persons agreed to distribute and possess with the intent to distribute a controlled substance;

> 2.    that Racoco Williams was a party to or member of that agreement;

> 3.    that Racoco Williams joined the agreement or conspiracy knowing of its objectives to distribute and possess with the intent to distribute a controlled substance and intending to join together with at least one other alleged conspirator to achieve those objectives; that is, that Racoco Williams and at least one other alleged conspirator shared a unity of purpose and the intent to achieve those objectives; and

> 4. that the weight or quantity of the controlled substance which was within the scope of the conspiracy and reasonably foreseeable to Racoco Williams was 5 kilograms or more.

(ECF No. 290).

Williams recognizes that the government may prove conspiracy with circumstantial evidence. (ECF No. 305 at 27). He argues, however, that the inferences of an agreement with two or more persons with respect to the April 2017 and August 2017 seizures of cocaine are too attenuated.

In order to prove that co-conspirators agreed to possess cocaine with intent to distribute, the government need not show that the conspirators agreed on all the details of the scheme so long as it can show the essential nature of the plan. *United States v. Parnell*, 652 F. App'x 117, 119 (3d Cir. 2016). As recounted above, Hylton and Thomas testified about Williams' agreement and involvement in the plan to possess with intent to distribute 6 kilograms of cocaine in April 2017 (including meeting Thomas at the airport and personally carrying the suitcase from which the cocaine was recovered into Hylton's residence). Contrary to Williams suggestion that Hylton's and Thomas' testimony was "uncorroborated and self-interested," (ECF No. 305 at 28), it is the jury's role to assess their credibility. In any event, there was evidence to corroborate their testimony about Williams' involvement, including text messages with Williams and the luggage tag for the suitcase from which the cocaine was recovered, which had Thomas' phone number on it. (Exh. 125). Hylton's testimony was supported by evidence showing her close relationship with Williams. There was evidence adduced to support that a woman agreed with Williams to act as a courier to bring the suitcases to Williams' hotel room from which 17 kilograms of cocaine was seized on August 29, 2017. There was sufficient evidence in the record to support the jury's verdict that Williams conspired with others to possess with intent to distribute cocaine and marijuana.

The conspiracy conviction at Count III, however, must be dismissed for another reason,

i.e., it constitutes a lesser-included offense to the continuing criminal enterprise conviction at

Count IV.  As explained in *United States v. Patterson*, 175 F. App'x 513 (3d Cir. 2006):

> Under *Rutledge v. United States,* 517 U.S. 292, 300, 307, 116 S. Ct. 1241, 134 L.Ed.2d 419 (1996), 21 U.S.C. § 846 is a lesser included offense in 21 U.S.C. § 848. Because we affirm the conviction under 21 U.S.C. § 848, we remand the case to permit the District Court to dismiss the conviction under 21 U.S.C. § 846. *Id.* at 307, 116 S. Ct. 1241.

*Id.* at 519.

d.   Count V

In count V of the superseding indictment, the government alleged:

> From in and around 2012, and continuing thereafter to in and around August 2017, in the Western District of Pennsylvania and elsewhere, the defendant, Racoco Williams, did knowingly, intentionally, and unlawfully conspire with persons both known and unknown to the grand jury to conduct and attempt to conduct financial transactions affecting interstate commerce involving the proceeds of a specified unlawful activity, that is, illegal drug trafficking in violations of 21 U.S.C. §§ 841 and 846, with the intent to promote the carrying on of the specified unlawful activity and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, contrary to the provisions of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i), all in violation of Title 18, United States Code, Section 1956(h).

(ECF No. 95).

With respect to count V, the jury was instructed that the government must prove each of

the following elements beyond a reasonable doubt:

1.      that an agreement existed between two or more people to commit an action in violation of (a) Title 18, United States Code, Section 1956(a)(1)(A)(i), or (b) Title 18, United States Code, Section 1956(a)(1)(B)(i);

2.      that Racoco Williams was a party to or member of that agreement; and

36

3.      that Racoco Williams joined the agreement or conspiracy knowing of its objectives and intending to join together with at least one other alleged conspirator to achieve those objectives; that is, that Racoco Williams and at least one other alleged conspirator shared a unity of purpose and the intent to achieve those objectives.

(ECF No. 290).

With respect to the first element, there are two statutory kinds of agreements, either of

which may be sufficient:

(a)      an agreement to commit Laundering of Monetary Instruments, in violation of 18 U.S.C. §

1956(a)(1)(A)(i), which contains four (4) elements:

1.      that Racoco Williams conducted or attempted to conduct a financial transaction, which affected interstate commerce;

2.      that Racoco Williams conducted the financial transaction with the proceeds of a specified unlawful activity, that is, illegal drug trafficking in violation of 21 U.S.C. §§ 841 and 846;

3.      that Racoco Williams knew the transaction involved the proceeds of some form of unlawful activity; and

4.      that Racoco Williams intended to promote the carrying on of the specified unlawful activity, specifically illegal drug trafficking in violation of 21 U.S.C. §§ 841 and 846;

Or:

 (b) an agreement to commit Laundering of Monetary Instruments, in violation of 18 U.S.C. §

1956(a)(1)(B)(i), which contains four (4) elements:

1.      that Racoco Williams conducted or attempted to conduct a financial transaction, which affected interstate commerce;

2.      that Racoco Williams conducted the financial transaction with the proceeds of a specified unlawful activity, that is, illegal drug trafficking in violation of 21 U.S.C. §§ 841 and 846;

3.      that Racoco Williams knew the transaction involved the proceeds of some form of unlawful activity; and

4.      that Racoco Williams conducted the financial transaction with knowledge that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of illegal drug trafficking in violation of 21 U.S.C. §§ 841 and 846.

(ECF No. 290).

Williams summarily argues that for the reasons he previously set forth, the government

failed to prove he was involved in illegal drug trafficking or a conspiracy (ECF No. 305 at 29).

The government again points to the witness and documentary evidence it presented to the jury, in

particular, evidence of Williams directing women to send wire transfers using drug proceeds

(ECF No. 310 at 27).  The court concludes that, for the reasons set forth above, there was

substantial evidence to uphold the jury's verdict on count V.  *See, e.g.* ECF No. 287 at 126-127

(Heavenly Fairley wiring money to support the conspiracy).


        e.   Count VI

In count VI of the superseding indictment, the government alleged:

        From in and around 2012, and continuing thereafter to in and around August 2017, in the Western District of Pennsylvania and elsewhere, the defendant, Racoco Williams, traveled in interstate commerce, with intent to promote, manage, establish, carry on, and to facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, (1) a business enterprise involving narcotics and controlled substances (as defined in Section 102(6) of the Controlled Substances Act) in violation of 21 U.S.C. §§ 841 and 846; and (2) an act which is indictable under 18 U.S.C. § 1956; and thereafter performed and attempted to perform an act to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying on of the unlawful activity, all in violation of Title 18, United States Code, Section 1952(a)(3).

(ECF No. 95).

With respect to count VI, the jury was instructed that the government must prove the

following elements beyond a reasonable doubt:

38

1.      that Racoco Williams traveled in interstate commerce, or used the mail or any facility in interstate commerce;

2.      that Racoco Williams did so with the intent to promote, manage, establish, or carry on, or to facilitate the promotion, management, establish, or carrying on, of illegal drug trafficking in violation of 21 U.S.C. §§ 841 and 846; and

3.      that Racoco Williams thereafter performed, or attempted to perform, an act indictable under 18 U.S.C. § 1956, i.e., to promote, manage, establish, or carry on illegal drug trafficking in violation of 21 U.S.C. §§ 841 and 846 or to facilitate the promotion, management, establishment, or carrying on of illegal drug trafficking in violation of 21 U.S.C. §§ 841 and 846.

Williams challenges the "interstate commerce" element.  Williams again argues that the couriers did not provide any evidence about the contents of the luggage, and, therefore, the jury could not infer that Williams' travels were intended to further drug trafficking (ECF No. 305 at 30).  The government points to extensive testimony and documentation that Williams, who does not reside in Pennsylvania (*see* Exh. 245), traveled extensively across state lines and directed others, who couriered illegal drugs and money, to do the same.  For example, there was testimony about suitcases carried by Thomas and delivered by Williams to Hylton across state lines (ECF Nos. 284, 287).  A rational jury could reasonably conclude that the travel was interstate and that it was done to facilitate drug trafficking.

4.   Summary of Rule 29 motion

Williams failed to meet the high standard to overturn the jury's verdict.  The evidence presented at trial was substantial and supported each element of each offense beyond a reasonable doubt.  The Rule 29 motion will be denied.

## IV.     Conclusion

For the reasons set forth above, with respect to the posttrial motions filed on behalf of Williams: (1) the motion for new trial pursuant to Federal Rule of Criminal Procedure 33 (ECF No. 303) will be denied; and (2) the motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 (ECF No. 304) will be denied.  The conspiracy conviction at Count III will be dismissed at sentencing, however, because it constitutes a lesser-included offense to the continuing criminal enterprise conviction at Count IV.

An appropriate order will be entered.


**BY THE COURT**,

Dated: May 2, 2024                    **/s/ JOY FLOWERS CONTI**
                                      Joy Flowers Conti
                                      Senior United States District Court Judge